IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the | § | |
| STATES OF TEXAS, ILLINOIS, | § | |
| COLORADO and TENNESSEE ex rel. | § | |
| DR. SUJATHA GOVINDARAJAN, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:18-CV-00463-E |
| | § | |
| DENTAL HEALTH PROGRAMS, INC. d/b/a | § | |
| COMMUNITY DENTAL CARE, et al., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Certain Defendants' Motion to Dismiss Relator's Complaint for Failure to State a Claim (Doc. No. 47). Having carefully considered the motion, the parties' briefing, the State of Texas Statement of Interest (Doc. No. 68), arguments at a May 1, 2020 hearing on the matter, and applicable law, the Court concludes the motion should be GRANTED in part and DENIED in part.

### BACKGROUND

The following allegations come from Relator Sujatha Govindarajan's Second Amended Complaint (Doc. No. 37). Relator, a dentist, was employed by defendant Dental Health Programs, Inc. d/b/a Community Dental Care (CDC) from 1999 to 2015. CDC, a non-profit dental service provider, received a majority of its funding from Medicaid and federal grants. In 2013, CDC had financial issues and discussed a possible affiliation with another non-profit dental service provider, defendant Sarrell Regional Dental Center for Public Health, Inc. (Sarrell).

1

Sarrell instead became affiliated with DentaQuest Care Group (DQCG), a non-profit subsidiary of Dental Service of Massachusetts d/b/a Delta Dental of Massachusetts (DSM), a non-profit dental service company.[1]  On December 17, 2013, CDC also affiliated with DQCG.  According to Relator's complaint, defendants Jeff Parker, Sarrell CEO, Chris Haugen, Sarrell General Counsel, and Jeremy Slayton, Sarrell CFO, along with other Sarrell management, "took control" of CDC.

During this transition, Relator served as CDC's Dental Director.  She was demoted to a general dentist position on August 14, 2014, about a week after raising "several federal grant terms violations" and questioning the "nature of [CDC's] financials."  Following her demotion, Relator learned of "additional Medicaid and [f]ederal [g]rant fraud," including upcoding of non-surgical extractions, billing for uncredentialed dentists under the credentials of other dentists, overtreatment, pressure to produce, and non-compliance with federal grant terms and conditions.

On May 1, 2015, Relator complained through counsel to CDC regarding employment issues, Medicaid and federal grant fraud, and forgery on Relator's MCNA Dental Plans (MCNA) contract, which Relator refused to sign because CDC was not compliant with the contract's terms.  CDC offered to mediate, but, on July 6, 2015, defendant Kevin Sutton, CDC Executive Director, pressured her to sign the MCNA contract.  In July 2015 and August 2015 emails, Relator complained to Sutton that the issues raised in the May 1, 2015, letter had not been addressed and again refused to sign the MCNA contract.

---

[1]  According to the Second Amended Complaint, the "DentaQuest Enterprises," of which DSM is the ultimate parent entity, is "the largest dental benefits administrator in the United States and also the largest in the Medicaid space."

On August 6, 2015, Relator's counsel received an email from Tom Bixby, a compliance counsel hired by defendant DentaQuest, LLC (DQ LLC), a for-profit dental benefits administrator, to investigate the CDC compliance issues.  On August 19, 2015, DQ LLC, "representing itself as the Texas Medicaid administrator," sent Relator a patient records audit letter asking her to send her patient records to defendant DentaQuest, Inc. a/k/a DentaQuest Group Inc. (DQ Inc.), the parent company of DQ LLC and a DSM subsidiary.  On August 21, 2015, Relator received an email from defendant Ron Price, CDC Compliance Officer, copying defendant Nick Messuri, DQ LLC VP and General Counsel, asking to discuss CDC compliance issues.  Relator later learned Price and Messuri were both DQ LLC attorneys.

From these instances, Relator "became aware CDC was owned and operated by [DQCG] in name only, but instead COVERTLY owned and operated by [DQ LLC]."  Relator became suspicious whether DQ LLC was disclosed as a controlling entity to CDC's federal grant funders. She also perceived a conflict of interest because DQ LLC had represented itself to be the Texas Medicaid administrator.

On September 28, 2015, Relator requested a copy of her provider contracts.  Sutton initially resisted her request, but, on October 30, 2015, she received her credentialing and contract documents, which were not with DQ LLC, but with defendant DentaQuest USA Insurance Company (DQ USA), a DQ LLC subsidiary.  This made Relator suspicious as to which entity was the "[t]rue" Texas Medicaid administrator that had contracted with the Texas Health and Human Services Commission (HHSC).

On November 5, 2015, Relator emailed Sutton to investigate her contracts further and invoked section 36.115 of the Texas Medicaid Fraud Prevention Act (TMFPA).  *See* TEX. HUM.

3

RES. CODE ANN. § 36.001 *et seq.*  Her access to CDC was "shut off" the next day because "her position had allegedly been eliminated," and, on November 7, 2015, she received a termination "package" from CDC.

After her termination, Relator discovered DQ USA, and not DQ LLC, was the respondent to a 2011 HHSC Request for Proposal (RFP) to provide dental services for individuals served by the Texas Medicaid and Children's Health Insurance Program dental programs.  DQ USA also responded to a February 2014 RFP and an April 2013 RFP to obtain the Medicaid contracts for the States of Colorado and Tennessee, respectively.  Defendant DentaQuest of Illinois (DQ Illinois), another DQ LLC subsidiary, was the respondent to a June 2013 RFP for the State of Illinois Medicaid contract.  Relator alleges, however, that DQ LLC was actually the "true" respondent in each case and, after the contracts were awarded, performed the obligations under the contracts.  Relator alleges she also confirmed her suspicion that DQ, LLC was not disclosed to federal grant funders as a controlling entity to CDC.

Relator filed her complaint under seal in this *qui tam* action on February 26, 2018 (Doc. No. 2).  The United States, on behalf of itself and the States of Texas, Colorado, Tennessee, and Illinois, declined to intervene on April 23, 2019 (Doc. No. 10), and the complaint was unsealed (Doc. No. 11).  Relator then amended her complaint twice.  Her Second Amended Complaint (Doc. No. 37), asserts violations of the False Claims Act (FCA), 36 U.S.C. § 3729 *et seq.*, the TMFPA, the Colorado Medicaid False Claims Act (CMFCA), COLO. REV. STAT. § 25.5-4-303.5 *et seq.*; the Illinois False Claims Act (IFCA), 740 ILCS COMP. STAT. 175/1 *et seq.*, and the Tennessee Medicaid False Claims Act (TMFCA), TENN. CODE ANN. § 71-5-181 *et seq.*, against the entities

mentioned above and a number of individual directors, officers, and/or employees of those entities.[2]

Relator's claims fall into four general categories.  First, Relator alleges fraudulent procurement of federal grants for CDC due to misrepresentations and nondisclosures related to DQ LLC's ownership, control and operation of CDC and CDC's subsequent submission of false claims for payment and unlawful acts under the FCA and TMFPA.  Second, Relator alleges DQ USA and DQ Illinois (1) fraudulently procured state Medicaid contracts by misrepresenting that they, and not DQ LLC, were the respondents to the Texas, Colorado, Tennessee, and Illinois RFPs and (2) thereafter obtained Medicaid contract renewals and payments as a result of unlawful acts committed by the defendants and/or their agents, employees and co-conspirators. Relator also alleges claims for conspiracy and retaliation under the FCA and TMFPA. Defendants move to dismiss all of the claims against them under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint alleging fraud also must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Fed. R. Civ. P. 9(b); *see United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (applying Rule 9(b) to FCA claims); *United States ex rel. Foster v. BristolMyers Squibb Co.*, 587 F. Supp.2d 805, 827 (E.D. Tex. 2008) (applying Rule 9(b) to TMFPA claims).

---

[2]  Those individuals are Steven Pollock, Fay Donohue, Brett Bostrack, Robert Lynn, James Hawkins, James Collins, Jeremy Slayton, Todd Cruse, Kevin Sutton, Ron Price, and Nick Messuri.

Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." *Id.* In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). The court's review generally is limited to the complaint, its proper attachments, and documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *See Lone Star Fund V (U.S.) v. Barclays Bank, N.A.*, 594 F.3d 383, 387 (5th Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a claim "is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

## ANALYSIS

A. <u>*Count One – Substantive Violations of the FCA*</u>

In Count One, Relator alleges defendants fraudulently induced the government to award and renew federal grants by misrepresenting and/or not disclosing that DQ LLC owned, operated,

and controlled CDC and the conflict of interest arising as a result of their relationship (Doc. No. 37, ¶¶ 357–58).  Relator further alleges CDC submitted false claims "through upcoding, pushing overtreatment, pushing for production, and violations of [f]ederal [g]rant terms and conditions by non-compliance with federal/state laws and regulations" (*Id.*).

The FCA is the federal government's "primary litigation tool for recovering losses resulting from fraud."  *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (internal quotation marks and citation omitted).  But, it "does not punish every type of fraud committed upon the government."  *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp.2d 745, 765 (S.D. Tex. 2010).  As relevant here, the FCA authorizes actions by the United States or by a relator in a *qui tam* capacity against a person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).  Claims under section 3729(a)(1)(A) are commonly known as "presentment claims," and claims under section 3729(a)(1)(B) are commonly known as "false-statement claims."  *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp.2d 499, 511 (N.D. Tex. 2012), *aff'd*, 858 F.3d 365 (5th Cir. 2017).

To properly plead a FCA violation, a complaint must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due. *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012) (quoting *U.S. ex rel. Longhi v. Lithium Power Tech. Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)).  The FCA "attaches liability, not to the underlying fraudulent activity ... but to the claim for payment."  *Longhi*, 575

F.3d at 467.

Liability for false-statement claims also may be imposed "'when the contract under which payment is made was procured by fraud.'" *Longhi*, 575 F.3d at 467–68 (quoting *United States ex rel. Willard v. Humana Health Plan of Texas, Inc.*, 336 F.3d 375, 384 (5th Cir. 2003)).  In that case, a party may be liable for subsequent claims for payment under the contract, even if those claims were not literally false, because "they derived from the original fraudulent misrepresentation." *Id.*  And, when "the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997).  "The violation of the statute or regulation does not create a cause of action under the [FCA]; liability arises only if the defendant has made a false certification of compliance with the statute or regulation, when payment is conditioned on that certification."  *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp.2d 487, 497 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004).

Traditionally, a *qui tam* complaint must "include the time, place and contents of the false representation[ ], as well as the identity of the person making the misrepresentation and what that person obtained thereby" to satisfy Rule 9(b).  *Grubbs*, 565 F.3d at 188 (internal quotation marks and citation omitted).  However, if the relator "cannot allege the details of an actually submitted false claim," the relator must "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Id.* at 190; *Colquitt*, 858 F.3d at 371 ("at a minimum, … a plaintiff [must] plead the

8

"who, what, when, where, and how" of the alleged fraud"); *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893–95 (5th Cir. 2013) ("a relator could, in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to *each* false claim").

### 1. *Fraudulent Inducement*

The crux of Relator's fraudulent inducement claim is that, beginning in December 2013, CDC and DQ LLC, to obtain federal grants, made misrepresentations of material fact regarding, and failed to disclose, DQ LLC's "for-profit ownership and control over CDC and conflict of interest to the funders of these federal grants" and to the Texas Department of State Health Services (DSHS), which administers the grants (Doc. No. 37, ¶ 357(a), (c)–(h)).[3] Clearly, DQ LLC did not own CDC; the Second Amended Complaint makes clear that CDC's sole member was DQCG. Relator alleges CDC and DQ LLC shared common directors, officers and/or employees and CDC hired DQ LLC "for management services" (Doc. No. 37 ¶ 141), but these facts are insufficient to allege DQ LLC owned or controlled CDC. *See United States v. Jon-T Chems. Inc.*, 768 F.2d 686, 691–92 (5th Cir. 1985) (even "one-hundred percent ownership and identity of directors and officers" together are an insufficient basis for applying alter ego theory); *see also United States ex rel. King v. Solvay S.A.*, 823 F. Supp.2d 472, 546–49 (S.D. Tex. 2011), *order vacated in part on reconsideration*, No. H-06-2662, 2012 WL 1067228 (S.D. Tex. Mar. 28, 2012).

Even had Relator alleged facts to show DQ LLC owned or controlled CDC, she does not

---

[3] Although Relator also alleges Sarrell controlled CDC, she does not allege any FCA violations with respect to that control or otherwise differentiate it from DQ LLC's control over CDC.

plead a FCA violation with the particularity required to satisfy Rule 9(b).   Relator lists grant sources and administrators and identifies Sutton and DQCG President and DQ LLC employee Todd Cruse as the signatories on the 2015 and 2016-17 federal grants, respectively.   But, to state a claim for fraudulent inducement by false statement, Relator must allege the circumstances of the fraud with particularity.   *See* FED. R. CIV. P. 9(b); *Grubbs*, 565 F.3d at 188.   Here, that would require facts to show the specific representations that form the basis of her claim,[4] the federal grant applications and contracts to which they pertain and why, and who was involved in obtaining those grants and what they knew with regard to whether the information provided was false.   Because Relator's allegations, even taken as true, do not "permit the [C]ourt to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, the Court must dismiss her claim for fraudulent inducement under the FCA.

### 2.   *False Claims Submitted*

Under Count One, Relator also alleges that CDC caused false claims to be submitted to the government "through upcoding, pushing overtreatment, [and] pushing for production" (Doc. No. 37 ¶ 357(b)).   More specifically, she pleads Dental Assistant "F" upcoded a federal grant denture procedure, billing it at a higher rate than called for in the treatment plan, in October 2014 (*Id.* ¶ 357(i)).   Also in October 2014, Dentist "A" was terminated after she complained the "front desk had up-coded her procedures without her consent" (*Id.* ¶ 357(j)).   Hygienist "C" was pressured to bill for local anesthesia services, when anesthesia had not been used, on federal

---

[4]   Relator identifies, and provides some additional information about, the grants in her response to the motion to dismiss (Doc. No. 60).   However the Court cannot consider new facts presented in a response when deciding a motion to dismiss.   *See Estes v. JP Morgan Chase Bank, N.A.*, 613 F. App'x 277, 280 (5th Cir. 2015).

grant Ryan White HIV patients at CDC's Vickery clinic (*Id.* ¶ 357(k)).[5]

Although Relator need not plead "the specific contents of an individual false claim to satisfy Rule 9(b)," she must still plead with particularity the circumstances constituting the fraud—*i.e.*, the who, what, where, when, and how." *United States v. Team Fin., L.L.C.*, No. 2:16-CV-00432-JRG, 2019 WL 3943958, at *4 (E.D. Tex. Aug. 21, 2019); *Bennett*, 747 F. Supp.2d at 781 (without identifying any "sales representative or employee who encouraged hospitals or physicians to "upcode" or any hospital or physician who did "upcode," plaintiff failed to allege the "who, what, when, where, and how of the alleged fraud"); *compare Grubbs*, 565 F.3d at 190 (complaint satisfied Rule 9(b) by describing particular workings of a scheme communicated directly to the relator by those perpetrating the fraud, how nursing staff attempted to assist relator in recording physician visits that had not occurred, and specific dates each doctor falsely claimed to have provided services to patients and type of medical service or billing code that would have been used in the bill). Without more specific facts to show the details of the claims submitted by CDC for services that were not provided or the circumstances of the fraud, these section 3729(a) claims must be dismissed.[6]

---

[5] These are the only allegations included under Count One's summary of false claims that relate to CDC's billing for services. Relator describes other additional categories of "false claims" in the body of her Second Amended Complaint (Doc. No. 37 ¶¶ 155–68). Although not specifically referenced under Count One, the Court has reviewed these allegations, which mirror categories of unlawful acts she also asserts are violations of the TMFPA, and finds that, for the same reasons, they fail to identify the relevant false claims submitted for payment or the particular details of fraud leading to a strong inference that false claims were actually submitted.

[6] In her response to the motion to dismiss, Relator included an exhibit identifying the individuals referred to by letter or number in the Second Amend Complaint (Doc. Nos. 59 & 60). As noted above, the Court cannot consider these new facts. *See Estes*, 613 F. App'x at 280. And, although helpful, the names alone would not cure the deficiencies in the pleading.

11

3. *False Certifications*

Relator also asserts, from January 2014 to November 2015, CDC and DQ LLC knowingly made intentional misrepresentations by falsely certifying the terms and conditions of federal grants (Doc. No. 37, ¶ 357(l)).  Of these grants, she specifically identifies "DSHS Title 5 for children under age 21, Ryan White for HIV patients and HUD grants" as having "stringent rules" requiring compliance with regulations, quality assurance, and employee training.  According to relator,  the certifications were false due to the following acts and omissions:

(1)     retaliation against Relator because of her complaints of Medicaid and federal grant fraud;

(2)     failing to provide adequate employee training resulting in Parkland shutting down nine CDC clinics due to "OSHA compliance issues";

(3)     violations of HIPAA due to lack of employee training and failing to update Notice of Privacy Practices;

(4)     violations of Texas Non-Profit Business Code section 22.052, which required nine Texas-licensed dentists to serve on the CDC board when there were none;

(5)     violations of the Texas Dental Practice Act when unlicensed dentists Terry Watson and Steve Adair performed chart audit reviews and non-dentist Haugen pushed for production;

(6)     failing to provide required employee training on child abuse, human trafficking, cultural diversity, OSHA, fire drills, etc.;

(7)     failing to provide an organizational structure, lines of responsibility, job performance evaluations, and job descriptions for each position;

(8)     providing immunizations to employees;

(9)     replacing Relator as Dental Director with an unlicensed dentist;

(10)     violating OSHA rules by cancelling training sessions and failing to comply with OSHA conditions; and

(11)    falsifying OSHA training records in February 2015 by erroneously giving
        the impression the training was provided by a live person.

(Doc. No. 37, ¶ 357(l)).

A false certification of compliance with a federal statute, regulation, or contract that is a

prerequisite to obtaining a government payment may be actionable under the FCA. *Bennett*, 747

F. Supp.2d at 765. But, as with her fraudulent inducement claim, Relator does not identify the

specific claims or grants (or grant terms or conditions) requiring certifications. Nor does she

identify the particular false statements with respect to those certifications that form the basis of

her claim. Accordingly, the Court finds it must dismiss Relator's claims for FCA violations

related to false certification of grant terms and conditions. *See, e.g., Nunnally*, 519 F. App'x at

894–95 (failure to allege with particularity an actual certification to the government that was a

prerequisite to obtaining a government benefit fails to satisfy Rule 9(b)).

The Court notes that, in addition to CDC and DQ LLC, Relator seeks to hold DSM, DQ

Inc., DQCG, and Sarrell liable "for any and all intentional violations of the FCA set forth above

by their subsidiaries" and Sutton, Cruse, Haugen and Slayton based on their positions with one or

more of the entities and/or the fact that they signed grants, contracts, and financials (Doc. No.

37, ¶¶ 359–70). The requirements of Rule 9(b), however, must be met for each defendant.

*United States ex rel. Capshaw v. White*, No. 3:12-cv-4457-N, 2018 WL 6068806, at *3 (N.D. Tex.

Nov. 20, 2018). Relator's conclusory allegations that these defendants had knowledge of and

participated in the FCA violations do not plead specific fraudulent conduct on their part. Thus,

even had Relator adequately pleaded a claim for FCA violations, she did not plead "factual

content that allows the court to draw the reasonable inference that ... [each Defendant is] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.[7]

Because Relator has not pleaded the allegations in support of her claims for violations of the FCA with sufficient particularity, the Court dismisses Count One of the Second Amended Complaint.

B. <u>Counts Four, Seven, Eight, and Nine – Fraudulent Inducement of State Medicaid Contracts</u>

As relevant here, the TMFPA imposes penalties on a person who:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorize; [or]

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized....

TEX. HUM. RES. § 36.002(1), (2).  The CMFCA, IFCA, and TMFCA prohibit (A) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (B) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.  *See* COLO. REV. STAT. ANN. § 25.5-4-305(1)(a), (b); 740 ILCS 175/3(a)(1)(A), (B); TENN. CODE ANN. § 71-5-182(a)(1)(A), (B).

The CMFCA, IFCA, and TMFCA each mirror the FCA.  Although the TMFPA provisions use different language, the Fifth Circuit and several federal district courts have considered TMPFA claims analogous to claims brought under the FCA.  *See, e.g., United States ex*

---

[7]  In addition, Relator has not alleged facts to show DSM, DQ, Inc., DQCG or Sarrell are liable for "violations of their subsidiaries."  To establish liability based on alter ego status, Relator would have to plead facts to show these entities exercised such control over CDC's internal business operations and affairs that the corporate separateness of the two entities should be disregarded.  *See Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 208–09 (5th Cir. 1996) (setting out factors for consideration).

*rel. Ramadoss v. Cinemark, Inc.*, 584 F.3d 655, 657 (5th Cir. 2009); *Waldmann v. Fulp*, 259 F. Supp.3d 619, 632–33 (S.D. Tex. 2016); *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-CV-0371-B, 2014 WL 3353247, at *4 (N.D. Tex. Jul. 9, 2014) (acknowledging the two statutes differ textually, but describing them as "analogous" and "depend[ent] on the same operative facts and legal requirements"); *United States ex rel. Carroll v. Planned Parenthood Gulf Coast, Inc.*, 21 F. Supp.3d 825, 831–32 (S.D. Tex. 2014); *United States ex rel. Simms v. Austin Radiological Ass'n*, No. A-10-CV-914-LY, 2012 WL 12850250, at *3 (W.D. Tex. Aug. 29, 2012); *United States ex rel. Texas v. Planned Parenthood Gulf Coast, Inc.*, No. 9-9-CV-124, 2012 WL 13036270, at *6 (E.D. Tex. Aug. 8, 2012).

The Texas Supreme Court also has described the TMFPA as "analogous" to the FCA, recognizing the statutes "are similar in aim and tactic." *In re Xerox Corp.*, 555 S.W.3d 518, 535 (Tex. 2018). However, in construing unrelated TMFPA sections,[8] the Texas Supreme Court also noted that the TMFPA's plain language controls with respect to claims brought under the that statute. *Id.* To that end, the State of Texas has filed a Statement of Interest in this case, urging the Court to interpret the TMFPA separately from the FCA in light of the textual differences (Doc. No. 68). Specifically, only claims under subsection (1) explicitly require the element of materiality. *See* TEX. HUM. RES. § 36.002(1). And, subject to a few exceptions, the TMFPA does not expressly require payment of a claim for any of the unlawful acts alleged. *Id.* § 36.002. Accordingly, the TMFPA's scope may "reach[ ] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process." *United States v. Catholic Health Initiatives*, 312 F. Supp.3d 584, 606–07 (S.D. Tex. 2018), *aff'd sub nom. United States ex rel.*

---

[8] At issue in *Xerox* was whether the proportionate responsibility scheme of Texas Civil Practice and Remedies Code Chapter 33 applied to a civil remedy action under the TMFPA. 555 S.W.3d at 535.

*Patel v. Catholic Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019).  Even so, a relator must satisfy the Rule 9(b) pleading requirement and allege the false statement or misrepresentation of material fact, or concealment or nondisclosure of information, with particularity.  Further, the false statement, misrepresentation, concealment, and/or nondisclosure must "permit[ ] a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." TEX. HUM. RES. § 36.002(1), (2).

Relator alleges defendants violated TMFPA subsections 36.002(1) and (2)[9] in fraudulently inducing the State of Texas to award the Texas Medicaid Contract to DQ USA.  Specifically, Relator alleges DQ USA knowingly misrepresented that it was, and knowingly concealed or failed to disclose that DQ LLC was, the respondent and prospective dental contractor in the RFP response (Doc. No. 37, ¶¶ 420–27).  Relator further alleges DQ USA knowingly misrepresented its skills, personnel, qualifications, and expertise required to perform under the Medicaid contract by providing information related to DQ LLC and the "DentaQuest organization" (*Id.*).

Defendants attached to their motion to dismiss excerpts of DQ USA's RFP response (Doc. No. 49-1, Ex. A-1).[10]  In the first paragraph of the Executive Summary, the response clearly identifies DQ USA as the "Respondent" bidding for the Texas Medicaid Contract and specifically defines, and thereafter refers to, DQ USA as "DentaQuest USA."  The response also sets out the experience of "[t]he DentaQuest organization," also referred to as "DentaQuest,"

---

[9]  The Second Amended Complaint also cites to subsections (3) and (12) of section 36.002 in the heading for this portion of Count Four, but then includes allegations pertaining only to subsections (1), (2), and (10).  Thus, the Court considers Relator's fraudulent inducement allegations under subsections (1), (2), and (10) only.

[10]  The Court may consider the RFP response because it is referenced by Relator's complaint and central to her claims.  *See Lone Star Fund V*, 594 F.3d at 387.

16

which is defined as "DentaQuest Group, Inc. *and* its subsidiaries."   And, the response fully

discloses both DQ USA's corporate affiliation and that DQ LLC provides management and

administrative services to DQ USA:

> Dental Service of Massachusetts, Inc. ("DSM"), the Respondent's ultimate parent
> company, is a Massachusetts dental service corporation that has insured and
> administered commercial dental benefits programs in Massachusetts since the
> 1960s. . . . The subsidiaries of DentaQuest Group, Inc. are engaged in the business
> of providing and administering dental benefits programs for the commercial group
> and individual markets, for managed care organizations that participate in
> government programs (Medicaid, CHIP and Medicare) and for state agencies
> responsible for Medicaid and CHIP programs. All business outside of
> Massachusetts is conducted under the DentaQuest brand. **DentaQuest, LLC, the
> immediate parent company of DentaQuest USA, provides substantially all
> management and administrative services required for the conduct of the
> businesses of DentaQuest Group companies including DentaQuest USA.
> Because of the common administration and management of the DentaQuest
> companies by one management organization, in this Response, we provide
> information with respect to the qualifications of DentaQuest Group, Inc. and
> its subsidiaries, referred to in this Response as "DentaQuest" or the
> "DentaQuest organization" to perform the services and meet the requirements
> described in the RFP.**

The RFP response makes clear that DQ USA was the respondent (and prospective dental

contractor), its parent company DQ LLC would be performing management and administrative

services, and the skills, qualifications, and expertise referred to in the response were that of DQ

Inc. and its subsidiaries.   Organizational charts provided in the response further illustrate the

intra-corporate relationships among the DSM affiliates.   The response also identifies "key

personnel," which Relator points out are shown in other documents to have been DQ LLC

employees, but she does not allege facts to show they also could not have served as "key

personnel" for DQ USA directly or indirectly under DQ LLC's administrative and management

services agreement.

17

Relator's allegations do identify some misrepresentations in the response.  First, under the "Respondent Identification and Information" section, DQ LLC's federal taxpayer identification number is shown as DQ USA's federal taxpayer identification number.[11]  Second, the response states that DQ USA has entered into letters of intent with providers, and Relator alleges DQ LLC entered into those letters of intent.  However, to be an unlawful act, a false statement or misrepresentation must be made knowingly and concern a material fact, which means the fact must have "a natural tendency to influence or to be capable of influencing."  TEX. HUM. RES. §§ 36.001(5-a), 36.002(1).  Here, Relator pleads no facts to show these misrepresentations were made knowingly[12] or concerned a material fact.  Although the response clearly could have been composed more carefully, these allegations do not state a claim for an unlawful act arising from a knowing false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment.  *See id.* § 36.002(1).

Nor do Relator's allegations that DQ LLC is the "real" Medicaid contractor allege a TMFPA violation for a knowing concealment or failure to disclose information that permits a person to receive a benefit or payment.  *See* TEX. HUM. RES. § 36.002(1).  Relator appears to assert that the relationship between DQ LLC and DQ USA and DQ LLC's performance of management and administrative services on behalf of DQ USA necessarily renders it, and not DQ USA, the contractor.  But, without more, Relator does not allege facts requiring that DQ

---

[11]  In the same section, the RFP response correctly shows both entities' federal taxpayer identification numbers in a "Structure of DentaQuest Companies" chart.

[12]  Under the TMFPA, a person acts "knowingly" with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. TEX. HUM. RES. § 36.0011.

USA's corporate form be disregarded.  *See, e.g., Jon-T Chems., Inc.*, 768 F.2d at 691-92;  *King*, 823 F. Supp.2d at 548–50.

Relator also complains the RFP response failed to disclose that DQ LLC was a "material subcontractor."  Based on the RFP's relevant definitions,[13] it appears likely DQ LLC should have been designated a material subcontractor.  However, the fact that the RFP response disclosed DQ LLC provided management and administrative services to DQ USA belies that the omission was made knowingly to conceal DQ LLC's role.  *See* TEX. HUM. RES. § 36.002(2).

Next, Relator alleges DQ USA did not disclose certain regulatory actions in the RFP response to a request for a brief description of "any regulatory actions, sanctions, and/or fines imposed by any federal or Texas regulatory entity or a regulatory entity in another state within the last three (3) years" with respect to the respondent and its parent.  First, Relator asserts DQ USA failed to identify a 2010 Massachusetts Office of State Auditor (OSA) audit and action plan for MassHealth, which administers the Massachusetts Medicaid program and for whom DQ LLC served as the dental plan administrator.[14]  Defendants argue the audit was not responsive because OSA audited MassHealth.  Second, Relator contends DQ USA should have disclosed a

---

[13]  The RFP defines "material subcontract" as "any contract, Subcontract, or agreement between the Dental Contractor and another entity that meets any of the following criteria: (1) the other entity is an Affiliate of the Dental Contractor; (2) the Subcontract is considered by HHSC to be for a key type of service or function, including: (a) Administrative Services (including but not limited to third party administrator, Network administration, and claims processing); (b) delegated Networks (including but not limited to behavioral health, dental, pharmacy, and vision); (c) management services (including management agreements with parent)…." (Doc. No. 49-1, Exh. A-2). A "material subcontractor" is defined as "any entity with a Material Subcontract with the Dental Contractor…. Material Subcontractors may include, without limitation, Affiliates, subsidiaries, and affiliated and unaffiliated third parties" (*Id.*).

[14]  *See* Independent State Auditor's Report on MassHealth's Administration of Dental Claims, July 1, 2005, to May 22, 2009, Mass. Auditor, No. 2009-8018-14C, https://www.mass.gov/files/documents/2016/08/xo/2009801814c.pdf (the "MA Audit").  This Court may properly consider the MA Audit because it is a public record and because Relator specifically incorporates it in her Complaint.  *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (in deciding Rule 12(b)(6) motion, court can take judicial notice of matters of public record).

Massachusetts Division of Insurance (DOI) decision and order following a public hearing and the DOI Commissioner's review of DSM's proposal for provider fees as required by statute.[15]   *See* MASS. GEN. LAWS ANN. ch. 176E, § 4.  Due to the breadth of the RFP request, both items could have been responsive to the request.  However, Relator has not alleged facts to show their omission amounts to a knowing concealment or nondisclosure to permit receipt of benefits or payments under the Medicaid program.  *See* TEX. HUM. RES. § 36.002(2).

Finally, Relator alleges DQ USA committed an unlawful act under section 36.002(10) by failing to provide HHSC a signed letter of commitment from GTESS, one of the subcontractors listed in its RFP response (Doc. No. 37, ¶¶ 428–30).  Under subsection (10), it is an unlawful act for a managed care organization like DQ USA to "knowingly fail to provide … information required to be provided by … contractual provision….", TEX. HUM. RES. § 36.002(10), but Relator does not plead any facts to show the alleged failure to provide the GTESS letter of commitment was knowing.

Under Counts Seven, Eight, and Nine, Relator alleges the Medicaid contracts in the States of Colorado, Illinois, and Tennessee also were fraudulently procured by misrepresentations and omissions that are largely the same as those alleged in Count Four.  But, as with respect to Texas, the RFP responses make clear, and do not misrepresent that DQ USA and DQ Illinois are describing, and relying on, the skills, qualifications, and experience of their extended corporate family, and not just their own.[16]

---

[15]   *See* Decision and Order, Mass. Div. of Insurance Office of Consumer Affairs and Business Regulation, Dkt. No. G2010-03, https://www.mass.gov/files/documents/2016/07/xt/g2010-03.pdf.

[16]   Defendants attached as exhibits to their motion excerpts from the February 26, 2014, Response to Colorado Department of Healthcare Policy and Financing for Medicaid Dental Coverage Technical Proposal (Doc. No. 49-1, Ex. A-3) and the June 14, 2013, Response to the Illinois Department of Healthcare and Family Services Dental

Relator alleges the following misrepresentations and/or omissions particular to the Colorado, Tennessee, or Illinois responses. First, the Colorado response indicates no positions "are expected to be provided through subcontractors," but Relator notes key personnel listed in the response were DQ LLC employees. In the Tennessee response, DQ USA disclosed only DSM, and not DQ LLC, in response to a question inquiring about any entity owning 5% or more of the respondent and, when asked about a credit reference and credit rating for the respondent, provided information pertaining to "DentaQuest" and DSM, respectively. And, DQ Illinois identified its parent entity as DSM, without also disclosing its immediate parent DQ LLC, in the Illinois RFP response.

To be sure, Relator has alleged responses that are far from precise, and the respondents clearly could, and probably should, have been more accurate and/or forthcoming. However, the Second Amended Complaint does not allege facts sufficient to show a knowing false statement or fraudulent course of conduct that was material and that caused the government to pay out money or to forfeit moneys due. *See* COLO. REV. STAT. ANN. § 25.5-4-305(1)(a), (b); 740 ILCS 175/3(a)(1)(A), (B); TENN. CODE ANN. § 71-5-182(a)(1)(A), (B); *see also Longhi*, 575 F.3d at 467–68.

Indeed, the scheme Relator alleges – that defendants concealed DQ USA and DQ Illinois were simply shell companies holding the licenses required to obtain the state Medicaid contracts and DQ LLC was the contractor – is simply not borne by the facts stated in her complaint. Relator, a dentist in Dallas, pleads no firsthand knowledge regarding the RFP response process or

Program Administration Contract Request for Proposal (Doc. No. 49-1, Ex. A-4). Relator's Second Amended Complaint alleges the Tennessee RFP response defined DQ USA as the respondent and separately referred to DSM subsidiaries as "DentaQuest" (*See* Doc. No. 37, ¶ 340).

fulfillment of the obligations under the state Medicaid contracts.  Instead, she relies on the RFP responses, the corporate relatedness of the entities, including shared personnel, addresses, etc., and that DQ LLC provided management and administrative services to its sister companies.  She has not alleged facts to show the relationship between the entities was concealed or the corporate form of either DQ USA or DQ Illinois should be disregarded.  *See Gundle Lining Constr. Corp.*, 85 F.3d at 208–09 (listing factors to consider in addressing whether an entity exercised such control over "the internal business operations and affairs" of another that the corporate separateness of the two entities can be disregarded).  Without more, Relator fails to state a cause of action for fraudulently inducing the state Medicaid contracts under the TMFPA, CMFCA, IFCA, and TMFCA.  *See* FED. R. CIV. P. 9(b).  Accordingly, Count Four as to fraudulent inducement and Counts Seven, Eight, and Nine must be dismissed.

C. *Count Four - TMFPA Violations after DQ USA Awarded Texas Medicaid Contract*

Relator alleges the following categories of unlawful acts under section 36.002(1), (2), (6), and (10) that occurred after DQ USA was awarded the Texas Medicaid contract.  With respect to the categories involving the practice of dentistry, Relator generally asserts the misconduct is "routine."  However, the Court considers only her specific allegations in light of the Rule 9(b) requirements that she plead fraud with particularity.

1. *Contractor Identification*

Relator alleges DQ USA knowingly misrepresented that it was the Texas Medicaid contractor performing services and deliverables and knowingly concealed that DQ LLC was that contractor (Doc. No. 37, ¶¶ 225, 432(a), 434(a), 439–40, 441(a), (b), (d), (e), (f), (h), (j), (k)).  The Court, though, has already determined Relator has not alleged facts to show DQ LLC was

the contractor.  Further, Relator does not allege with any particularity the specific circumstances of the misrepresentations and/or omissions.  *See* Fed. R. Civ. P. 9(b).

### 2.  Certifying Compliance

Relator also alleges false statements by DQ USA in certifying compliance with HHSC contractual obligations by signing the Texas Medicaid Contract and its amendments/renewals and by CDC, at the direction of DQ LLC, in certifying compliance "with terms and conditions of Medicaid contracts (MCNA and DentaQuest)" "to procure the Texas Medicaid Contract" (Doc. No. 37, ¶¶ 226–27, 248, 432(b), (c), 441(g), (v), (w)).[17]  She identifies the categories of alleged non-compliance, but does not state a claim for a TMFPA violation because she does not identify the particular false certifications or the applicable contracts, amendments or renewals requirements for certification.

### 3.  Overinflated Administrative Expenses

Relator complains DQ USA overinflated categories of administrative expenses by approximately $85 million from 2011 to date in its Financial Statistical Reports (FSR) (Doc. No. 37, ¶¶ 223–24, 432(x), (xi), 441(c)).  She does not identify any particular false statement in the FSRs or otherwise.  Nor does she specifically dispute the amount of the administrative expenses. Instead, she appears to allege that, based on the lack of DQ USA employees, administrative expenses were "shifted" to DQ LLC, which is based in Wisconsin, and were not "directly or

---

[17]  Relator asserts the false statements on compliance regarded: (1) provision of licensed and permitted personnel to perform contractual obligations; (2) Pollock serving as DQ LLC executive director while also serving other entities in other capacities; (3) failing to disclose DQ LLC controlled and operated CDC, creating an organizational conflict; (4) failing to report CDC fraud and abuse arising from Price and Messuri approaching Relator to investigate compliance and fraud issues; (5) Price and Messuri failing to conduct themselves in a professional manner when contacting Relator; and (6) failing to comply with federal and state laws as shown by OSHA and infection control violations, violations of section 22.052 of the Texas Non-Profit Business Code, unlicensed dentists performing CDC dentist chart audit reviews, and DQ LLC illegitimately operating as a provider by covertly owning and operating CDC and causing CDC to submit claims for unlawful acts to the Texas Medicaid Program.

indirectly in support of Texas Medicaid/CHIP operations."  Without allegations regarding the details of, or any misrepresentations or false statements, regarding the expenses, Relator fails to state a claim for an unlawful act.

### 4.  Legal Proceedings

Relator alleges a "HHSC uniform managed care manual" required managed care organizations to "provide written notification of all current and pending" legal and other proceedings.  She asserts DQ USA violated section 32.001(2) by failing to disclose an April 29, 2013 Settlement Agreement between the Commonwealth of Massachusetts, Executive Office of Health and Human Services (EOHHS) and DSM requiring DSM to pay $2,928,000 and a 2014 lawsuit pertaining to "Orthodontic Medicaid" naming DQ LLC and DSM as defendants (Doc. No. 37, ¶ 434(c)).  However, she does not plead facts to show, as she alleges, that the failure to disclose the information permitted DQ USA to renew its Medicaid contract and DQ LLC to receive payments under the Medicaid program.

### 5.  Organizational Conflict of Interest

Relator alleges DQ USA failed to disclose an "organizational conflict of interest" arising from DQ LLC "causing CDC to submit claims for [u]nlawful [a]cts to the government" by (Doc. No. 37, ¶¶ 228–29, 434(b)).  Relator does not plead what disclosure was required.  Further, as discussed above, she does not plead facts to show DLC operated or controlled CDC and, thus, fails to plead a TMFPA violation.

### 6.  Licensing

Relator alleges a violation of section 36.002(6) as a result of claims submitted for services rendered by DQ LLC without a license or certificate of authority required for a Medicaid

contractor in performing its contractual obligations (Doc. No. 37, ¶¶ 230–32, 436–38). Relator alleges DQ LLC performed the following contractual obligations without a license or certificate of authority: quality improvement and utilization management; chart audits of Texas dentists; claims processing; contracting Texas dentists; credentialing Texas dentists; disbursing funds to Texas dentists; clinical protocols like detecting fraud & abuse, clinical practice guidelines; and receipt of "continuation of care."

It is an unlawful act to "knowingly present or cause to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who: (A) is not licensed to provide the product or render the service, if a license is required; or (B) is not licensed in the manner claimed." TEX. HUM. RES. § 36.002(6). Here, however, DQ LLC was not the Medicaid contractor. Further, Relator fails to plead facts to show what licenses and/or certifications were required of DQ LLC. Finally, Relator does not identify the claims presented or caused for be presented under the Medicaid program.

7. *Adverse Treatment and Corporate Practice of Dentistry*

Relator alleges CDC management gave adverse actions, including bullying Relator and withholding workdays for dentists that underdiagnosed patients (Doc. No. 37, ¶¶ 243, 441(i), (s)). Management also overbooked patients and pressured dentists to meet certain production numbers and increase production (Doc. No. 37, ¶¶ 246–47, 441(m), (u)). Because her allegations are not connected to any false statement, misrepresentation, concealment, or nondisclosure of information, Relator fails to state facts in support of an unlawful act.

8.  *Medically Unnecessary Procedures*

Based on a review of a dentist chart, Relator "questioned" whether an extraction of three baby teeth was necessary (Doc. No. 37, ¶¶ 240, 441(n), (o), (p)).   In July 2015, Dentist "B" noted and thought unnecessary another extraction of six baby teeth (*Id.*).   On August 21, 2015, Dental Hygienist "C" told Relator the dentist at the Southeast clinic pulled loose baby teeth all the time (*Id.*).   Relator also discovered the use of nitrous on every pediatric patient that requirement treatment even when not medically necessary (*Id.*).   Because Relator's allegations are unspecific and do not plead the "the who, what, where, when, and how" of any particular false statement, misrepresentation, or nondisclosure, she fails to state an unlawful act.

9.  *Overtreatment*

Relator alleges routine overtreatment of patients by dentists, specifically the primary Dental Director and Dentist "2", from July 2014 through November of 2015 (Doc. No. 37, ¶¶ 242, 441(r)).   Dentist "C" documented overdiagnoses and overtreatment plans for unnecessary dental work on numerous occasions.   Dentist "2"'s patients often had to return for re-do treatment.   The allegations lack the specificity required to plead an unlawful act.

10. *Substandard Care to Increase Production*

During March 2015, a Co-Dental Director asked Hygienists "A" and "B" to perform a deep cleaning in a one-hour sitting when the procedure should have taken three hours spread over two sittings (Doc. No. 37, ¶¶ 251–52, 441(x)).   The Co-Dental Director also pressured and criticized Dentist "F" for abandoning a patient when the dentist believed a physical referral was needed for the patient, who had high blood pressure, before treatment.   On January 9, 2018, a former dental hygienist told Relator that CDC management (under Jeff Parker) had "repeatedly"

asked her to bill for anesthesia for cleaning procedures but she told them no. These allegations are not specific enough to state any particular unlawful act.

### 11. Coronal Polishing

On March 3, 2014, Relator observed a dental assistant performing a coronal polishing procedure, and the clinic manager indicated dental assistants were routinely performing the procedures without a dentist and billing it as prophylaxis, per Sarrell management, in contravention of Texas State Board of Dental Examiners Rule 114.5 (Doc. No. 37, ¶¶ 253–54, 441(y)). The Court also finds these allegations are not specific enough to state any particular unlawful act.

### 12. Upcoding Extractions

Relator alleges CDC, at the direction of DQ LLC, routinely upcoded simple extractions (Doc. No. 37, ¶¶ 239, 441(n)). During October 2014 to November 2015, Relator observed CDC billed a higher extraction fee for a few patients she had referred to Dentist "1" at the Deharo clinic when clinical notes and patient interviews did not reflect a surgical procedure was performed. Dentist "B" also noted patients she referred to Dentist "1" were charged a surgical extraction fee, but she believed the extractions should have been billed at a simple extraction fee. After an August 17, 2015 extraction at CDC's Vickery clinic, a patient told Relator facts that led Relator to conclude the patient, who paid a surgical extraction fee, had only a simple extraction. Dental Assistant "A", who assisted Dentist "1" CDC's Deharo clinic, told Relator that Dentist "1" billed almost every extraction as surgical. On August 21, 2015, Dental Assistant "B" recoded a simple root tip extraction performed by Relator to a surgical extraction. When Relator told Dental Assistant "B" to change the code, Dental Assistant "B" said the primary Dental Director

always billed "root tips as surgical extractions." The Court finds that, but for the failure to identify the relevant individuals, Relator has alleged enough of the particular details regarding several incidents of upcoding to state a claim for violations of TMFPA section 36.002(1) by CDC. *Compare U.S. v. Team Fin., L.L.C.*, 2019 WL 3943958, at *6.

*13. Billing for Uncredentialed Dentists*

Relator alleges CDC, at the direction of DQ LLC, routinely billed for uncredentialed dentist procedures "under [c]redentialed dentists and billing dentists to Medicaid" (Doc. No. 37, ¶¶ 241, 441(q)). CDC Chairman Parker informed CDC CEO Sharon Fulcher-Estes that "DentaQuest management" planned on billing uncredentialed dentists' prophylaxis procedures under the credentials of other dentists. On February 24, 2014, Relator told Parker it was illegal and not to do so.

Dental Assistant "G" told Relator she noticed un-credentialed Dentist "G" being billed under credentialed Dentist "H" and notified office manager Manuela Deleon at CDC's Irving clinic. Deleon called Parker, Chairman of CDC's Board, who told her to "stop that drama." Dental Assistant "G" quit because "she did not want her DA license to be affected." HR "A" investigated why Dental Assistant "G" quit, but Haugen "essentially" told HR "A" to "mind her business." HR "A" quit her job in July 2014 "stating that she had witnesses who several times observed DentaQuest bill uncredentialed dentists under credentialed dentists."

On October 24, 2015, Dental Assistant "H", a CDC Medicaid biller, quit after Sarrell told her to bill uncredentialed dentist procedures under credentialed dentists. Dental Assistant "H" also told Relator "DentaQuest" wanted new, uncredentialed dentists to be billed under Relator's Medicaid identification.

On January 6, 2015, Dentist "H" emailed Relator that Maria Rodriguez made an appointment at the East Dallas clinic for her child.  Dentist "H" was the provider assigned for the child, but Dentist "H" did not work at the location and was concerned that other dentists were using her credentials.

On September 10, 2015 a procedure performed by another provider was billed under Relator's ID when Relator had the day off and did not see the patient. Relator notified Operations Manager Nadia Dorise, who said it was an error.  Sutton said he would have finance correct it, but no action had been taken as of Relator's last day at CDC.

On January 28, 2015, Mandy Holland, from CDC's licensing and credentialing department, asked Relator to complete her MCNA application and contract because her credentials expired in December 2014. Holland wrote that she would "cover all [Relator's] procedures since January 1, 2015" once Relator was approved.

Relator has alleged facts to show some improper billing of uncredentialed dentist procedures, but she has not identified the individuals involved in or aware of, or other details regarding, any particular false statement, misrepresentation, concealment, or nondisclosure to state a claim for a TMFPA violation.

*14. Forgery*

CDC dentists (including Relator) on multiple occasions had their signatures and/or initials forged or the dates for their signatures altered on Medicaid contracts at DQ LLC's direction in 2014 (Doc. No. 37, ¶¶ 244–45, 441(t)).  Relator specifically alleges the date of her signature was altered and her initials were forged 30 times on a 30-page MCNA Medicaid contract renewal by Sarrell employee Marlene Whitmore.  HR "A" informed Relator that HR

29

"A" saw the dates for several dentists' signatures altered on Medicaid contracts or their signatures copied, but noted the dentists always had signed the original signature page.  Although Relator clearly has pleaded a fraudulent act in the forgery of her contract, she does not allege facts sufficient to show how that forgery could permit CDC to receive an unauthorized Medicaid payment or benefit.

For all the foregoing reasons, the Court finds that Relator's allegations do not state a claim for violation of the TMFPA after DQ USA was awarded the Texas Medicaid Contract and dismisses Count Four as to those claims.

### D.  *Conspiracy*

In Counts Two and Five, Relator alleges a number of defendants conspired to defraud the United States government[18] and the State of Texas[19] by (1) getting false and fraudulent claims allowed or paid and (2) failing to disclose or directing their agents and personnel not to disclose and/or to conceal their fraudulent practices in order to obtain grants to which they were not entitled.  Relator complains of defendants' failures to disclose CDC was "in fact operated by" DQ LLC and DQ LLC, as opposed to DQ USA, was to provide services under the Texas Medicaid contract (Doc. No. 37, ¶¶ 380–83, 486–90).

Rule 9(b) applies to Relator's conspiracy claims, *see Grubbs*, 565 F.3d at 193, and, to plead conspiracy, she "must plead with particularity the conspiracy as well as the overt acts taken in furtherance of the conspiracy."  *Id.* (citing *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008)).  Specifically, Relator must allege "particular circumstances" from

---

[18]  In Count Two, Relator sues DQ LLC, DQ USA, DQCG, DSM, Sarrell, Haugen, Slayton, Sutton, and Cruse as conspirators under FCA section 3729(a)(1)(C).

[19]  In Count Five, Relator sues DQ LLC, DQ USA, DQCG, DSM, Sarrell, CDC, Haugen, Slayton, Sutton, Pollock, Donohue, Bostrack, Lynn, Hawkins, Collins, Price, and Messuri under TMFPA section 36.002(9).

which agreement may be "naturally inferred." *See Grubbs*, 565 F.3d at 193.  Alleging multiple people committed acts resulting in violations of the statutes, without more, only "point[s] to a possibility of an agreement among them." *See Grubbs*, 565 F.3d at 193–94; *Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp.2d 519, 548 (N.D. Tex. 2010) (allegations that three defendants independently violated FCA and had "agreed to or acquiesced in violations by the other [d]efendant(s), on other occasions," were insufficient to plead conspiracy).

Here, Relator alleges the defendants "agreed together" to defraud, but appears to rely on the facts that the entities were affiliated and the individual defendants were working on behalf of those entities as agents or employees.  She does not allege any particular language or conduct attributable to any of the named defendants that indicates an agreement to defraud the federal government or the State of Texas.  *See U.S. ex rel. Headen v. Abundant Life Therapeutic Servs. Tex., LLC*, No. H-18-773, 2019 WL 1930274, at *10 (S.D. Tex. Apr. 30, 2019) (dismissing conspiracy claim for failure to allege agreement between people or entities); *King*, 823 F. Supp.2d at 516-17 (conspiracy claim insufficiently pleaded when relators did not allege agreement to defraud the government).  Further, the fact that affiliated entities, and their agents and employees, were involved in the alleged misconduct does not give rise to a conspiracy.  *See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (a "corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation"); *U.S. ex rel. Ligai v. ETS-Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *15 (S.D. Tex. Sept. 16, 2014) ("As a matter of law, a parent corporation cannot conspire with its own subsidiary"), *aff'd sub nom. U.S. ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015).  Because Relator does not plead the allegations in support of

31

her conspiracy claims with sufficient particularity to establish any agreement to conspire, the Court dismisses Courts Two and Five of the Second Amended Complaint.  *See, e.g., Headen*, 2019 WL 1930274, at *10.

E.   *Retaliation*

In Counts Three and Six, Relator asserts retaliation claims under FCA section 3730(h) and TMFPA section 36.115.[20]   The FCA authorizes a cause of action by employees, contractors, or agents who have been "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and condition of employment" because they assisted in or brought *qui tam* actions or took other efforts to stop FCA violations.  31 U.S.C. § 3730(h); *United States ex re. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371 (5th Cir. 2011) (per curiam).  The TMFPA contains a parallel provision prohibiting retaliation against an employee, contractor, or agent for lawful acts taken in furtherance of a TMFPA action or to stop a TMFPA violation.  TEX. HUM. RES. § 36.115(a); *Simms*, 2012 WL 12850250, at *7.

To state a retaliation claim, Relator must allege: (1) she engaged in a protected activity; (2) her employer knew she engaged in the protected activity; and (3) she was discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of the protected activity.  *See Patton*, 418 F. App'x at 371–72.  A protected activity is one "in furtherance of" uncovering fraud or potential fraud against the government.  *Id.* 372; *United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F.

---

[20]  In Count Three, Relator sues CDC, DQ LLC, DQ USA, Sarrell, and all of their parent corporations.  In Count Six, Relator sues the same defendants with the addition of DQ Inc.  Relator also asserted her retaliation claims against a number of individual defendants, but notified the Court in her sur-reply and during the May 1, 2020, hearing on the motion that she is abandoning those claims.  Accordingly, the Court dismisses Relator's retaliation claims against individual defendants Cruse, Haugen, Sutton, Price and Messuri under Counts Three and Six.

App'x 391, 395 (5th Cir. 2016); *United States ex rel. Johnson v. Raytheon Co.*, 395 F. Supp.3d 791, 798 (N.D. Tex. 2019) (internal complaint to employer may be deemed "protected" if it raises concerns about fraud). The notice prong of a retaliation claim may be "satisfied based on allegations that the employee complained directly to her supervisors." *United States ex rel. George v. Boston Sci. Corp.*, 864 F. Supp.2d 597, 608 (S.D. Tex. 2012).

Relator alleges discriminatory and retaliatory acts occurring beginning in 2014. A civil action under FCA section 3730(h) or TMFPA section 36.115 must be brought no later than three years after the date when the retaliation occurred. *See* 31 U.S.C. § 3730(h)(3); Tex. Hum. Res. § 36.115(c). Because Relator did not file this action until February 26, 2018, the statute of limitations bars recovery for any retaliatory acts alleged to have occurred before February 26, 2015. *See Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) (Rule 12(b)(6) dismissal is appropriate when a successful affirmative defense, such as a statute of limitations defense, "appears clearly on the face of the pleadings").

As for retaliatory acts after February 26, 2015, Relator alleges she learned her MCNA Medicaid contract was forged after she had notified CDC operations director Sutton that she would not sign the contract due to CDC's non-compliance with the contract's terms. She retained counsel, who wrote a May 1, 2015 letter to CDC regarding, among other things, "CDC's Medicaid and [f]ederal [g]rants fraud." She alleges retaliation after the letter was sent, including (1) pressuring her to sign the MCNA contract and threatening to move her from CDC's Garland location, (2) blocking her access to the Garland location and her patients, (3) singling her out for a difficult and unwarranted after-hours policy requiring answering  patient calls within fifteen minutes, (5) singling her out for a patient chart audit, and (6) DQ LLC attorneys contacting her,

despite knowing she had counsel, to investigate CDC compliance issues without disclosing they were attorneys (Doc. No. 37, ¶¶ 405–06, 512–18).

Meanwhile, Relator continued to complain of Medicaid and federal grants fraud to Sutton in emails dated July 15, 2015, August 5, 2015, September 23, 2015, September 25, 2015, and October 7, 2015.  On November 5, 2015, Relator emailed Sutton to investigate her contracts and the "true" Texas Medicaid contractor, invoking the TMFPA section 36.115.  She received a letter of termination from CDC on November 7, 2015.

The Court finds Relator's allegations, taken as true, sufficiently state claims for retaliation against CDC.  According to the Second Amended Complaint, her investigation raised concern regarding Medicaid and grant fraud against the government and her counsel placed CDC on notice of her concerns beginning at least with the May 1, 2015 letter.  *See George*, 864 F. Supp.2d at 605 ("internal complaints that 'concern false or fraudulent claims for payment submitted to the government' [constitute] protected activity" if "the complaints raise concerns about fraud.").

A retaliatory action, however, must be related to terms and conditions of a relator's employment.  *See* 31 U.S.C. § 3730(h)(1); TEX. HUM. RES. § 36.115(a).  And, a defendant must be a party with whom the plaintiff is an employee, contractor, or agent.  *U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 324 (5th Cir. 2016).  Although Relator asserts generally that DQ USA, DC LLC, DQ, Inc., and Sarrell (and all their parent corporations) participated in the retaliation, she alleges no facts to show an employment, contractual, or agency relationship with DQ LLC, DQ Inc., or Sarrell or any of their parent corporations.  Although she alleges signing a provider service contract with DQ USA, she has alleged no facts showing retaliatory conduct by DQ USA.  Accordingly, Counts Three and Six must be dismissed except as to CDC.

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss (Doc. No. 47) is **GRANTED in part and DENIED in part.**  The Court **GRANTS** the motion as to Counts One, Two, Four, Five, Seven, Eight, and Nine.  The Court **DENIES** the motion as to Counts Three and Six with respect to those retaliatory acts alleged after February 26, 2015 against CDC; otherwise, the Court **GRANTS** the motion as to Counts Three and Six and **DISMISSES with prejudice** any remaining retaliation claims.

Although she has amended her complaint twice already, Relator requests that, in the event the Court deems her factual allegations insufficient, she be allowed to replead.  A district court has discretion whether to dismiss a claim with or without prejudice, *see Club Retro L.L.C. v. Hilton*, 568 F.3d 181, 215 n.34 (5th Cir. 2009), and the court may deny an opportunity to replead if an amendment of a claim is futile.  *See Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016).  After considering the allegations and arguments in support of Relator's state law fraudulent inducement claims, and based on Relator's lack of firsthand knowledge of facts related to those claims, the Court finds amendment would be futile.  Accordingly, the claims in Count Four with respect to the fraudulent inducement of the Texas Medicaid contract and in Counts Seven, Eight, and Nine are **DISMISSED with prejudice.**

The Court finds Counts One, Two, Four, except as to fraudulent inducement, and Five are **DISMISSED without prejudice** and, if Relator can in good faith replead facts to support her claims, she may do so on or before June 29, 2020.  *See* FED. R. CIV. P. 15(a)(2).  In the event she opts to replead, the Court requests that Relator clearly and succinctly plead the particular facts relevant to her claims without repetition.  If she does not replead her claims, the disposition of

the claims will be converted into dismissal with prejudice.

**SO ORDERED**; signed June 8, 2020.

_____
ADA BROWN
UNITED STATES DISTRICT JUDGE