# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

**UNITED STATES OF AMERICA AND THE
STATES OF TEXAS, COLORADO
and TENNESSEE ex. rel. DR. SUJATHA
GOVINDARAJAN**

**Plaintiffs**

**vs.**                                          **CIVIL ACTION NO.3:18-cv-00463-N**

**DENTAL HEALTH PROGRAMS,
INC. d/b/a COMMUNITY DENTAL CARE;
DENTAQUEST USA INSURANCE COMPANY,
INC.; DENTAQUEST, LLC f/k/a DORAL DENTAL
USA LLC; DENTAL SERVICE
OF MASSACHUSETTS, INC. d/b/a
DELTA DENTAL OF MASSACHUSETTS.**

**Defendants**

## TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................1

II.    APPLICABLE STATUTES ...............................................................................6

   A.  FEDERAL FALSE CLAIMS ACT ............................................................ 6

   B.  TEXAS MEDICAID FRAUD PREVENTION ACT ("TMFPA") .................... 6

   C.  COLORADO FALSE CLAIMS ACT ......................................................... 7

   D.  TENNESSEE FALSE CLAIMS ACT ........................................................ 7

III.   JURISDICTION AND VENUE .......................................................................7

IV.  CONDITIONS PRECEDENT ........................................................................8

V.   PARTIES .........................................................................................................9

VI.  FACTS ...........................................................................................................11

   A.  OVERVIEW OF RELATOR'S ORIGINAL SOURCE

      KNOWLEDGE IN UNCOVERING DENTAQUEST's FRAUD ................................ 11

      1.  Relator's Employment History at Defendant CDC..............................11

      2.  CDC Became Affiliated with a DQ Subsidiary ..................................12

      3.  DQ Caused CDC To Commit

         Medicaid and Federal Grants Fraud.............................................12

      4.  Relator Became Aware that CDC was

         Operated Covertly by DQ LLC

         the Medicaid Administrator ......................................................13

      5.  DentaQuest, LLC Sent Relator a Chart Audit Letter .........................14

      6.  Relator's Investigation of who the "True" HHSC .............................15

      7.  After Termination Relator Confirmed her Suspicion of DQ LLC     Being the Administrator
to the State(s) Medicaid Contracts. ..................................................16

      8.  Relator is Not an "Insider" in Terms of How Claims ........................16

   B.  FEDERAL GRANTS FCA VIOLATIONS ........................................... 17

      1.  Background .......................................................................17

      2.  DQ LLC Had a Controlling Interest in CDC

         And Controlled CDC's Internal Business Operations ........................18

      3.  CDC Made False Statements in Federal Grant Contracts....................28

      4.  FCA Violations After Award of Federal Grants

         Simple Extractions to Surgical Extractions .....................................33

   C.  UNLAWFUL ACTS IN VIOLATION OF TMFPA AFTER

      DQ USA OBTAINED THE TEXAS MEDICAID CONTRACT ................................ 35

1. Background
In the Texas Medicaid Contract ................................................................... 36

2. DQ USA Knowingly Failed to Provide to the Commission
Information Required to be Provided by
Information of its Material Subcontractor DQ LLC .................................... 47

3. DQ USA Violated Section TMFPA 36.002 (6) (A) And
Has Presented Approximately $5.2 Billion in Claims for Unlawful Acts ............... 60

4. $ 104 Million of Overinflated Administrative Expenses
in DQ USA's Financial Statistical Reports ("FSR") ................................... 66

5. DQ USA False Statements in Certifying
Compliance to Contractual Terms ............................................................ 74

6. DQ LLC Caused CDC to Commit
Unlawful Acts in Violation of TMFPA
Simple Extractions to Surgical Extractions .............................................. 75

D.  **FACTS PERTAINING TO RELATOR'S RETALIATION
AND WRONGFUL TERMINATION**.............................................. **79**

1. Relator's MCNA Medicaid Contract
Was Forged by DQ Management ............................................................. 79

2. Relator's Retaliation and Unlawful Termination on November 6. 2015
After Letter Sent Complaining of Medicaid and Federal Grants Fraud.................... 80

E.  **FALSE CLAIMS SUBMITTED AFTER DENTAQUEST
OBTAINED THE COLORADO MEDICAID CONTRACT** ...................... **85**

F.  **FALSE CLAIMS SUBMITTED AFTER DENTAQUEST
OBTAINED THE TENNESSEE MEDICAID CONTRACT** ..................... **87**

VII.  **CAUSES OF ACTION** ...................................................................... **88**

A.  **COUNT ONE-- SUBSTANTIVE VIOLATIONS
OF THE FEDERAL FALSE CLAIMS ACT** ................................... **88**

1. Summary of False Claims ..................................................................... 89

2. Liability of Additional Defendants for FCA Violations ........................... 96

3. FCA Damages ..................................................................................... 96

4. Relator's Award .................................................................................. 96

B.  **COUNT TWO -- RETALIATION UNDER
THE FEDERAL FALSE CLAIMS ACT** ........................................ **97**

1. Relief Requested Per FCA Anti-Retaliation Provision ............................ 99

C. **COUNT THREE-- SUBSTANTIVE VIOLATIONS OF THE TEXAS MEDICAID FRAUD AND PREVENTION ACT** ........................................ **101**

   1. DENTAQUEST'S UNLAWFUL ACTS AFTER CONTRACT PROCUREMENT ........................................... 103

   2. Defendants Liable for the Violations of the TMFPA ................................ 108

   3. REMEDIES AND CIVIL MONETARY PENALTIES ........................... 111

   4. Relator's Award ...................................................................................... 113

D. **COUNT FOUR—UNLAWFUL TERMINATION UNDER ANTI-RETALIATION PROVISIONS OF THE TMFPA** ......................... **113**

   1. Relief Requested Per TMFPA's Anti-Retaliation Provision ................. 116

E. **COUNT FIVE-- COLORADO FALSE CLAIMS ACT** ............................ **118**

   1. Damages and Penalties ........................................................................... 121

   2. Defendants Liable for Violations of Colorado False Claims Act ........... 121

F. **COUNT SIX - TENNESSEE MEDICAID FALSE CLAIMS ACT** ........... **122**

   1. Damages and Penalties ........................................................................... 124

   2. Defendants Liable for Violations of Tennessee False Claims Act ......... 125

VIII. **PRAYERS FOR RELIEF** .......................................................................... **125**

A. **US GOVERNMENT PRAYER FOR RELIEF** ...................................... **125**

B. **STATE OF TEXAS PRAYER FOR RELIEF** ........................................ **127**

C. **STATE OF COLORADO PRAYER FOR RELIEF** ............................... **128**

E. **STATE OF TENNESSEE PRAYER FOR RELIEF** .............................. **129**

IX. **JURY DEMAND** ........................................................................................ **130**

X. **EXHIBITS** .................................................................................................. **131**

A. **EXHIBIT A** .............................................................................................. **131**

B. **EXHIBIT B** .............................................................................................. **136**

C. **EXHIBIT C** .............................................................................................. **144**

D. **EXHIBIT D** .............................................................................................. **146**

E. **EXHIBIT E** .............................................................................................. **148**

F. **EXHIBIT F** .............................................................................................. **150**

G. **EXHIBIT G** .............................................................................................. **152**

H. **EXHIBIT H** .............................................................................................. **154**

## PLAINTIFFS' CORRECTED THIRD AMENDED COMPLAINT

COMES NOW **DR. SUJATHA GOVINDARAJAN,** on behalf of the **UNITED STATES OF AMERICA AND THE STATES OF TEXAS, COLORADO and TENNESSEE,** by and through her attorneys, James "Rusty" Tucker of the Law Offices of James R. Tucker, P.C., and respectfully would show unto the Court the following:

## I.   INTRODUCTION

1.   This is an action to recover billions of dollars in damages and civil penalties from Defendants (collectively referred to herein as "DentaQuest" or "Defendants") and is brought by Relator on behalf of the United States of America and States of Texas, Colorado and Tennessee arising from false statements and/or Unlawful acts and claims made, and presented, and caused to be presented by the defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq*., as amended (hereinafter "FCA"), the Colorado False Claims Act, Tennessee False Claims Act, and the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§ 36.001 *et seq*. (hereinafter "TMFPA").

2.   DentaQuest's (hereinafter sometimes referred to as "DQ") false statements, and/or Unlawful acts as a Managed Care Organization (hereinafter "MCO") resulted in a substantial breach of regulatory requirements set forth by each States' Department of Insurance and the respective Medicaid agencies for MCO licensure to perform services, and caused loss of millions of taxpayer dollars, thereby deeply compromising the Medicaid and Federal Grants program.

3.   Relator, a Texas licensed dentist for over 21 years, brings this *Qui Tam* action perpetrated by Defendants, primarily by DentaQuest, LLC (hereinafter "DQ LLC"), a for-profit Medicaid administrator and the primary operations entity of the DentaQuest enterprise, which wholly owns several DentaQuest subsidiaries contracted with U.S. States to administer Medicaid.

4.   The States of Texas in 2011, Colorado in 2014, and Tennessee in 2013 issued a Request for Proposal (hereinafter "RFP") from MCO Respondents to appoint a Dental Contractor to administer their States' Dental Medicaid programs. Each State mandated and relied upon the fact that their Respondents to the RFP possessed a license issued by their State Department of Insurance to serve as Contractor, and if the Contractor were to delegate the services to a Subcontractor, employee or agent, they too were required to have a license issued by the respective State Department of Insurance.

5.   DentaQuest USA Insurance Company Inc. (hereinafter "DQ USA"), a wholly owned subsidiary of DQ LLC, which procured the Medicaid Contract in Texas, Colorado and Tennessee, is currently the Contractor in these States.

6.   DQ LLC provides substantially all administrative and management services for DQ USA to the TX, CO, and TN Medicaid contracts. To provide these services, DQ LLC was required to have the State(s) department of insurance license and be identified as a Subcontractor to the respective State contracts. However, DQ LLC was not licensed in any of these States to provide the services.

7.   Accordingly, liability of the Defendants arises from DQ LLC currently providing Texas, Colorado and Tennessee Medicaid Contractual obligations without a license issued by

the respective States' Department of Insurance, in violation of a mandatory requirement by the Departments of Insurance and State Medicaid agencies for MCO's that their employees, agents and Subcontractors be licensed to perform services under the Contract.  This has resulted in billions of dollars of civil monetary remedies for Unlawful Acts in violation of the TMFPA in Texas and false claims submitted by the Defendants to each of the other States and to the federal government in gross violation of FCA and the other States' FCA's.

8.    If the States were aware or were to become aware that an unlicensed entity is currently performing their contractual obligations, one remedy available to them would be to cancel DQ's contracts and/or take other appropriate action against an illegitimate entity in order to safeguard their laws, protect tax payer dollars, and provide justice to truthful bidders and contractors who uphold the integrity of Medicaid administration.

9.    There is undisputable evidence that DQ LLC is currently performing services in Texas, Colorado, and Tennessee without a license. Defendants revealed in their 2011 Texas Medicaid RFP response, 2016 Nebraska and Arkansas Medicaid RFP responses, 2017 Nevada and 2019 Louisiana Medicaid responses to RFPs that DQ LLC provides substantially all management and administrative services for operations of DQ USA and other DQ subsidiaries. Defendants also disclosed a DQ Corporate organizational chart in their response to the 2011 Texas RFP revealing DQ LLC's licensure status in States of Mississippi, Maryland, Ohio, Pennsylvania, Rhode Island, Utah, Nevada, and South Carolina, but NOT in Texas, Colorado, or Tennessee. To this day DQ LLC is not licensed in any of these States alleged in the Qui Tam action to provide Medicaid contractual obligations.

10. DQ USA, which was the "Proposer" to the Louisiana Department of Health ("LDH") Medicaid RFP, and recently won the contract as announced by the LDH on February 28, 2020, admitted in its August 6, 2019 proposal that DQ LLC administers all State contracts:

> "DentaQuest's state contracts are held by a variety of DentaQuest subsidiary companies. All state contracts, however, with the exception of Oregon, are administered by DentaQuest, LLC, the administrative and managerial arm of DentaQuest's benefits business"

11. In Texas, the Defendants have also conspired to substantially overinflate categories of administrative expenses such as Marketing, Amortization/ Depreciation, Salaries and Corporate allocations by over $100 million from 2011 to present. DQ USA's Financial Statistical Reports (hereinafter "FSR") reflect millions of dollars of salaries claimed for "Ghost Employees" since DQ USA had "0" employees and "0" experience to provide contractual obligations in Texas, Colorado and Tennessee as discussed herein. In fact. a January 9, 2020 Texas OIG audit report corroborates that DQ USA in its 2017 FSR had Unallowable, Unsupported, and Overstated Expenses.

12. By controlling and operating CDC from December 18, 2013 to present, DQ LLC caused CDC to commit fraud and abuse against the Medicaid and Federal Grant programs that Relator complained about, but was unlawfully terminated on November 6, 2015 in retaliation to her complaints and investigation of the "True" Medicaid administrator in Texas. Prior to that time, Relator had been employed at CDC for 16 years, and had maintained a spotless record and received excellent performance reviews.

13. CDC compliance officers Ron Price and Nick Messuri were DQ LLC attorneys and also compliance officers for DQ USA's Special Investigative Unit ("SIU") associated with

HHSC, the Texas State Medicaid agency, and by their contractual obligations to the State, were required to report CDC's fraud and abuse. However, neither they nor DQ USA did so (equivalent to "the fox guarding the henhouse"). They were also required to report DQ LLC's conflict of interest with CDC per HHSC's contractual obligations, which was never disclosed as well.

14.   CDC, assisted by DQ LLC, defrauded the Federal Grants program by making false statements material to fraudulent claims because DQ LLC was illegally providing administrative and management services to CDC as a Dental Service Organization ("DSO") without being registered in Texas as one, which the funders of grants were unaware of.

15.   Accordingly, and as detailed below, Defendants are liable to the United States and States of Texas, Colorado, and Tennessee for more than $5 billion for (a) submission of false and fraudulent claims to the federal government and the States of Colorado and Tennessee, (b) committing Unlawful Acts and overinflating expenses in Texas, and (d) making false statements to the funders of Federal Grants after the grants were awarded.

16.   Relator also brings a Retaliation claim against her employer, CDC, which unlawfully terminated Relator due to her complaining of CDC's Medicaid and Federal Grants fraud, investigating the relationship of DQ LLC to CDC, and investigating DQ LLC's HHSC contract fraud in Texas. Defendants are liable under the FCA and TMFPA anti-retaliation statutes for the amount of twice her salary, attorney fees and other damages permitted to be recovered as set forth in the respective Statutes.

## II.    APPLICABLE STATUTES

17.  Plaintiff DR. SUJATHA GOVINDARAJAN (the "Relator") brings this action on behalf of the United States of America, States of Texas, Colorado and Tennessee against Defendants for civil damages and penalties arising from the Defendants' violation of the Federal False Claims Act ("FCA"), Texas Medicaid Fraud Prevention Act ("TMFPA"), Colorado False Claims Act, and Tennessee False Claims Act.

18.  Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily children under the age of 18 and the poor and disabled. The federal government's involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

### A.    FEDERAL FALSE CLAIMS ACT

19.  The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the government for payment or approval of payment is liable for three times the amount of damages sustained by the Government, plus a civil penalty of up to $11,000 for each such claim submitted or paid up through July 31, 2016, and for the time period August 1, 2016 until time of trial civil penalties of $10,781.40 to $21,562.80 per claim. The FCA allows any person having information regarding a false or fraudulent claim against the government to bring an action for himself or herself (the "Relator" or "*qui tam* plaintiff") and on behalf of the government and to share in any recovery.

### B.    TEXAS MEDICAID FRAUD PREVENTION ACT ("TMFPA")

20.  The TMFPA provides for civil remedies and civil monetary penalties of up to $11,000 for each claim for Unlawful Act as defined therein up through July 31, 2016, and for

the time period August 1, 2016 until time of trial the civil penalties of $10,781.40 to $21,562.80 per claim.

### C.    COLORADO FALSE CLAIMS ACT

21.   The Colorado False Claims Act provides for civil remedies and civil monetary penalties of up to three times the state's actual financial loss, plus a fine of between $5,000 and $10,000 for each violation of the Act through July 31, 2016, and for the time period August 1, 2016 until time of trial the civil penalties are $10,781.40 to $21,562.80 per claim.

### D.    TENNESSEE FALSE CLAIMS ACT

22.   The Tennessee False Claims Act provides for damages and civil remedies and civil monetary penalties of up to three times the actual harm to the state, plus a fine equal to between $2,500 and $10,000 for each violation of the law. Plaintiff further seeks recovery pursuant to the Tennessee Medicaid False Claims Act for up to three times the actual harm to the state, as well as a penalty of between $5,000 and $25,000 for each violation.

### III.    JURISDICTION AND VENUE

23.   This Court has Jurisdiction over the subject matter of this action because it arises under the FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 et. seq.  This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. This Court also has pendent jurisdiction of all state causes of action set forth herein pursuant to 28. U.S.C. Sec. 1367 and 31 U.S.C. Sec. 3732(b) because these actions arise from the same transactions or occurrences as the Federal FCA action.

24.  This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. Sec. 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred.: Section 3732(a) also authorizes nationwide service of process. During the time period relative to the Complaint, one or more of the Defendants transacted business in the Northern District of Texas and may of the violations of 31 U.S.C. Sec. 3729 described herein occurred within this judicial district.

25.  Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) one or more of the Defendants reside in this district; (ii) one or more of the Defendants transacts business in this district and did so at all times relevant to this complaint; and, as averred below, (iii) the Defendants committed acts prohibited by 28 U.S.C. § 3729—which are acts giving rise to this action within this district.

## IV.   CONDITIONS PRECEDENT

26.  Before filing her Original Complaint, Relator served a copy of same upon the United States and the States of Texas, Colorado and Tennessee, together with a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. §3730(b) (2) of the FCA and the statutes of the four states involved. The Relator has made the required disclosure ("Disclosure Statement") to the U.S. Government by providing to the Attorney General of the United States, the U.S. Attorney for the Northern District of Texas, and the Attorney General's Offices for the States of Texas, Colorado and Tennessee, a copy of the Original Complaint and a statement of

all material information relative to this Complaint. The Disclosure Statement consisted of an Affidavit of the Relator and exhibits thereto, and other evidence submitted was supported by material evidence and information known to the Relator at the time of her filing, establishing the existence of Defendants' False Claims and Unlawful Acts. Because the information provided included attorney-client communications and work product of Relator's attorneys, and was submitted to the Attorney General of the United States, the U.S. Attorney for the Northern District of Texas, and the Attorney General's Offices for the States of Texas, Colorado, and Tennessee in their capacity as potential co-counsel in the litigation, the Relator understands that the Disclosure Statement is confidential. Relator has complied with all other conditions precedent to bringing this action.

27.  Relator does not believe that any of the information upon which she bases her allegations is the subject of public disclosure. In the unlikely event the Court were to deem that certain information has been publicly disclosed, Relator is nevertheless the original source of, and has direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the federal and state governments before filing this action.

## V.    PARTIES

28.  Relator is a licensed Dentist in State of Texas for over 21 years and is a citizen of the State. During the years 1999-2015, Relator was an employee of Defendant Dental Health Programs Inc. d/b/a Community Dental Care ("CDC"), a non-profit dental services provider funded by Medicaid and Federal Grants.

29.   Relator has direct, independent and personal knowledge of the fraud perpetrated by the DentaQuest Defendants during the time of her employment and thereafter. Relator brings this action based upon her direct, independent, and personal knowledge. As set forth below, Relator is aware of multiple False Claims and/or Unlawful Acts, as defined herein, whereby Medicaid and the federal government were fraudulently billed by the DentaQuest Defendants to the United States as well as the States of Texas, Colorado and Tennessee.

30.   Defendant Dental Health Programs Inc. d/b/a Community Dental Care is Relator's ex-employer, is based in Texas with its principal place of business at 3910 Gaston Avenue, Dallas, Texas 75246, which is affiliated with a non-profit DentaQuest subsidiary, DentaQuest Care Group ("DQCG") in name only. However, it is covertly controlled and operated by Defendant DQ LLC. Said Defendant has been properly served with process.

31.   Defendant DQ LLC is a foreign limited liability company organized under the laws of the State of Delaware, has transacted business in the State of Texas and has its principal place of business located at 465 Medford Street, Boston Massachusetts 02129. DQ LLC was formerly known as Doral Dental USA LLC, established in 1993 which changed its name to DQ LLC in November of 2009. Defendant DQ LLC is the primary operations entity of the DentaQuest enterprise, is the wholly owned parent company of Defendants DQ USA. Said Defendant has been properly served with process.

32.   Defendant DQ USA was incorporated in State of Texas on August 31, 2005, has its principal of business located at 11044 Research Blvd., Building D, Suite D- 400, Austin TX 78759 and has transacted business in the States of Texas, Colorado and Tennessee. DQ USA is a wholly owned subsidiary of DQ LLC. Said Defendant has been properly served with process.

33.  Defendant DSM is a non-profit dental service company and is the ultimate parent of all DQ entities which initially was incorporated as a Massachusetts Dental Service Company. It was sponsored by the Massachusetts Dental Society through introduction of enabling legislation, MGL Chapter 176E, enacted in July 1962. DSM created DentaQuest Ventures Inc. in May of 2001 to establish dental insurance business outside of Massachusetts. Defendant DSM is a foreign limited liability company organized under the laws of the State of Delaware with its principal place of business located at 465 Medford Street, Boston Massachusetts 02129 and has transacted business in the State of Texas. Said Defendant has been properly served with process.

## VI.    FACTS

### A.    OVERVIEW OF RELATOR'S ORIGINAL SOURCE KNOWLEDGE IN UNCOVERING DENTAQUEST's FRAUD

#### 1. Relator's Employment History at Defendant CDC

34.  Relator was employed as a Dentist with CDC, a Texas non-profit organization, for 16 years (1999 to 2015). CDC's major sources of funding were Medicaid and Federal Grants and its mission was to provide quality dental care in an environment of safety and compassion, and its patients include families, pregnant mothers and infants, children, teens, adults, seniors, homeless persons and those with HIV/AIDS. Relator maintained a spotless record throughout her tenure and performed extremely well in clinical and management roles. She was promoted to Dentist-in-Charge of CDC's Garland Clinic on June 3, 2003. She was later promoted to Dental Director for all CDC clinics on November 8, 2013 by CEO Sharon-Fulcher Estes.

### 2. CDC Became Affiliated with a DQ Subsidiary

35.   During Relator's employment at CDC, there were 14 non-profit dental clinics in the DFW metroplex to provide dental care to low income seniors, children, homeless and HIV population. During February-March of 2013, before Relator's tenure as Dental Director, CDC experienced financial distress and it had to lay off several employees. On May 31, 2013 CDC board appointed a new CEO, Sharon-Fulcher Estes ("Estes"), to help rectify the situation.

36.   On September 5, 2013 after assessing CDC's financial situation, Estes initiated talks with another non-profit dental service provider named Sarrell Regional Dental Center for Public Health ("Sarrell Dental") in Alabama. On December 17, 2013 CDC became affiliated with DQCG, a non-profit DentaQuest subsidiary of Dental Service of Massachusetts ("DSM"), which was also the ultimate parent of all DentaQuest for-profit subsidiaries that serve as Medicaid administrators in U.S. State Medicaid contracts.

### 3. DQ Caused CDC To Commit Medicaid and Federal Grants Fraud

37.   Sarrell Dental, which was also affiliated with DQCG, its CEO Jeff Parker ("Parker"), General Counsel Chris Haugen ("Haugen") and CFO Jeremy Slayton ("Slayton"), who were all in reality DQ LLC employees, took control of CDC, pushing Relator (who was the Dental Director at the time) aside and also CEO Sharon Fulcher-Estes aside. Parker became the chairman of the CDC board of directors and Haugen the Secretary. DentaQuest management moved all of CDC's books and financials out of Texas to Sarrell Dental in Alabama and caused CDC's fraud and abuse towards the Medicaid and Federal Grants program.

38.   Relator served as CDC's Dental Director from November 8, 2013 through August 14, 2014, however was moved to the position of a general dentist after she made complaints of

CDC's several violations and non-compliance of Federal Grants terms and conditions via emails dated August 5, 2014 and August 6, 2014. Afterwards, she discovered additional Medicaid and Federal Grants fraud in the form of upcoding of non-surgical extractions, billing of uncredentialed dentists under credentialed dentists, overtreatment, and non-compliance with Federal Grant terms and conditions, falsely certifying them at the time of renewal. Relator also found out that her MCNA Medicaid contract was forged after she refused to sign it citing CDC's violation of MCNA Contract terms and conditions.

39.   Thereafter, on May 1, 2015, Relator made complaints to CDC of Medicaid and Federal Grants fraud of upcoding of non-surgical extractions, billing of uncredentialed dentists under credentialed dentists, overtreatment,  and non-compliance with Federal Grant terms and conditions, falsely certifying them at the time of renewal and forgery of her MCNA Medicaid Contract, through her counsel Bob Goodman's letter, invoking the FCA Sec. 3730 (h) and TMFPA Sec. 36.115 anti-retaliation provisions.

#### 4.   Relator Became Aware that CDC was Operated Covertly by DQ LLC the Medicaid Administrator

40.   After receiving Relator counsel's letter, CDC offered to mediate and on June 1, 2015, DQ LLC presented as Relator's employer and Haugen presented as an employee of DQ LLC. However, they did not address or take any steps to correct CDC's fraud that Relator had complained about. Through subsequent emails, Relator complained to CDC Executive Director, Kevin Sutton, that the issues she raised in her counsel's May 1, 2015 letter were not being addressed. On August 6, 2015 Relator's counsel received an email from Tom Bixby ("Bixby"), a compliance counsel hired by DQ LLC, to investigate CDC compliance issues complained of by Relator, and asked for an interview with Relator.

41. Relator silently became aware that CDC was covertly controlled and operated by DQ LLC. DQ LLC's controlling and operating CDC unfortunately turned an innocent public serving, charity non-profit organization into a for-profit self-serving corporate practice. This resulted in failure to comply with Federal Grants terms and conditions that Relator had complained about and falsely certifying them at grant renewals, as well as fraudulent billing to Medicaid and Federal Grants.

42. Relator continued her complaints of Medicaid and Federal Grants fraud via five emails to Executive Director Kevin Sutton from July through October of 2015, stating that the issues she had raised in her counsel's letter were not being addressed.

### 5. DentaQuest, LLC Sent Relator a Chart Audit Letter

43. DQ LLC singled Relator out by sending patient records audit letters in August and September of 2015, representing itself to be the Texas Medicaid administrator, and accused her of billing fraud. One of the letters asked her to send her patient records in 10 days to DentaQuest, Inc, at the same address as DQ LLC.

44. On the same day of August 21, 2015, when Relator received a DQ LLC chart audit letter, she also received an email from Ron Price ("Price") representing himself as CDC's Compliance Officer, asking Relator for an interview to investigate CDC compliance issues that she had complained about, knowing that Relator had counsel representing her who had sent CDC a letter on May 1, 2015 with her complaints of CDC's Medicaid and Federal Grants fraud that he wanted to speak to her about. Price did not reveal to Relator who he worked for and that he was an attorney employed by DQ LLC, which Relator later found out. Price was also a compliance officer for DQ USA's Special Investigative unit for HHSC.

45.  On September 25, 2015, Relator through her counsel questioned Bixby about the relationship between DQ LLC and CDC (Bixby mentioned to her counsel that he represented DQ LLC), because DQ LLC wanted to investigate CDC compliance issues which Relator perceived as a conflict of interest (equivalent to "the fox guarding the hen house"), but never received a response from Bixby or DentaQuest prior to her termination as to the relationship between the two entities. Relator also became suspicious whether DQ LLC was disclosed to the Federal Grant funders as a controlling entity of CDC, because the funders of the Federal Grants would never have awarded CDC the funds had they known the true nature of DQ LLC's control of CDC and its conflict of interest.

### 6.   Relator's Investigation of who the "True" HHSC Administrator Was and her Unlawful Termination

46.  Relator requested a copy of her DentaQuest contracts to understand its terms and conditions pursuant to the chart audit letter from DQ LLC. She was shocked to find out that she signed her contract with the entity DentaQuest "USA" on September 30, 2011, representing itself as "DentaQuest" and not with DentaQuest, "LLC", which had sent her the patient record audit letter on August 19, 2015 also representing itself as "DentaQuest" and the administrator to Texas Medicaid Contract. She also learned that DQ LLC was not a party to her contract with DQ USA (the Provider service agreement between DQ USA and Texas Dentists).

47. Relator became suspicious of who "DentaQuest" and the "True" HHSC administrator was, suspecting that HHSC may not be aware that DQ LLC was performing its contractual obligations, while not being a party to its contract, and that it had a conflict of interest with CDC.

48.   Accordingly, on November 5, 2015, Relator sent an email to CDC's Executive Director Kevin Sutton, to investigate her DentaQuest contracts and invoking the TMFPA's anti-retaliation provision, Section 36.115. Relator's email access was cut off within 24 hours and she received a letter of termination by Fed-ex on November 7, 2015 from CDC on CDC letterhead copying Todd Cruse, a DQ LLC employee.

### 7.    After Termination Relator Confirmed her Suspicion of DQ LLC Being the Administrator to the State(s) Medicaid Contracts

49.   After her termination, Relator confirmed her suspicion that DQ LLC was the administrator to Texas Medicaid Contract, without being a party to the Contract and doing so unlawfully because it was not licensed by Texas Department of Insurance ("TDI") as required by the Contract.

50.   Relator further discovered that DQ LLC was also providing services to the Colorado and Tennessee State Medicaid Contracts without being disclosed as a party to the contracts and doing so unlawfully because it was not licensed by the respective State Insurance departments as required by the Contracts.

### 8.    Relator is Not an "Insider" in Terms of How Claims Were Billed to the Government by the Defendants

51.   As demonstrated below, Relator does have abundant original source knowledge of facts pertaining to Unlawful Acts committed by the Defendants in violation of the TMFPA and violations of the FCA by the Defendants. However, she was in no way an "insider" for purposes of how claims got billed to the State and Federal Governments. She never personally billed claims to the government, and all billing to Medicaid and the Government was handled by others who were employed by various Defendants and other parties. Relator does have

sufficient knowledge of facts that demonstrate that there was a reliable indicia that false claims were submitted in violation of the FCA, and that Unlawful Acts were committed by the Defendants in violation of the TMFPA.

## B.  FEDERAL GRANTS FCA VIOLATIONS

### 1.  Background

52.  Approximately, fifty percent of CDC revenue came from Federal grants and majority of the federal funds were from Title 5 Child Health/ Prenatal and Ryan White HIV grants. Title 5 grants paid approximately $1.5 million/year and Ryan White paid approximately $700,000, with supplemental funds amounting to more than a million per year if the funds were depleted. Funds from these grants were used to provide dental services to low income children, pregnant women, and HIV patients.

53.  CDC received Federal Grants from various sources, and they included, but were not limited to:

  A. *HUD (Housing and Urban Development) Community Development Block Grants (CDBG)* for Seniors and Children for CDC clinics in McKinney, Plano, Garland, Dallas and Irving;
  B. *Parkland Health and Hospital Systems HRSA* (Health Resources and Service Administration) administrated grants for the homeless population in Stewpot dental clinic and for Battered/Sheltered women at the Mobile Dental Unit of CDC; and
  C. *DSHS (Department of State Health Services) overseen by HHSC* administered Grants for the HIV population (Ryan White Grant) and HHSC administered Grants for children and pregnant women (Title V Maternal and Child Health Dental block grants)

54.  Per CDC's tax returns, Part VIII Statement of Revenue, CDC after the 2013 affiliation with DQ obtained Federal Grants in the amounts of $3,848,626 in 2014, $2,055,031 in 2015, $ 1,106,881 in 2016, $ 1,450,659 in 2017 making the total amount of CDC grants to

be approximately $8.5 million during 2014 - 2017. Adding approximately $ 1.2 million for years 2018 and 2019 would make the total the amount of Federal Grants that CDC procured to be approximately $10.9 million during DQ management.

55.   Federal Grants had stringent terms and conditions to their contracts and audited CDC annually to ensure compliance. CDC had been receiving funds from Federal Grants for a long time even prior to the DQ affiliation, where the prior management worked hard to ensure that CDC followed State and Federal rules and regulations, and that CDC was not in violation of any Grants terms and conditions.

### 2.   DQ LLC Had a Controlling Interest in CDC And Controlled CDC's Internal Business Operations

56.   CDC affiliated with DentaQuest Care Group ("DQCG"), a Massachusetts non-profit on December 17, 2013 and the management employees took over control and operations of CDC. The management employees Parker, Haugen and Slayton, however, were also DQ LLC employees. Parker and Haugen served on CDC board as Chairman of the Board and as Secretary of the Board, respectively.

57.   The funders of the federal grants were unaware that (a) DQ LLC had a controlling interest in CDC since it had the authority to appoint CDC's board (b) DQ LLC appointed Parker and Haugen to the board and had CDC hire them for management services (c) DQ LLC employees Parker, Haugen and Slayton controlled and operated CDC's internal business operations and affairs and propagated fraud and abuse; and (d) the same DQ LLC employees were paid bonuses based on CDC's performance and their individual performance.

### (1)   DQ LLC's Controlling Interest in CDC

58.  Title 5 grants define "Controlling Interest" as:

"Operational direction or management of a disclosing entity which can be maintained by any or all of the following devices: the ability or authority, expressed or reserved, to amend or change the corporate identity (i.e. joint venture agreement, unincorporated business status) of the disclosing entity; **the ability or authority to nominate or name members of the Board of Directors or Trustees of the disclosing entity**…)". "A disclosing entity is defined as a Medicare provider or supplier, or other entity that furnishes services or arranges for furnishing services under Medicaid or the Maternal and Child health program, or health related services under the social services program". **(emphasis added).**

### (a)   DQ LLC Had the Authority to Appoint CDC Board Members

59.  DQ LLC has a controlling interest in CDC because as per CDC tax returns Part VI, Section A "**DentaQuest, LLC has the authority to elect or appoint members of the governing body**". (emphasis added). Also, the Texas Secretary of State "Statement of Change of Registered Agent/Office" filed on May 16, 2016 "Signature of authorized person" was signed by Mary Rebecca Mix, a DQ LLC attorney, on April 28, 2016.

### (b)   DQ LLC Set Incentive Plans for Its Employees Who Made Bonuses from CDC's Performance

60.  CDC's tax returns also indicate in its Part III Supplemental Information: "**DentaQuest, LLC sponsors a target incentive plan** that allows participants annually to earn a threshold, target or superior incentive (as a percentage of their base salary). The actual incentive to be awarded is based on the achievement of performance goals set at the beginning of the year by the compensation committee …". "**The company (CDC) provides annual incentive bonuses to management employees that are calculated on the performance of the company and the individual employee**".  **(emphasis added).**

        **(c)**      **DQ LLC Violated Texas Business Organization Code**
                             **of CDC Board Composition to Wholly Control CDC**

61.   Current CDC Board members Gregory Winn, Tequilla Terry and Brian Novy are all DQ LLC employees, and none of them are Texas licensed dentists in violation of the Texas Business Organization code 22.052 which requires a non-profit organization to have nine Texas licensed actively practicing dentists on its board of directors. This violation has occurred since the December 17, 2013 CDC affiliation with DQCG, when there was an unlawful removal of Texas licensed Dentists from CDC Board of Directors by Parker, who asked existing Baylor College of Dentistry Texas licensed dentists to resign. However, to keep Grant funders who rely on CDC's non-profit  status by its board members and meeting minutes during their audits and renewals, and the State of Texas from being suspicious of a violation, DQ LLC did **not** remove the name of Baylor dentists from the Texas Secretary of State records, thus making it seem like these dentists were still on CDC's board.

        **(2)**      **DQ LLC Exercised Such Control of CDC's Internal**
                           **Business and Operations That Their Corporate**
                           **Separateness Should Be Disregarded**

62.   In addition to CDC's tax returns, there is undoubted Relator's original source evidence that DQ LLC, which had a controlling interest in CDC, controlled CDC's internal business operations. DQ LLC employees Parker and Haugen were not just hired by CDC for "management", but in reality, were board members, being the Chairman of CDC Board and Secretary to CDC Board, respectively. They had visibility of CDC's operations and controlled the clinic schedules, Federal Grants and Medicaid billing, Grant audits and compliance monitoring, hiring and firing dentists, setting their salary, hiring other CDC staff etc. DQ LLC's controlling interest in CDC was so pervasive that **Steven Pollock, CEO of DQ LLC was**

**copied on Executive Director Sutton's August 27, 2015 CDC production email**. Following are facts that demonstrate DQ LLC control of CDC:

### (a)     DQ LLC Controlled CDC's CEO

63.    DQCG affiliated with CDC in 2013 and caused mismanagement of the organization. There were several staff turnover, complaints from staff, OSHA non-compliance, complaints from dentists for overbooking them and patient complaints. Relator as Dental Director made complaints of the operational mismanagement to CEO Sharon Fulcher-Estes verbally and by emails and noted that Estes would each time defer the complaints to Parker and Haugen.

64.    After a July 30, 2014 Federal Grant pre-audit Meeting, Relator complained to Estes that CDC was in violation of several federal grants terms and conditions and they had to be addressed prior to the audits to prevent the grants from terminating their contract and/or revoke funds to CDC.

65.    Estes who had no control over CDC spoke to Parker the next day about Relator's complaints and told him: **"I am the CEO, let me run the company".**

66.    Parker and Haugen called a webinar meeting on August 1, 2014 from Alabama to speak to Relator and Estes. During the webinar, Parker exhibited hostility, taunting Estes for wanting to run the company causing Estes to cry. Further evidence of DQ LLC's control of CDC CEO is as follows:

(i)  Estes at the webinar told Parker: "I am not privy to any company financials"; and

(ii) Estes after the meeting, holding her tears told Relator: "I cannot even hire anybody without Jeff interfering with my decision".

**(b)     DQ LLC Caused CDC to Commit
Medicaid and Federal Grants fraud**

67.  DQ LLC caused CDC to routinely upcode simple teeth extraction procedures to more expensive surgical extractions and submit upcoded procedure false claims to Federal Grants and Medicaid. There was an instance where dentist Dr. Applewhite complained to Relator that her front desk upcoded her denture plan treatment to a more expensive procedure, who refused to correct the upcoding even after Dr. Applewhite asked her to do so.

68.  Parker and Haugen thwarted a Medicaid fraud investigation by Dental Assistant McFarland and HR Dianey Zimmer who questioned the improper billing of a non-credentialed dentist Dr. Rice's dental treatment procedure under the provider ID of a credentialed dentist Dr. Pena, when Dr. Pena did not see the patient.

69.  Relator's initials were forged 30 times on a 30-page MCNA Medicaid contract and the date to her signature was altered by Marlene Whitmore, a Sarrell employee working under the direction of Parker, when Relator refused to sign the MCNA contract that required compliance with federal and state regulations under their terms and conditions, because she believed CDC was not in compliance and hence refused to sign for that reason.

**(c)     DQ LLC Controlled Clinic Patient Schedules
and Pushed Dentists for Production**

70.  Parker and Haugen pushed office managers to book more patients for dentists, pushed dentists for production, giving adverse actions to dentists who did not "produce", and pressuring a dental hygienist to bill for anesthesia when she did not numb the patients. Relator has several emails from Parker where he applauded dentists for high production numbers and displayed negativity if they were low.

71.  Parker's June 5, 2014, June 24, 2014, June 17, 2014, July 28, 2014 emails stated the need for dentists to produce $750.00 for each staff in the clinic and when the production numbers were not reached, his July 8, 2014, July 10, 2014, July 23, 2014, August 7, 2014 emails stated, "dug in a hole". Parker's July 16, 2014 and September 11, 2014 emails referred to a dentist as a "quality dentist" because they met high production numbers. Parker's April 30, 2014 email copying Haugen stated to put the "low producers" in the Mobile Dental unit clinic that treated children and battered and sheltered women. Further evidence of DQ LLC's control of CDC is as follows:

    (i) Emails dated February 17, 2014, February 21, 2014, March 31, 2014, April 3, 2014 from Parker and Haugen to CDC front desk staff questioning why they didn't do a better job with booking, billed under $600 on a day and why the clinics saw less patients.

    (ii) Emails from CDC dentists to DQ management dated February 17, 2014, June 25, 2014, July 1, 2014, July 18, 2014, July 25, 2014 with complaints of being overbooked with patients. As Dental Director, Relator complained by her June 15, 2014, July 29, 2014, and August 5, 2014 emails to Parker, Haugen and Estes that dentists were being overbooked by management, and were unable to provide quality care to patients and practice good record keeping, with a reminder of Dental Practice Act ("DPA") regulations that non-dentists could not oppose or influence a dentists professional judgement.

    (iii) Haugen called himself "VP of Business Development" and took control of CDC. He took charge of HR, OSHA and Federal grants contracts and compliance with its terms. Relator, who was an employee with CDC for at least 14 years at that time, served as dentist-in-charge at the Garland clinic and then as the dental director, was aware of federal grant requirements through the grant meetings she attended, and became aware that CDC was in violation of several including but not limited to; lack of procedures, policies and training for Child Abuse, Human Trafficking, OSHA, Cultural Diversity and Fire drill. Relator made complaints verbally and by several emails to the CEO, but to no avail because the CEO had no voice in the company and had to get everything approved by Parker.

**(d)      DQ LLC Made Employment Decision as to Relator Without CEO's Knowledge**

72.   Relator complained of CDC's several violations of Federal Grants terms and conditions in her August 5, 2014 and August 6, 2014 emails, scheduled an OSHA meeting on August 6, 2014 to appoint hygienist Misty Smith, a dental hygienist as CDC's OSHA administrator, with CEO Estes's approval. However, on August 14, 2014, Parker moved Relator from her position of dental director to a general clinical dentist. Estes had no knowledge or understanding of the events and in her September 9, 2014 email to Relator stated:

> "I just want you to know, without a doubt, you have done an excellent job in serving as the role of Dental Director. You've always tried to balance what is right for the patient and from a business standpoint. I've been extremely pleased with your work. Please know that the changes are in no direct correlation to your abilities to serve in the role but, to carry forth the vision and strategy as set by executive leadership at DentaQuest Care Group."

**(e)      DQ LLC Got Involved After Relator's Complaints of CDC Medicaid and Federal Grants Fraud**

73.   Relator made complaints to CDC of Medicaid and Federal Grants fraud of upcoding of non-surgical extractions, billing of uncredentialed dentists under credentialed dentists, overtreatment, and non-compliance with Federal Grant terms and conditions, falsely certifying them at the time of renewal and forgery of her MCNA Medicaid Contract, through her counsel Bob Goodman's May 1, 2015 letter. DQ LLC, instead of CDC or DQCG, got involved after Relator's complaints and following facts support this:

    a.  Goodman's letter with complaints of CDC fraud was received by DQ LLC, which presented as Relator's employer and offered to mediate;

    b.  DQ LLC hired Bixby, compliance counsel to investigate Relator's complaints;

    c.  DQ LLC attorney Ron Price emailed Relator to investigate CDC compliance issues and copied Nick Messuri and Karla Rutledge who were all DQ LLC attorneys. Incidentally, Price and Messuri were also compliance officers for DQ USA, the Medicaid administrator; and

d. DQ LLC attorney Mary Rebecca Mix was copied onto email from Sutton, CDC Executive Director when Relator emailed him a request for her DQ contracts she signed in 2011, where Sutton resisted her contract request.

### (f)   DQ LLC Set Relator's Salary and Asked her to Resign at Mediation

74. Prior to affiliation with DQCG, Relator's compensation was on an hourly basis. As dental director of CDC in 2014, Relator worked extremely hard and long hours and was paid overtime. In June of 2014, Haugen visited Relator at the Garland clinic and stated that Relator was doing a good job as dental director and they were setting her salary for $150,000 per year. Relator was informed later by HR Zimmer that Parker and Haugen set Relator on a salary because they were afraid Relator was making too much with the overtime, she was putting in.

75. After Relator's counsel sent the letter on May 1, 2015 to CDC with complaints of CDC's Medicaid and Federal Grants fraud, CDC offered to mediate on June 1, 2015. At the mediation, DQ LLC presented as Relator's employer and Haugen presented as a DQ LLC employee. DQ LLC provided Relator with a Mediation Settlement Agreement ("MSA") asking her to resign her employment that stated:

> "The above-referenced dispute convened for mediation on June 1, 2015. Sujatha Govindarajan ("Govindarajan") and DentaQuest, LLC ("DentaQuest") agreed as follows: Govindarajan agrees to resign her employment with DentaQuest, effective _____, 2015"

### (g)   DQ LLC Controlled CDC HR Thwarting Her from HR Complaint Investigations

76. After CDC's affiliation with DQCG in December 2013, Haugen, with the title "VP of Business Development" took in-charge of HR and in February 2014, hired Dianey Zimmer as HR manager to work under him. Zimmer resigned from CDC on or about July 28, 2014 and informed Relator that she found CDC's ethics under DQ management intolerable. Zimmer told

Relator that she had lodged a complaint against Haugen because he thwarted her from investigating a sexual harassment complaint. She also mentioned to Relator that Haugen in June of 2014 thwarted her from a Medicaid fraud investigation of improper billing of uncredentialed dentist procedures under the ID of a credentialed dentist and told Zimmer to mind her business.

77.  Zimmer sent an email to CEO Estes on July 31, 2014 copying Relator, Parker and Haugen, asking Estes to terminate their access to any of her information and commented on aspects of CDC management. Following are the excerpts from Zimmer's July 31, 2014 email to Estes:

> "Sharon,
>
> Please terminate access of any of my information immediately. See below. I do not feel comfortable with CDC's ethics and want to ensure all my access is terminated immediately…As I stated before I was unable to stay is due to the unprofessional malice that is Community Dental Care/DentaQuest & Sarrell…
>
> I knew after I complained formally against Chris (Haugen) I would pay "I had a target". I understand how the world works and am proud to say that I did the best ethically I could despite the constant mismanagement there is at CDC. I was told to stop investigating a serious sexual harassment/bullying claim and at that point I knew it was a matter of time. As I know I will not get an immediate response, CDC's policy is to always ignore issues or complaints, I request a response by Friday regarding my pay.
>
> Sincerely,
>
> Dianey Zimmer"

### (h)    DQ LLC Caused 9 CDC clinics to Shut Down Due to OSHA & Infection Control Violations

78.  CDC was not in compliant with OSHA and infection control regulations from the time of CDC's affiliation with DQCG in December of 2013. Relator complained to Estes on several occasions, and through her July 17, 2014 email to CEO asked for CDC employees to be trained on OSHA regulations, stating it was also required by the Texas State Board. With the

CEO's approval, on August 6, 2014, Relator scheduled a meeting, to appoint Misty Smith, a dental hygienist to take on the role of an OSHA administrator because Parker had appointed newly hired Debbe Velasquez to take on the role, whose background was a pharmaceutical rep and upon information and belief was a jewelry saleswoman, who had no clinical knowledge or background to understand OSHA regulations.  However, Haugen bullied Relator and cancelled her OSHA meeting by his August 6, 2014 email to Relator, stating that the directive to do so was from Parker and that he would discuss the OSHA situation with Relator the following week; which he never did. Instead, he assisted Parker with Relator's demotion.

79.  Relator continued her complaints of CDC's violations of OSHA regulations through her August 5, 2014, August 6, 2014, and her counsel's May 1, 2015 letter to CDC. On September 23, 2015 Parkland hospital that housed 9 CDC clinics closed them initially citing OSHA and infection control violations and afterwards permanently shut them down on November 6, 2015, leaving several indigent and homeless patients who were funded by federal grants without dental care.

80.  Dr. Raghunath Puttaiah, OSHA and infection control expert at Baylor Texas A & M College of Dentistry was a witness to CDC's OSHA and infection control issues, as he was called upon by Parkland to assess the violations and informed Relator later in 2016 that CDC was non- compliant in several areas; the top most being CDC employees lack of OSHA training because CDC could not produce any employee OSHA training records.

81.  A May 2016 Parkland hospital board briefing document stated: "During the final lease negotiations, the joint commission cited the in-place operator Community Dental Care, for violations which potentially could have effected Parkland's accreditation".

### 3.      CDC Made False Statements in Federal Grant Contracts

82.   Attached hereto as Exhibit "A" and incorporated by reference is a chart identifying in infinite detail the CDC federal grants, the years and amounts awarded, and the false statements made by CDC and DQ LLC personnel in response to the questions asked in the contract. The chart supports Relator's position that the funders of CDC's Federal Grants were unaware of DQ LLC having a controlling interest in CDC and that DQ LLC performed administrative and management services DSO services to CDC.

### 4.      FCA Violations After Award of Federal Grants

### (1)      DQ LLC Was Unlawfully Providing DSO Services to CDC Which Violates the FCA

83.   After affiliation with DQCG on December 17, 2013, CDC hired DQ LLC for its operations to provide administrative and management services. An entity that provides such business support services to dentists is called a Dental Service Organization ("DSO"). OIG's May 31, 2017 report defines DSO's as "Management service companies that provide or administer business support to dentists and dental practices. Examples of business support services include human resources, marketing, facilities maintenance, procurement and billing". Per the OIG, DSO's are required to be registered in Texas with the Secretary of State to provide these services, however DQ LLC is not registered as a DSO.

84.   DQ LLC is currently performing DSO services for CDC unlawfully which violates the FCA because it is not registered in Texas as a DSO and the funders of the grants (Title 5, HIV, Irving, McKinney, Dallas and Garland CDBG) are unaware of DQ LLC's role. An OIG

May 31, 2017 report indicates the need for DSO's to be registered in Texas and lists 129 DSO's registered in Texas, however, DQ LLC is not one of them.

85.  Evidence that DQ LLC provides administrative and management services to CDC:

i.    CDC's tax returns state: "The company hires DentaQuest, LLC (A related party) to provide management services"; and

ii.   Defendants October 9, 2019 brief Pages 3-4 states: "After DQCG became the sole member of CDC, CDC hired another entity in the DentaQuest corporate organizational chart, DQ LLC to provide management services". "DQ LLC personnel held roles at CDC, and DQ LLC employees provided management and administrative services pursuant to that arrangement"

### (2)    Misuse of Grant Funds by DQ LLC Which Has a Controlling Interest in CDC

86.  The following provisions of the Title 5 Contract stipulate use and misuse of funds and action involving breach of contract:

**(i)  "Section 4.03 Use of Funds:**

Contractor shall expend Department funds only for the provision of approved services and for reasonable and allowable expenses related to those services"

**(ii) Section 12.06 Misuse of funds and performance malfeasance**

 Contractor shall report to the contract manager assigned to the Program Attachment, any knowledge of debarment, suspected fraud. Program abuse, possible illegal expenditures, unlawful activity, or violation of financial laws, rules, policies and procedures related to perform services under this contract.

**(iii) Section 16.01 Actions constituting breach of contract:**

Action or inactions that constitute breach of contract include, but are not limited to the following:

-    Failure to comply with any provisions of this contract, including failure to comply with all applicable statutes, rules, and regulations
-    discovery of a material misrepresentation in any aspect of Contractor's application or response to the Solicitation Document

- any misrepresentation in the assurances and certifications in Contractor's application or response to the Solicitation Document or in this Contract

### (iv) Section 16.02 General Remedies and Sanctions

If Contractor breaches this Contract by failing to comply with one or more of the terms of this Contract, including but not limited to compliance with applicable statutes, rules, or regulations, the Department may take one or more of the following actions:

a) Terminate this Contract
b) Suspend all or part of this Contract
c) Deny additional or future contracts with Contractor
d) Reduce the funding
e) Disallow costs and credit for matching fund
f) Temporarily withhold cash payments pending resolution of issues of noncompliance

87.   Title 5 funds provided to non-profit CDC to treat indigent children and pregnant women were being misused to pay incentive bonuses to DQ LLC management employees (not registered as a DSO), who caused CDC to commit fraud and abuse. Funders would consider this as misuse of their funds, program abuse and illegal expenditure, in violation of their contract terms and determine it to be a breach. Accordingly, they could impose remedies ranging from terminating the contract to withholding cash payments.

### (3)    DQ LLC Violated Grant Terms That CDC's Board have Volunteer Directors

88.   The Ryan White Grants had requirements to be compliant with their Contract terms and regarded the failure to do so to be a material breach:

"Failure to comply with any of these assurances or any other requirements specified within this Contract shall put Contractor in default and material breach of said Contract and may result at the sole and absolute discretion of County in the disallowance of funds and the withholding of future awards to Contractor, in addition to any other remedies available to County as permitted by law".

89. Ryan White HIV grants administered by DSHS evaluated administrative compliance by CDC during their audits. DSHS performance standards criteria for CDC stated: "The agency is governed by a volunteer board of directors". However, Jeff Parker, Chairman of CDC's board of Directors and Chris Haugen, Secretary of Board were hired by CDC to provide management services, got paid by CDC for the services and even more egregious, got paid bonuses based on CDC's performance. Accordingly, the were not serving on CDC's board in a "volunteer" capacity. The funders of the grant would consider this a material breach of their contract terms.

### (4)    CDC Assigned Rights to a Third Party In Violation of Ryan White Grant Terms

90.   CDC's contract with DCHHS prohibited any third party to be the beneficiary of the contract and CDC was prohibited from assigning its rights and duties without consent of the County. However, DQ LLC was a third -party beneficiary of the contract and CDC assigned its administrative and management duties to DQ LLC personnel, who unlawfully provided DSO services to CDC, without being registered in Texas as one. Specifically, the contract stated:

(i)  31. Third parties: The obligation of each party to this Contract shall inure solely to the benefit of the other party, and no other person or entity shall be a third party beneficiary of said Contract or have any right to enforce any obligation created or established under said Contract.

(ii) Assignment: Contractor may not assign its rights and duties under said Contract without the prior written consent of County and approval of the County Commissioners Court, if such assignment is due to a change in ownership or affiliation. Any assignment attempted without such prior consent shall be null and void. Such consent shall not relieve the assignor of liability in the event of default by its assignee.

### (5)  CDC Made Profit and Paid DQ LLC Employees
### In Violation of Ryan White Contract Terms

91.  Ryan White funds were awarded to CDC under the assumption that CDC was a non-profit organization, without the funders being aware that CDC's controlling entity was DQ LLC, and that profits were being made from the use of grant funds which were distributed to DQ LLC management, who were also the board members. Parker's February 28, 2014. April 11, 2014. May 20, 2014, May 24, 2014, and June 21, 2014 emails boasted that CDC made profit, was cash flow positive and made a remarkable turnaround. This would be material to the funders as it was against DCHHS's contractual terms that sets forth Contractor obligations in Section 7 (k) for "Eligible Organization" stating:

> "Contractor acknowledges and agrees that grant funds are allocated to individual service providers through a combination of competitive and noncompetitive bidding processes administered by the DCHHS Grants Management Division. **Contractor acknowledges and agrees that eligible contractors are faith-based and/or non-profit community-based organizations.** Contractor further acknowledges and agrees that awards can be made to public or nonprofit entities or to "for-profit" entities if such entities are the only available providers of quality HIV care in the EMA (Eligible Metropolitan Area). If Contractor is a "for-profit" organization, **Contractor shall demonstrate that no profit is being made from the use of grant funds** in accordance with Appendix VI, Grants to For-Profit Organizations, of the public Health Service Grants Policy Statement and Contractor must be incorporated as a "for-profit" organization for a minimum of three (3) years prior to submission of any proposal for said Contract". **(emphasis added)**

### (6)  DQ LLC Caused CDC to Falsely Certify
### Federal Grants Contract Terms and Conditions

92.  CDC was in violation of several grants' terms and conditions, who regarded non-compliance as a breach, imposing remedies ranging from termination to withholding payments. Attached hereto as Exhibit "B" is another chart identifying CDC's federal grants and false statements made by CDC and DQ LLC personnel to the funders of the grants certifying

compliance with the grants' terms and conditions that was material to the funders as discussed in the chart.

### (7)    False Claims Submitted Relating to Federal Grants

93.   CDC, at the direction of DQ LLC, performed Unlawful Acts as mentioned below and submitted false claims to federal grants who paid a fee for service. The Unlawful Acts caused grant funds to be utilized early and CDC then requested for more funds.

### (a)    False Claims Submitted by Upcoding
### Simple Extractions to Surgical Extractions

94.  CDC, at the direction of DQ LLC, routinely up-coded simple extractions to surgical extractions as simple extractions (ADA code D 7140) were being performed routinely by the CDC dentists, but they were billed as surgical extractions (D 7210, D 7250) resulting in false claims submission to federal grants. Relator specifically observed these violations during the time period October 2014 until November 2015 when she was wrongfully terminated. Examples of what Relator personally observed are as follows:

(a)    Relator had a few Garland patients that she referred to Dentist Dr. Sauter for extractions at the Saturday Deharo clinic and CDC billed a higher fee where the clinical notes of the dentist did not reflect a surgical procedure being performed and the patient interview did not corroborate a surgical procedure as defined by ADA CDT codes;

(b)    Dentist Dr. Shenoy had also noted that her patients whom she referred to Sauter at the Saturday Deharo clinic for extractions were charged a surgical extraction fee where she believed that the extractions were simple and should have been billed a simple extraction fee;

(c)    Relator saw a patient from the CDC Vickery clinic week of August 17th of 2015 where an extraction was performed, and the patient related to Relator the extraction procedure that led to Relator's conclusion that the patient had only a simple extraction, but she paid a surgical extraction fee;

(d)      Dental Assistant Lopez assisted Relator during weekdays at CDC's Garland clinic and assisted Sauter on Saturdays at CDC's Deharo clinic had seen Relator perform simple extractions and surgical extractions.  He stated to Relator several times that Sauter billed almost every extraction as surgical. Lopez mentioned to Relator that he felt bad for the patients; and

(e)      On August 21, 2015, Dental Assistant Salazar, recoded a simple extraction procedure Relator performed to a surgical extraction when Relator and her chairside assistant Dental Assistant Carmona had billed the root tip extraction as simple. When Relator confronted Salazar about changing the procedure code to surgical without her knowledge or authorization, she stated: " I have assisted the primary Dental Director, several times and she always bills Root tips as surgical extractions"

### (b)      False Claims by Upcoding Denture Procedure

95.   There were also instances Relator was informed of where there were upcoding denture procedures on Federal Grant patients. In October of 2014, Dental Assistant Soto, who worked at the CDC front desk Grand Prairie location, upcoded a Federal Grant denture procedure without the consent of the dentist Dr. Applewhite who treatment planned the procedure. When Dr. Applewhite discovered the upcoding, she confronted Soto and informed her that the denture was being billed at higher price in contrast to her treatment plan, however Soto did not change the code to the appropriate code. Dr. Applewhite then complained to the operation manager Dorothy Robinson, that Dental Assistant Soto had upcoded her treatment planned denture procedure without her consent and doing so was fraud. Dr. Applewhite was terminated the following week and informed Relator that she was terminated in retaliation for her complaint to the operation manager.

## C.  UNLAWFUL ACTS IN VIOLATION OF TMFPA AFTER
## DQ USA OBTAINED THE TEXAS MEDICAID CONTRACT

### 1. Background

96.   Texas Health and Human Services Commission ("HHSC") released a Request for Proposal ("RFP") on February 22, 2011, to appoint a Dental Contractor for Dental Services for Texas Medicaid Members and Children's Health Insurance Program (CHIP) Members, -- RFP No. 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. There were a total of 9 Respondents to the RFP and 3 of them won the bid for Texas Medicaid Contract – DQ USA, MCNA and Delta Dental, the announcement of which was made by HHSC in July of 2011. The operational date of the Contract was March 1, 2012 and 6 months after the Contract inception, Delta Dental dropped out of the Contract, leaving DQ USA and MCNA as the dental contractors for the Texas Medicaid Contract.

97.   DQ USA responded to the RFP on May 10, 2011 with "Business" and "Programmatic" components and signed the contract with HHSC on August 17, 2011, accepting the Contractual terms and conditions.  DQ USA, however breached the very terms of the Contract thereof, by committing a litany of Unlawful acts in violation of several sections of TMFPA provisions as discussed herein.

98.   DQ USA is a Managed Care Organization ("MCO") that is contracted with the State of Texas to provide comprehensive Dental Services to qualified Medicaid and CHIP Members through a Network of licensed dentists. TMFPA holds MCO's to a higher standard and Section 36.002 (10)(B) specifically details Unlawful Acts related to an MCO contracted with HHSC, when they fail to provide to the Commission information required to be provided by its Contractual Provisions. As discussed herein, in addition to DQ USA violating other

provisions of the TMFPA, DQ USA specifically committed seven different Unlawful acts in violation of the TMFPA Section 36.002(10)(B) MCO provision.

### (1)   DQ LLC Provided Services for DQ USA
### In the Texas Medicaid Contract

99.   DQ USA, in its response to HHSC's RFP, revealed that DQ LLC provided its services and described qualifications, expertise and personnel of DQ LLC as having experience since 1993. DQ LLC was established in 1993 as it revealed in its Virginia January 18, 2011 proposal where DQ LLC was the Contractor.

### (a)   DQ USA Revealed in its Response to RFP
### That DQ LLC Provides Its Services

100. DQ USA responded to the Texas Medicaid RFP with a joint proposal (against HHSC's Contractual Terms 3.19) as "DentaQuest" which it defined as "DentaQuest Group Inc. and Subsidiaries", that included DQ LLC, to perform services for the RFP:

> "Because of the common administration and management of the DentaQuest companies by one management organization, in this Response, we provide information with respect to the qualifications of DentaQuest Group, Inc. and its subsidiaries, referred to in this Response as "DentaQuest" or the "DentaQuest organization" to perform the services and meet the requirements described in the RFP".

101. DQ USA revealed in its RFP response that DQ LLC substantially provided its administrative and management services:

> "DentaQuest, LLC, the immediate parent company of DentaQuest USA, provides substantially all management and administrative services required for the conduct of the businesses of DentaQuest Group companies including DentaQuest USA".

**(b)      DQ USA Had an Agreement With
DQ LLC to Provide Its Services**

102. Effective December 31, 2007, DQ USA entered into an agreement with DQ LLC

to perform all its services as reflected in Form B Registration Statement that DQ USA filed

with the Texas Department of Insurance ("TDI") on April 30, 2011:

Section 4.2.3.3.4 Form B Insurance Holding Company System Registration Statement-Filed with Texas Department of Insurance by DentaQuest USA Insurance Company Inc (the "company")

"Effective December 31 2007, the company entered into an agreement with DentaQuest LLC, formerly known as Doral Dental USA LLC (DQ, LLC) pursuant to which DQ, LLC provides various services to the company such as information technology, facilities and equipment, human resources services, executive and managerial support, legal services, regulatory filing and compliance services, accounting services, cash management services, actuarial and underwriting services, sales and marketing services, enrollment services, claims processing services, billing and collection services, customer services, provider relations and credentialing services, and additional other services".

**(c)      DQ LLC Employees Provided Services for Texas
Contract and DQ LLC's Skills and Qualifications Were Used**

103. DQ USA responded to the RFP as "DentaQuest" and provided DQ LLC's skills

and personnel to fulfil the requirements of the contract as discussed above in its RFP response.

"DentaQuest has employed the full scope of its administrative services to manage Medicaid, Medicare and CHIP dental programs since 1993".

"For the past 18 years DentaQuest has provided medically necessary covered dental services to Medicaid and CHIP populations identical to those listed in Attachments B and B1 of this RFP… We serve nearly 15 million members – 12.7 million government-sponsored program members and 2.3 commercial program members – in 23 states".

104. DQ USA provided an organizational chart A and B for Texas operations listing

DQ Corporate structure and DQ LLC employees:

"Chart A (on next page) depicts the DentaQuest corporate structure and lines of authority from a leadership perspective

An organizational chart (Chart A)

DentaQuest Group is headed by Fay Donohue, who serves as President and CEO. As indicated in the chart above (Chart A), the company's chief financial officer, general counsel, senior vice president of human resources, senior vice president of dental management and chief operating officer report directly to her.

President Steve Pollock oversees company functions including operations, IT, business development and sales, and client services. Steve will be the senior executive responsible for the management of the Texas contract".

105. Organizational Chart A listed key DQ LLC employees as follows:

President & CEO Fay Donohue, SVP Human Resources & Administrative Services Sheryl Taylor, SVP Chief Financial Officer (CFO) Jim Collins, SVP General Counsel Myra Green, SVP Dental Management Kevin Klein, President Steve Pollock, SVP operations Ken Erdelt, SVP Business Development Bob Lynn, VP Government Relations Claudine Swartz, SVP IT Steve Laurent, SVP Chief Sales Office Dennis Leonard, BT Program manager Angela Kish

106. Organizational Chart B was the "Texas Organizational Chart" that listed about 20 DQ LLC employee names (confirmed from DQ LLC's 2010 Idaho response to RFP and DQ LLC 2011 Virginia response to RFP)

### (d)    DQ LLC Continues to Employ All Personnel and Provide Services for DQ USA

107. DQ USA, which was the "Proposer" to the Louisiana Department of Health ("LDH") Medicaid RFP, and recently won the contract as announced by the LDH on February 28, 2020, corroborated in its August 6, 2019 proposal that DQ LLC employs all Personnel and administers all State contracts:

"**DentaQuest, LLC** Immediate Parent Company **employs all staff, management, and executives**".

"DentaQuest's state contracts are held by a variety of DentaQuest subsidiary companies. All state contracts, however, with the exception of Oregon, are administered by DentaQuest, LLC, the administrative and managerial arm of DentaQuest's benefits business"

### (2)   By Texas Medicaid Contract Definition DQ LLC is a Material Subcontractor to DQ USA

108. The Texas Medicaid Contract Attachment A- Medicaid/CHIP Dental Services Terms & Conditions defines a Material Subcontract as follows:

(i) **Material Subcontract** means any contract, Subcontract, or **agreement** between the Dental Contractor and another entity that meets any of the following criteria:

    1.  **the other entity is an Affiliate** of the Dental Contractor;

    2.  the Subcontract is considered by HHSC to be for a key type of service or function, including

        a.  **Administrative Services** (including third party administrator, Network administration, and claims processing);

        b.  delegated Networks (including behavioral health, dental, pharmacy, and vision);

        c.  **management services** (including management agreements with parent);

        d.  reinsurance; or

        e.  call lines (including nurse and medical consultation); or

    3.  any other Subcontract that exceeds, or is reasonably expected to exceed, the lesser of a) $500,000 per year, or b) 1% of the Dental Contractor's annual revenues under this Contract.  Any Subcontracts between the Dental Contractor and a single entity that are split into separate agreements by time period, Program, Service Area, or otherwise, will be consolidated for the purpose of this definition

        For the purposes of this Agreement, Material Subcontracts do not include contracts with any non-Affiliates for any of the following, regardless of the value of the contract: utilities (e.g., water, electricity, telephone, Internet, trash), mail/shipping, office space, maintenance, security, or computer hardware

(ii) **Affiliate** means any individual or entity that meets any of the following criteria:

    1.  owns or holds more that a five percent (5%) interest in the Dental Contractor (either directly, or through one or more intermediaries)

    2.  In which the Dental Contractor owns or holds more than a five percent (5%) interest (either directly, or through one or more intermediaries)

3. **Any parent entity or subsidiary entity of the Dental Contractor, regardless of the organizational structure of the entity**

4. **Any entity that has a common parent with the Dental Contractor (either directly or through one or more intermediaries)**

5. Any entity that directly or indirectly through one or more intermediaries, controls, or is controlled by, it is under common control with, the Dental Contractor or,

6. Any entity that would be considered to be an affiliate by any securities and Exchange Commission (SEC) or Internal Revenue Service (IRS) regulation, Federal Acquisition Regulations (FAR), or by another applicable regulatory body.

109. DQ LLC is a wholly owned parent of DQ USA and is therefore an affiliate. DQ USA entered into an agreement with DQ LLC filed with TDI on April 30, 2011 to perform its services, and because DQ LLC provides the administrative and management services for DQ USA to fulfill the requirements of the Texas Medicaid Contract, it is a Material Subcontractor per HHSC's definition. However, DQ USA in its response to the Texas Medicaid RFP did not identify DQ LLC as a Material Subcontractor, nor provide information of DQ LLC as the Contractual Document required.

### (3)   Texas Medicaid Contract Mandated Identification of Subcontractors

110. The Contractual Document Attachment B-1- Medicaid/CHIP Dental Services RFP explicitly required that all subcontractors be identified, as evidenced by the following section:

**1.20 Use of Subcontractors**

Respondents planning to Subcontract all or a portion of the work to be performed **must identify the proposed Subcontractors** and describe the subcontracted functions in their proposals….(emphasis added)

111. It should be noted that ALL of the other bidders for the Texas HHSC Contract answered truthfully and identified their parent performing services for them as a Material Subcontractor in the "Executive Summary" and "Corporate Background and Experience" section.  Specifically, competitors MCNA and Delta Dental, which also won a portion of the Texas Medicaid Contract, responded to the RFP accurately by identifying their parent as their Material Subcontractors and providing information of the parent as required by the RFP. Additionally, unlike DQ LLC, the parent entities of MCNA and Delta Dental had a Third- Party Administrator License ("TPA") license that was required to perform services under the contract.

112. DQ USA, which was the Respondent to the Nevada Medicaid RFP ("Vendor"), accurately identified DQ LLC as its Subcontractor as it stated in its March 29, 2017 response to Nevada RFP:

> "DentaQuest, LLC—which is currently the DentaQuest enterprise's primary operations entity—will be providing typical administrative and management services under the Contract as a subcontractor to Vendor"

### (4)  DQ USA is an MCO that Violated its Contractual Obligations with HHSC In Violation of TMFPA 36.002(10)(B)

113. Texas Human Resources Code § 32.039(a) defines a Managed Care Organization ("MCO") as: "any entity or person that is authorized or permitted by law to arrange for or provide a managed care plan".

114. Section 36.0011 (a) states: A person acts "knowingly" with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.

115. Subsection (10) of TMFPA Section 36.002 states: "It is an Unlawful Act if the person is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:… "(B) fails to provide to the commission or appropriate state agency information required to be provided by law, commission or agency rule, or contractual provision".

116. Unlike TMFPA provisions 36.002 (1) and (2) that impose liability on a person for false statements, fraudulent misrepresentations and/or failure to disclose information, the 36.002(10)(B) provision imposes liability on an MCO for each Unlawful Act arising from their contractual obligation violations. Specifically, the Section 36.002(10)(B) provision imposes liability on an MCO like DQ USA for failing to provide to the commission information required to be provided by the contractual provision.

117. The State of Texas in its December 18, 2019 Statement of Interest when referencing TMFPA (10)(B) provision stated:

> "Defendants further contend that the TMFPA, "does not cover garden variety (sic) contractual issues." Defendants' Motion at 36. Defendants argument on this point misses the independent basis for liability that may arise from each unlawful act, including **contractual violations** under TEX. HUM. RES. CODE § 36.002(10)(B).
>
> The plain language of the TMFPA must control, and **the language covers an MCO's contractual obligations". (emphasis added).**

118. As a Managed Care Organization contracted with HHSC, DQ USA violated TMFPA Sec. 36.002(10)(B) in multiple instances, because DQ USA violated its contractual obligations by knowingly failed to provide to HHSC information that was required to be provided by its contractual provisions.

### (a)      DQ USA's Contract and Subsequent Amendments Had the Same Contractual Elements and Terms

119. HHSC defines contract as:

"Contract or Agreement means this formal, written and legally enforceable contract between the Parties, and all amendments and attachments thereto".

120. HHSC Dental Services Contract Amendment states:

"The parties agree to amend the Contract as provided in this Amendment. The Parties agree that the terms of the Contract will remain in effect and continue to govern except modified in this Amendment".

121. In the Contract and all subsequent amendments A, B, C, D, E, F, G, H, I, J, K and so forth that DQ USA signed with HHSC (which are attached hereto as Exhibit "C" and incorporated by reference), the contract terms and conditions that also included the RFP terms and conditions were the same at the initial contract award and at each amendment. The following are the Contract Elements per HHSC Contractual terms Section 3.01:

**Section 3.01 Contract Elements:**

(a) **Contract documentation**: The Contract between the Parties will consist of the Dental Program Contract documents and all attachments and amendments to these documents.

(b) **Order of documents**: In the event of any conflict or contradiction between or among these documents, the documents must control in the following order of precedence:

(1) The final executed HHSC CHIP Dental Contract document, and all amendments thereto;

(2) Contract **Attachment A** – "HHSC's Dental Contract Terms and Conditions," and all amendments thereto;

(3) Contract **Attachment B** – "Scope of Work/Performance Measures," and all attachments and amendments thereto;

B 1: HHSC Medicaid/CHIP Dental Services RFP

B 2: Medicaid medically necessary covered dental services

B 2.1: CHIP Medically necessary covered dental services

B3: Dental Services Deliverables/Liquidated damages matrix

(4)  The HHSC UMCM, and all attachments and amendments thereto; and

(5) Contract **Attachment C** – "Dental Contractor's Proposal."

### (b)    DQ USA Had a Continuing Duty to Provide to HHSC Information Required by the Contractual Provision

122. DQ USA had a continuing duty to provide to HHSC information that was required to be provided by the contractual provisions, because the contract terms and conditions that also included the RFP terms and conditions were the same at the initial contract award and at each amendment A, B, C, D, E, F, G, H, I, J, K and so forth. By DQ USA's signature at the initial contract award and the amendments thereof, DQ USA certified it would be compliant with each contractual provision that included the ones alleged below under the TMFPA Section 36.002(10 (B).

### (c)    DQ USA's Failure to Provide to HHSC Information Was "Knowing"

123. DQ USA's failure to provide the information required by the contractual provisions to HHSC was "**knowing**" because:

a.   The contractual document Attachment A-Medicaid/CHIP Dental Services Terms & Conditions which DQ USA **signed with HHSC initially and at each amendment**, stated:

**Section 1.03 Inducements:**

**In making the award of this Contract, HHSC relied on Dental Contractor's assurances of the following:**

(2) Dental Contractor and its Material Subcontractors have the skills, qualifications, expertise, financial resources and experience necessary to provide the Services and Deliverables described in this Contract in an efficient, cost-effective manner, with a high degree of quality and responsiveness, and has performed similar services for other public or private entities;

(3) Dental Contractor has thoroughly reviewed, analyzed, and understood the RFP, has timely raised all questions or objections to the RFP, and has had the opportunity to review and fully understand HHSC's current Dental Program and operating environment for the activities that are the subject of the Contract and the needs and requirements of the State during the Contract term;

(4) Dental Contractor has had the opportunity to review and understand the State's stated objectives in entering into this Contract and, based on such review and understanding, Dental Contractor currently has the capability to perform in accordance with the terms and conditions of this Contract;

**Accordingly, on the basis of the terms and conditions of this Contract,** HHSC desires to engage Dental Contractor to perform the Services and provide the Deliverables described in this Contract under the terms and conditions set forth in this Contract.

b.   In the "Required Certifications" form that DQ USA signed on May 5, 2011, DQ USA certified provisions of Contractual Document Attachment B-1-Medicaid/CHIP Dental Services RFP as follows:

**By Submitting a proposal, the respondent agrees and certifies the following:**

2.   The Respondent accepts the RFP terms and conditions, including Uniform Contract Terms and Conditions, and other RFP requirements unless specifically noted on the Respondent information and Disclosure Form. HHSC reserves the right to reject any or all of the respondent's proposed exceptions.

3.   The Respondent guarantees that the proposal complies with all RFP requirements, at the costs outlined in the proposal. The respondent further guarantees that the terms specified in the proposal will remain firm and binding through the contract termination date, unless the parties agree to modify such terms in the contract. **(emphasis added**)

**2.      DQ USA Knowingly Failed to Provide to the Commission
Information Required to be Provided by
Contractual Provision in Violation of TMFPA Sec. 36.002(10)(B)**

124. Following are the specific violations of TMFPA (10)(B) that DQ USA knowingly committed:

**(1)     Knowingly Failed to Provide to HHSC
Information of Its Subcontractor DQ LLC**

125. DQ USA knowingly failed to provide to HHSC information of its Subcontractor DQ LLC that was required to be provided by its contractual provision "Respondent information and Disclosures Part 3 Subcontractor information":

> HHSC Contractual Document RFP attachment "Respondent information and Disclosures" "Part 3: Subcontractor information" required the following information for DQ USA's Subcontractors:
>
> **Subcontractor Information**: Provide the following information for each proposed subcontractor. Attach additional pages if necessary.
>
> 1. Organization's Legal name
> 2. Doing Business As:
> 3. Physical Address
> 4. Mailing Address
> 5. Taxpayer Identification Number
> 6. Legal Status
> 7. Business Structure
> 8. State of Incorporation, if Applicable
> 9. Name of Parent Entity, if Applicable
> 10. HUB status

126. In response to the requirement to provide information of its Subcontractors, DQ USA provided the above information of these 5 Subcontractors (GTESS was identified as Material Subcontractor):

> GTESS, Apple Specialty Advertising, Marfield Corporate Stationery, Harp Enterprises Inc., and Trachmar,
>
> However, information pertaining to DQ LLC was not provided.

### (2)     Knowingly Failed to Provide to HHSC
### Information of its Material Subcontractor DQ LLC

127. Relator reincorporates facts by reference set forth in Section VI C 1 (2)- "By Texas Medicaid Contract definition, DQ LLC is a Material Subcontractor to DQ USA", and therefore DQ LLC which is providing administrative and management services to fulfil the requirements of the Texas contract is a Material Subcontractor to DQ USA.

128. DQ USA knowingly failed to provide to HHSC information pertaining to its Material Subcontractor DQ LLC, that was required to be provided by its contractual provision "4.2.4 Section 4- Material Subcontractor Information"

Contractual Document (CD) Attachment B-1 – Medicaid/CHIP Dental Services RFP, Sections 1-5, specifically required information of the Material Subcontractor:

**4.2.4- Material Subcontractor Information**

For each Material Subcontractor, the Dental Contractor must provide:

1. The Material Subcontractor's legal name, trade name, dba , acronym, and any other name under which the Material Subcontractor does business.

2. The type of service(s) to be provided by the proposed Material Subcontractor.

 3. The Respondent's estimated annual payments to the Material Subcontractor.

4. The physical address, mailing address, and telephone number of the Material Subcontractor's headquarters office, and the name of its Chief Executive Officer.

5. Whether the Material Subcontractor is an Affiliate of the Respondent, or is an unrelated third party (see  Attachment A, "Dental Contract Terms and Conditions," for a definition of "Affiliate").

6. **If the Material Subcontractor is an Affiliate, then provide**:

 a. Identification of the Material Subcontractor's parent organization, and the Material Subcontractor's relationship to the Respondent;

b. The proportion, if any, of the Material Subcontractor's total revenues that are received from non-Affiliates.   If the Material Subcontractor has significant revenues from non-Affiliates, then also indicate the portion, if any, of those external (nonAffiliate) revenues that are for services similar to those that the Respondent would procure under the proposed Subcontract;

**c.** A description of the proposed method of pricing under the Subcontract;

d. Indicate if the Respondent presently procures, or has ever procured, similar services from a non-Affiliate;

e. The number of employees (staff and management) who are dedicated full-time to the Affiliate's business;

f. Whether the Affiliate's office facilities completely separate from the Respondent and the Respondent's parent.   The approximate number of square feet of office space that are dedicated solely to the Affiliate's business;

 g. Attach an organization chart for the Affiliate, showing head count, Key Personnel names, titles, and locations; and

h. Indicate if the staff and management of the Affiliate are directly employed by the Affiliate itself, or are they actually, from a technical legal perspective, employed by a different legal entity (such as a parent corporation). What corporation's name shows up on the employee's W2 form?

7. A description of each Material Subcontractor's corporate background and experience, including its estimated annual revenues from unaffiliated parties, number of employees, location(s), and identification of three (3) major clients.

8. **A signed letter of commitment from each Material Subcontractor** that states the Material Subcontractor's willingness to enter into a Subcontractor agreement with the Respondent, and a statement of work for activities to be subcontracted. Letters of Commitment must be provided on the Material Subcontractor's official company letterhead, signed by an official with the authority to bind the company for the subcontracted work. The Letter of Commitment must state, if applicable, the company's certified HUB status.

 9. Type of ownership (e.g., wholly-owned subsidiary of a publicly-traded corporation; wholly-owned subsidiary of a private (closely-held) stock corporation;  subsidiary or component of a non-profit foundation; subsidiary or component of a governmental entity such as a County Hospital District; independently-owned member of an alliance or cooperative network;  joint venture (describe owners); etc.).  Indicate the name of the ultimate owner (e.g., the name of a publicly-traded corporation or a County Hospital District).

10. Indicate status (any/all that may apply): sole proprietor, partnership, corporation, forprofit, non-profit, privately owned, and/or listed on a stock exchange.

11. The name and address of any sponsoring corporation or others (excluding the Subcontractor's parent) who provide financial support to the Material Subcontractor, and indicate the type of support, e.g., guarantees, letters of credit, etc. Indicate if there are maximum limits of the additional financial support.

12. The name and address of any health professional that has a five percent (5%) or greater financial interest in the Material Subcontractor, and the type of financial interest.

**13. The state in which the Material Subcontractor is incorporated, commercially domiciled, and the state(s) in which the organization is licensed to do business**

14. **The Material Subcontractor's federal taxpayer identification number**.

15. Whether the Material Subcontractor had a managed care contract terminated or not renewed for any reason within the past three (3) years.  In such instance, the Respondent must describe the issues, the parties involved, and provide the address and telephone number of the other party to the contract. The Respondent must also describe any corrective action taken to prevent a future occurrence of any problems that may have led to the termination; and

 17. The website address (URL) for the homepage(s) of any website(s) operated, owned, or controlled by the Material Subcontractor including any websites run by another entity on the Material Subcontractor's behalf.  If the Material Subcontractor has a parent, then also provide the same for the parent organization, and any parent(s) of the parent organization.  If no websites exist, provide a clear and definitive statement to this effect. **(emphasis added)**

**(3)      Knowingly Failed to Provide to HHSC Signed
Letter of Commitment from GTESS**

129. Contractual Document (CD) Attachment B-1 – Medicaid/CHIP Dental Services

RFP, Sections 1-5, specifically required:

> "A signed letter of commitment from each Material Subcontractor that states the Material Subcontractor's willingness to enter into a Subcontractor agreement with the Respondent, and a statement of work for activities to be subcontracted. Letters of Commitment must be provided on the Material Subcontractor's official company letterhead, signed by an official with the authority to bind the company for the subcontracted work. The Letter of Commitment must state, if applicable, the company's certified HUB status."

130.   DQ USA's response was:

"Please see Tab M for the subcontractor letter of commitment."

131. Attached hereto as Exhibit "D" and incorporated by reference is an attachment that DQ USA submitted with its business proposal entitled "Business Specifications Binder Attachments List". DQ USA submitted this list also a 2nd time on pages 2-3 of the business proposal showing a list of attachments that accompanied DQ's proposal. The column "Tab" shows attachments A-U as submitted attachments. A review of the attachments reveals that all the attachments were present along with DQ USA's proposal submission EXCEPT for Tab M "Signed Letters from Material Subcontractors".

132. DQ USA knowingly failed to provide to HHSC as required by the above contractual provision a "signed letter of commitment" from GTESS which DQ USA identified as its Material Subcontractor in its May 10, 2011 proposal, evidenced by the omission of the letter along with the other attachments. Failure to provide this was knowing because DQ USA provided all the other attachments along with the proposal except for a GTESS signed letter of commitment. DQ USA had signed the contract certifying that it accepted the RFP terms and conditions and guaranteed that its proposal complied with the RFP requirements, and should have known that by its contractual obligation, DQ USA was required to provide to HHSC a letter of commitment from each Material Subcontractor.

**(4)      Knowingly Failed to Provide to HHSC Required
Information of DSM's Sanction**

133. DQ USA was required to provide to HHSC information of its parent Dental Service of Massachusetts ("DSM")'s letter of deficiency, corrective action and sanction issued to it in 2012 per its contractual provision, which DQ USA failed to provide.

**(a)      HHSC Contractual Provisions Requiring
DQ USA to Provide DSM's Sanction**

134. Contractual Document (CD) Attachment B-1 – Medicaid/CHIP Dental Services RFP, Sections 1-5, specifically required:

**4.2.3 Section 3 – Corporate Background and Experience.**

**With respect to the Respondent and its parent** (and including other managed care subsidiaries of the parent), briefly describe any regulatory actions, **sanctions, and/or fines** imposed by any federal or Texas regulatory entity or a regulatory entity in another state within the last three (3) years. The response should include a description of any **letters of deficiencies, corrective actions, findings of non-compliance, and/or sanctions**. Please indicate which of these actions or fines, if any, were related to Medicaid or CHIP programs. HHSC may, at its option, contact these clients or regulatory agencies and any other individual or organization whether or not identified by the Respondent. **(emphasis added)**

135. HHSC Contractual Elements includes the HHSC UMCM, and all attachments and amendments. Per HHSC,

"Uniform Managed Care Manual (UMCM) means the manual published by or on behalf of HHSC that contains policies and procedures required of the Dental Contractor. The UMCM, as amended or modified, is incorporated by reference into the Contract".

136. "UMCM Chapter 5.8 Report of Legal and Other Proceedings and Related Events **section III (3)**" required DQ USA to provide information of DSM's sanctions, that stated:

**Section III:**

**Medicaid or CHIP Managed Care Matters Pertaining to the MCO or Affiliates:**

MCO must notify HHSC of the following matters relating to the MCO or its Affiliates, **including parent companies**, if the MCO knows about the matters and they pertain to the CHIP or Medicaid managed care programs:

(1) all known media reports involving actual, potential, or perceived misreporting of costs or profit levels;

(2) all governmental actions or proceedings involving actual, potential, or perceived misreporting of costs or profit levels;

(3) subject to the exclusions listed in Section VII, **other governmental actions or proceedings involving the assessment of sanctions, remedies, fines, or penalties, including Liquidated Damages, in excess of $500,000.**

For purposes of this Section, the MCO is not required to notify HHSC of governmental actions or proceedings initiated by HHSC. IV. Matters Pertaining to the MCO or Parent

**VII. Exclusions**: The following matters related to the MCO or its Affiliates are excluded from the requirements of Section III, Subsection (3). In addition, the following matters related to the MCO are excluded from the requirements of Section VI, provided the worst-case outcome would not have an adverse material effect on the financial condition or results of operations of the MCO, as defined in Section IV: (1) personnel actions, including wrongful discharge, discrimination, or harassment, if the actions do not involve whistleblower claims; (2) property damage; (3) personal injury claims, where there is no related issue involving the provision of medical services or coverage; (4) landlord/tenant issues; (5) equipment vendor issues; (6) lease issues; (7) mechanic's liens; (8) provider claims adjudication appeals; (9) complaints, actions, litigation, or disputes with HHSC; (10) trademark, patent, or other intellectual property disputes; and (11) any other matter, which is not required for disclosure under Sections II–VI and where the amount claimed and at stake continues to be less than $500,000 or its value in non-cash components, including the total of alleged or potential damages, relief, penalties, costs, fines, interest, legal fees, arbitration fees, court costs, and all components. **(emphasis added)**

### (b)    DSM As DQ USA's Parent Provided Unconditional Corporate Guarantee for DQ USA

137. DQ USA in its RFP response identified Dental Service of Massachusetts, Inc.

("DSM") as its ultimate parent and therefore was required to disclose proceedings against DSM:

*The legal name of the Respondent's ultimate parent (e.g., the name of a publicly-traded corporation, or a County Hospital District, etc.).*

The legal name of DentaQuest's ultimate parent company is Dental Service of Massachusetts, Inc.

138. Contractual Document Attachment "D" provided a "Corporate Guarantee" of DSM as a parent which unconditionally guaranteed DQ USA's performance in the Texas Medicaid Contract. The Corporate Guarantee stated, in relevant part:

"In consideration of the execution by the Texas Health & Human Services Commission ("Beneficiary") of the HHSC Contract No. 529-12-003-00002, as amended, hereinafter the ("Contract") with DentaQuest USA Insurance Company, Inc. ("Subsidiary"). Dental Service of Massachusetts, Inc. ("Parent") unconditionally and irrevocably guarantees to Beneficiary, on the terms and conditions herein, the full and faithful performance by Subsidiary of all of the obligations. Undertaken by Subsidiary pursuant to the Contract and as it may hereafter be amended, modified, or extended from time to time, by work authorizations or otherwise.

If subsidiary fails or refuses to complete any of its obligations, Parent shall complete, or cause to be completed. The obligation that Subsidiary failed or refused to complete, or be considered to be in breach of the Contract to the same extent as Subsidiary, pursuant to the terms and conditions of the Contract..."

### (c)     DQ USA Failed to Provide Information as required by Contractual Provision

139. DQ USA knowingly failed to provide to HHSC in its contract amendments information of its parent DSM's letter of deficiency, corrective action plan and fine issued by Massachusetts Executive Office of Health and Human Services ("EOHHS") on August 10, 2012, which was required to be provided by the contractual provision "4.2.3 Section 3 – Corporate Background and Experience" and "Section III (3) UMCM Chapter 5.8 Report of Legal and Other Proceedings and Related Events" .

140. On August 10, 2012, EOHHS issued a letter to Ms. Fay Donohue, President and CEO of DSM, providing a corrective action plan to correct its claims processing issues, imposed

a $2,928,000 fine in liquidated damages, and provided a letter of deficiency stating that DSM

had failed to meet its claims processing requirements. Specifically, the letter stated:

"Dear Ms. Donohue:

The purpose of this letter is to notify you that, as further described below, the Executive Office of Health and Human Services (EOHHS) is requiring Dental Service of Massachusetts, Inc. (DSM) to pay liquidated damages under the Dental Third Party Administrator Contract between EOHHS and DSM (Contract). The Contract requires among other things, that DSM:

a. **Establish a process** to ensure that only medically necessary covered services are paid for eligible members in accordance with MassHealth regulations (Contract Section 3.3 A.8.)
b. **Ensure its claims processing system** pays claims according to dental program policy (Contract Section 3.3.B.2.)
c. Ensure its claims processing system accurately performs edits and audits in accordance with EOHHS policies and procedures and federal requirements (Contract Section 3.3.B.3.)
d. Is liable to EOHHS for liquidated damages if it does not, unless approved in writing by EOHHS, perform claims processing in accordance with the requirements of MassHealth regulations at 130 CMR 420.000 and 130 CMR 450.000 (Contract Section 5.3. and Appendix H, Exhibit 2, Item 13)

Pursuant to Section 5.3.B of the Contract, EOHHS has determined that DSM is liable for **liquidated damages in the amount of $2,928,000…**

As documented by State Audit Reports, reports generated by MassHealth, and reports by DSM itself, **DSM has failed to meet claims processing requirements** over 85,000 times where it has inappropriately paid over 85,000 claims to 922 providers…

Sincerely,

Priscilla Portis, Contract Officer" **(emphasis added)**

141. The above corrective action plan issued by EOHHS to correct DSM's claims

processing system, where DQ LLC was the Subcontractor to DSM and performed its claims

processing, arose from the Massachusetts Office of State Auditor (OSA)'s audit of

MassHealth's administration of dental claims which in its November 16, 2010 official audit

report stated: "Our audit identified that deficiencies in the Dental Program's claims processing system has resulted in millions of dollars in ineligible claims and, in some cases, potentially fraudulent claims being paid by MassHealth."

142. DQ USA also knowingly failed to provide information to HHSC in its contract amendments of the settlement agreement entered between EOHHS and DSM on April 24, 2013, an excerpt of which follows:

> "This settlement Agreement (the "Agreement") is entered into as of April 24, 2013 by and between Commonwealth of Massachusetts, Executive Office of Health and Human Services (EOHHS) and Dental Service of Massachusetts, Inc. (DSM), a corporation with principal offices located at 465 Medford Street, Boston, Massachusetts (DSM)…
>
> DSM shall pay to EOHHS the sum of $2,928,000 payable in twelve (12) monthly installments" …

### (5)   Knowingly Failed to Provide to HHSC Information of a 2014 Lawsuit Where DSM and DQ LLC Were Defendants

143. The HHSC UMCM Chapter 5.8 Report of Legal and Other Proceedings and Related Events also required the following disclosure:

a.  Section II. Matters Pertaining to the MCO or Affiliates

MCO must notify HHSC of the following matters related to the MCO or its affiliates, **including parent companies**:

(3) **Class-action complaints or lawsuits**, petitions for class-action status, filed against the MCO or its Affiliates

b.  Section VIII. Notice Requirements

**The MCO must provide written notification within 30 calendar days** after becoming aware of a matter.  In addition, by September 1 of each year, the MCO must submit a cumulative annual report listing all current or pending matters, and all matters resolved or dismissed during the past 12 months. (**emphasis added**)

144. DQ USA Knowingly failed to provide to HHSC information required to be provided by the above contractual provision of a 2014 class action lawsuit in Massachusetts pertaining to the Orthodontic Medicaid program, where the named defendants were DQ LLC and DSM (parents of DQ USA), that was required per the Uniform Managed Care Manual Contractual provision-- Section II "Matters pertaining to the MCO or Affiliates" and Section VIII "Notice requirements."

145. The class action lawsuit *H.et al v. Deval Patrick, et al*-- where the plaintiffs were Medicaid Orthodontists of Massachusetts Association Inc., Bennett C, Robert C, Sam H, Steven L and Gloriely Z  and named Defendants were DQ LLC, DSM, Deval Patrick, Brent Martin, John Palanowicz and Kristin Thorn, was filed on January 15, 2014 and terminated on September 14, 2016.

### (6)      Knowingly Failed to Provide Information Pertaining to DQ LLC's Financials

146. Contractual Document (CD) Attachment B-1 – Medicaid/CHIP Dental Services RFP, Sections 1-5, specifically required:

Section 4.2.3.4 Financial Report of Parent Organization, and Corporate Guarantee

If another corporation or entity either substantially or **wholly owns the Respondent**, submit the most recent detailed financial reports (as required above in Section 4.2.3.3) for the Parent Organization.  If there are one (1) or more intermediate owners between the Respondent and the ultimate owner, this additional requirement is applicable only to the ultimate owner.   **(emphasis added)**

147. DQ LLC is undoubtedly the "wholly owned" parent of DQ USA as evidenced by the Defendants' own Certificate of Interested Persons filed on October 10, 2019 in connection with this lawsuit which states:

"DentaQuest USA Insurance Company, Inc, is a wholly owned subsidiary of DentaQuest, LLC, which is a wholly owned subsidiary of DentaQuest Group, Inc., which is a wholly owned subsidiary of Catalyst Institute Inc. No publicly held corporation owns 10% or more of Catalyst Institute, Inc.'s stock".

148. DQ USA knowingly failed to provide to HHSC information required to be provided by the contractual provision of financials of its wholly owned parent DQ LLC; instead, DQ USA provided financials of DSM. This information was required by "Section 4.2.3.4 Financial Report of Parent Organization, and Corporate Guarantee". This response is false because even though DQ USA identified DSM as its ultimate parent in the RFP response, DQ LLC was not an "intermediate parent", but was the wholly owned parent of DQ USA and therefore DQ LLC's financials should have been provided instead. The response of DQ USA stated:

"Please refer to Tab L for the DSM audited financials for 2010".

**(7)     Knowingly Failed to Provide Information
Of its Organizational Conflict of Interest**

149. HHSC defined Organizational Conflict of Interest and required disclosure of the same:

(i)  Contract Section 13.03 Organizational conflicts of interest.

**a.  Definition**
An organizational conflict of interest is a set of facts or circumstances, a relationship, or other situation under which the Dental Contractor or a Subcontractor has past, present, or currently planned personal or financial activities or interests that either directly or indirectly:
  i.    Impairs or diminishes the Dental Contractor's or Subcontractor's ability to render impartial or objective assistance or advice to HHSC; or
  ii.   Provides the Dental Contractor or Subcontractor an unfair competitive advantage in future HHSC procurements (excluding the award of this Contract).

**B. Warranty:**
   Except as otherwise disclosed and approved by HHSC prior to the Effective Date
   of the Contract, Dental Contractor warrants that, as of the effective date and to the
   best of its knowledge and belief, there are no relevant facts or circumstances that
   could give rise to an organizational conflict of interest affecting this contract…

**C. Continuing duty to disclose:**
   **i.**   Dental Contractor agrees that, if after the Effective Date, Dental Contractor
            discovers or is made aware of an organizational conflict of interest, **Dental
            Contractor will immediately and fully disclose such interest in writing
            to the HHSC project manager**. In addition, Dental Contractor must
            promptly disclose any relationship that might be perceived or represented
            as a conflict after its discovery by the Dental Contractor or by HHSC as a
            potential conflict. HHSC reserves the right to make a final determination
            regarding the existence of conflicts of interest, and Dental Contractor
            agrees to abide by HHSC's decision.
   **ii.**  The disclosure will include a description of the actions that Dental
            Contractor has taken or proposes to take to avoid or mitigate such conflicts.

**D. Remedy**
   **If HHSC determines that an organizational conflict of interest exists, HHSC
   may, at its discretion, terminate the Contract** pursuant to Subsection
   12.03(b)(9). **If HHSC determines that Dental Contractor was aware of an
   organizational conflict of interest before the award of this Contract and did
   not disclose the conflict** to the contracting officer, such nondisclosure will be
   considered a **material breach** of the Contract.  **(emphasis added)**. Furthermore,
   such breach may be submitted to the Office of the Attorney General, Texas Ethics
   Commission, or appropriate State or Federal law enforcement officials for further
   action. **(emphasis added)**

### (a)   DQ USA Had an Organizational Conflict of Interest

150. Relator reincorporates by reference the facts set forth in section VI B 2 – "DQ LLC

had a controlling interest in CDC and Controlled CDC's internal business operations" to

reiterate that DQ LLC controlled CDC. By its control, DQ LLC caused CDC to commit fraud

and abuse like upcoding of non-surgical extractions to surgical extractions and billing

procedures performed by non-credentialed dentists under the provider ID of credentialed

dentists, and never addressed the fraud that Relator raised nor made any attempts to correct

them. Because DQ LLC also provided administrative and management services to CDC, DQ

LLC submitted CDC's Medicaid claims for unlawful acts to its subsidiary DQ USA, with whom

CDC dentists were contracted with. While serving at the same time as an administrator of the Texas Medicaid Contract, DQ LLC processed CDC's fraudulent claims to get reimbursement from HHSC, which demonstrates a flagrant conflict of interest. The profits made by CDC with DQ LLC's fraudulent conduct were used to pay bonuses of DQ LLC management employees.

### (b)   CDC's Board Minutes Indicated DQ Would Reimburse CDC's Uncredentialed Dentist Procedures, Validating the Conflict of Interest

151. CDC's September 24, 2013 Board Minutes reflect CEO Sharon Fulcher- Estes's statement: "We have learned that we can bill DentaQuest whether or not the provider has been credentialed, which can take anywhere between six to nine months. Claims will be back paid once the provider is credentialed"

### (c)   DQ USA's Non-Disclosure of its Organizational Conflict of Interest was in Violation of Section 13.03 of Its Contract with HHSC

152. DQ USA knowingly failed to provide to HHSC information required to be provided by the contractual provision of its organizational conflict of interest with CDC through its parent DQ LLC that was required of contractual provision "Section 13.03 Organizational Conflict of Interest -Section C Continuing duty to disclose". HHSC is unaware of the nature of parties involved and relationships between CDC, DQ LLC and DQ USA. As per HHSC's definition of Conflict of Interest:

A. **DQ USA was not able to offer Impartial Advise to HHSC Regarding CDC fraud**: DentaQuest USA's Special Investigative Compliance Officers, Ron Price and Nick Messuri, were also CDC's compliance officers, who approached Relator to investigate compliance issues of Medicaid fraud that Relator raised, never investigated it, nor reported it to HHSC (equivalent to "the fox guarding the henhouse"). Because DQ USA was not able to offer an impartial and/or objective advise to HHSC regarding CDC fraud, it confirms DQ USA's organizational conflict of interest as per HHSC definition.

B. **DQ USA had an unfair competitive advantage at future procurement**: HHSC's fixed monthly premium rate cell calculation to MCOs incorporate an amount for dental services performed, an amount for administering them and a risk margin. Because DQ LLC pushed CDC to see more patients and to perform more dental services, the premium rate paid to them by HHSC would be higher due to the increased dental services at CDC and amount for administering them. DQ USA at contract negotiations could show they served more members/processed more claims, that could give them an unfair competitive advantage at future contract procurement in securing more members, which again per HHSC's definition was a Conflict of Interest. **(emphasis added)**

### 3.  DQ USA Violated Section TMFPA 36.002 (6) (A) And Has Presented Approximately $5.2 Billion in Claims for Unlawful Acts

153. Relator reincorporates by reference facts discussed herein from Section VI C 1 (1) (a)- (d) "DQ LLC provided services for DQ USA in the Texas Medicaid Contract" that DQ LLC and its employees and agents provide services for the Texas Medicaid Contract. DQ LLC is currently providing these services without being a party to the Medicaid contract and without a Texas Department of Insurance ("TDI") license, which is required.

154. DQ LLC sent chart audit letters to Relator and other CDC dentists in August and September of 2015, which confirmed that DQ LLC performed Quality Improvement, Utilization Review and Claims Processing functions for the Texas Medicaid Contract.

155. Specifically, Relator's August 19, 2015 and September 10, 2015 chart audit letters and four other CDC Garland clinic dentists September 11, 2015 letter stated:

"One of the primary responsibilities of **DentaQuest, LLC (DentaQuest)** is to ensure that State Medicaid funds are utilized for the performance of quality cost effective dentistry. To that end, DentaQuest performs a number of Quality Improvement and Utilization Review functions on a continuing basis. The goals of the Utilization Review and Quality Improvement program are to maximize the level of reimbursement to our dentists, while concurrently supporting the delivery of the highest quality, cost effective dentistry.

One of the cornerstones of **Quality Improvement/Utilization Review** programs is patient chart audits. The purpose of the audit process is to monitor and assure that all

services submitted for reimbursement are rendered as billed, appropriately coded following the descriptors and nomenclature as published in the American Dental Association Current Dental Terminology and that all meet the accepted standard of care. The other is to verify that the charting and patient treatment record requirements for participating providers are being incorporated into everyday practice. The Clinical Management Department **completed its review of all paid claims** and as a result of this analysis has identified patterns of utilization and variances from the billing patterns of network providers that warrant further review. As a result of this data analysis DentaQuest will be performing audits on the following enrollees that had services performed in your office" **(emphasis added**)

Please submit a copy of Treatment notes, Treatment plan, Medical history Signed consent, Diagnostic quality radiographs, Pre and post-operative diagnostic quality radiographs, Sedation record related to the above mentioned members for the identified timeframe, to the following address: DentaQuest, Inc. Attention: Tracey Roach 12121 North Corporate Pkwy, Mequon, WI 53092

### (1)  DQ LLC Does Not Have a TDI License in Texas

156. DQ USA's 2011 RFP response provided an organizational chart of DQ companies reflecting DQ LLC's licensure status in States of Mississippi, Maryland, Ohio, Pennsylvania, Rhode Island, Utah, Nevada, and South Carolina, but **NOT** in Texas.

157. The Defendants' own January 17, 2020 brief in this case stated that DQ LLC is not licensed in Texas.

158. A search with the TDI for licensed companies authorized to operate in Texas does not yield any results for DQ LLC.

### (2)  DQ LLC Was Required by HHSC and TDI to Have a License to Perform Services as an Administrator

159. DQ LLC was required by HHSC to be licensed by the TDI to provide services and deliverables under its contract. The TDI requires administrators to have a Certificate of Authority (license). TDI also requires Utilization Review Agents ("URA") to be certified. DQ LLC is not licensed in any capacity by the TDI nor certified as a URA from 2011 to present.

160. Following regulations set forth requirements for licensure of an administrator:

### (a)      HHSC Requirement for Licensure
### To Perform Services

161. HHSC sets forth the following requirement for licensure in its contract requiring

DQ USA's employees, agents, or Subcontractors who provide services or deliverables under

the Contact to be properly licensed:

**Section 7.02 Dental Contractor responsibility for compliance with laws and regulations**

*Dental Contractor is responsible for ensuring each of **its employees, agents, or Subcontractors who provide Services or Deliverables under the Contract is properly licensed,** certified, and/or has proper permits to perform any activity related to the Services or Deliverables.* **(emphasis added)**

### (b)      TDI Requirement of Licensure
### for Administrators

162. The Texas Department of Insurance ("TDI") mandates administrators to have a

license (Certificate of Authority). Following is the TDI regulation:

(1) Texas Administrative code Title 28 Insurance, Part 1 -Texas Department of Insurance, Chapter 7- Corporate and Financial Regulation, Subchapter P- Administrators Rule, §7.1603 entitled "Certificate of Authority Required":

    a) Unless a person meets an exemption under Insurance Code §§ 4151.002, 4151.004, or 4151.0021, **a person acting as or holding themselves out as an administrator must hold a certificate of authority under Insurance Code Chapter 4151.**

    b) An administrator contractor and an administrator subcontractor must hold a certificate of authority under the Insurance Code Chapter 4151"

(2) Insurance Code, Title 13- Regulation of Professionals, Subtitle D- Other Professionals, Chapter 4151 -**Third Party Administrators**, Subchapter B- Certificate of Authority:

**Section 4151.051 Certificate of Authority Required**

a)   An individual, corporation, organization, trust, partnership, or other legal entity may not act as or hold itself as an administrator unless the entity is covered by and is engaging in business under a certificate of authority issued under this chapter.

b)   An administrator is required to hold only one certificate of authority issued under this chapter. **(emphasis added)**

163.  It is to be noted that the other bidders to the Texas Medicaid RFP's identified their parent as Material Subcontractor to provide administrative and management services and the parent had a Third-Party Administrator license ("TPA"). Following is some of the other bidder's parent TPA license status, which was the Material Subcontractor performing services under their respective contracts:

(i)  MCNA: Parent- Managed Care of North America Inc: TPA
(ii) Delta Dental: Parent- Delta Dental of California: TPA
(iii) Amerigroup: Parent Amerigroup Corporation: TPA
(iv) United Health Care: Parent Dental Benefit Provider: TPA

### (c)      TDI Requirement for URAs to Have Certificate of Registration

164.  TDI requires Utilization Review Agents (URAs) to have certificate of registration. TDI defines URA as:

 "Utilization Review Agents are registered or licensed entities that review requests for health care services being provided (concurrent), proposed to be provided (prospective), or already provided (retrospective). URAs determine whether services are medically necessary and appropriate and may also determine if services are experimental and investigational".

Insurance Code, Title 14 Utilization Review and Independent Review, Chapter 4201 Utilization Review Agents, Subchapter A General Provisions, Subchapter C Certification Sec 4201.101, "Certificate of Registration" required States:

**"A Utilization review agent may not conduct utilization review unless the commissioner issues a certificate of registration to the agent under this subchapter." (emphasis added)**

        **(3)     DQ USA knowingly Presented $5.2 Billion in Claims for Unlawful Acts for Services Rendered by DQ LLC Which is Not Licensed by TDI to Perform Services**

165. A "Claim" as defined in Chapter 36.001 of the Texas Medicaid Fraud Prevention Act ("TMFPA") as follows:

(1) "Claim" means a written or electronically submitted request or demand that:

(A) is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid or

(B) **states the income earned or expense incurred by a provider** in providing a product or a service and that is used to determine a rate of payment under the Medicaid program. **(emphasis added)**

166. A provider also is an MCO (TMFPA Section 36.001(9)(D):

"Provider" means a person who participates in or who has applied to participate in the Medicaid program as a supplier of a product or service and **includes…** (D) **a managed care organization….(emphasis added)**

167. Subsection (6) of TMFPA Section 36.002 states that a person commits an Unlawful Act if the person "knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who (A) is not licensed to provide the product or render the service, if a license is required".

        **(a)     HHSC Determined the Rate of Medicaid Payment From the FSR**

168. There are 2 Financial Statistical Reports ("FSRs") submitted by DQ USA each year:

(i) **Summary Income Statement** for the fiscal year that shows DQ USA's Revenue, Expenses (administrative and dental) and Net Income.

(ii) **Administrative expenses** for the fiscal year which include expenses for salary, utilities, equipment, supplies, marketing, amortization/depreciation, corporate allocations etc.

169. The FSR's for MCO's required certification signed by the MCO, and HHSC in the certification section referred to data submitted in the FSR (income earned, or expense incurred-"claim") as "encounter data":

"The named managed care organization, herein referred to as "MCO" or "Contractor," is authorized to **submit encounter data** to the Texas Health and Human Services Commission (HHSC) for services rendered by the undersigned MCO, in machine-readable form, as specified by HHSC. Contractor is also **required to submit data in the attached Financial Statistical Report (FSR)". (emphasis added)**

170. HHSC determined rate of Medicaid payment based on encounter data and financial data from the claims submitted. Rate Period 1 and 2 was used at the initial contract award.

**"Medicaid Premium Rate development**:  Rate Periods Following Rate Period 2.

HHSC will establish base Premium Rates for the Rate Periods following Rate Period 2 **by analyzing historical Medicaid Encounter Data and financial data.**  This analysis will include a review of historical enrollment and claims experience information; any changes to Covered Services and covered populations; rate changes specified by the Texas Legislature; and any other relevant information.  HHSC may modify the base Premium Rates using diagnosis based risk adjusters to yield the final Premium Rates". **(emphasis added)**

### (b)    DQ USA's Income Earned or Expenses Incurred Are the Claims Presented to the Medicaid Program

171. Attached hereto as Exhibit "E" and incorporated by reference is an FSR of DQ USA's Summary Income Statement for the Fiscal year September 2018 to August 2019. DQ USA's income earned was $641,429,960 million which is the amount presented in claims for unlawful acts that year. In the alternative, DQ USA's expenses the same year of $614,347,409 million would be the amount presented in claims for Unlawful Acts for services rendered by DQ LLC, which is not licensed to provide these services.

172. As an MCO, DQ USA (assisted by DQ LLC) has knowingly presented approximately $5.2 billion in claims for Unlawful Acts from 2012 March when contract inception took place to present, for services rendered by DQ LLC which is not licensed by the TDI to provide services, in violation of TMFPA section (6)(A), simply by virtue of the fact that the income earned or expense incurred by it as a Provider was used by the State to determine a rate of payment to it under the Medicaid program.

### 4.   $ 104 Million of Overinflated Administrative Expenses in DQ USA's Financial Statistical Reports ("FSR")

173. DQ USA and MCNA, the two Texas Dental Medicaid administrators, submit monthly administrative expenses to HHSC in their FSR's. HHSC defines Administrative expenses in its FSR as:

> "Administrative Expenses – includes those expenses that are directly or indirectly in support of the Texas Medicaid/CHIP Dental operations of the DMO. Administrative expenses include Salaries, Wages and other benefits, Payroll taxes, Utilities and Maintenance, Auditing and other consulting expenses etc".

174. DQ USA in its response to 2011 RFP provided information with respect to the qualifications of the DQ organization, referred to as "DentaQuest", to perform services for the RFP. However, the DQ organization was not identified as a Subcontractor for DQ USA and therefore was not a party to the Texas Medicaid Contract. DQ organization included DQ LLC were also not qualified to provide services to the Texas Medicaid Contract since they lacked an administrator license issued by the TDI.

175. FSR administrative expenses submitted by DQ USA contained false representations that claimed expenses for its corporate parent and DQ LLC employees who were not a party to the Texas Medicaid Contract. Furthermore, the expenses submitted were

over inflated and HHSC was paying DQ USA more than the amount required for the Texas Medicaid and CHIP operations.

176. DQ USA overinflated categories of administrative expenses such as salary, marketing, amortization/depreciation and corporate allocations in comparison with MCNA, the 2nd administrator, who has the same role as DQ USA. As described below, OIG in its January 9, 2020 report had similar findings, stating that DQ USA in its 2017 FSR had "Unallowable, Unsupported, and Overstated Expenses".

### (1)    DQ USA's Response to Some of the RFP questions Validate the Misrepresentations in the FSRs

177. The following DQ USA's 2011 RFP response support Relator's allegations of false representations in the FSRs.

(1) Number of Employees:

- - DentaQuest USA: "0"
- - DentaQuest has a staff of approximately 980 employees ("DentaQuest" was identified as "DentaQuest Group Inc. and its subsidiaries" in its RFP response)

(2) DentaQuest, LLC, the immediate parent company of DentaQuest USA, provides substantially all management and administrative services required for the conduct of the businesses of DentaQuest Group companies including DentaQuest USA

(3) Respondent Information and Disclosures:

   a. Part 1 Organization's Legal Name: DentaQuest USA Insurance Company

   b. Part 2 Respondent Contact Information: Steven Pollock, President

   c. Part 3 **Subcontractor Information:**

   - - GTESS Corporation
   - - Apple Specialty Advertising
   - - Marfield Corporate Stationery
   - - Harp Enterprises Inc.
   - - Trachmar

178. DQ USA was the "Proposer" for Louisiana Department of health, bureau of health services and financing and in its August 6, 2019 response to the RFP stated: "**DentaQuest, LLC** Immediate Parent Company **employs all staff, management, and executives**". (emphasis added). This confirms that DQ USA as of 2019 has no employees just like it stated in its 2011 Texas Medicaid RFP response.

### (a)   HHSC Required Certifications in FSR

179. HHSC required the Contractor to sign "certification" for FSR's stating:

"The named managed care organization, herein referred to as "MCO" or "Contractor," is authorized to submit encounter data to the Texas Health and Human Services Commission (HHSC) **for services rendered by the undersigned MCO**, in machine-readable form, as specified by HHSC. Contractor is also required to submit data in the attached Financial Statistical Report (FSR)".

180. HHSC also required certification for accurate data:

By signature below, Contractor certifies that the data or documents so recorded and submitted as input data or information, based on its best knowledge, information, and belief: are in compliance with Subpart H of the Balanced Budget Act Certification requirements; **are complete, accurate, and truthful**; and are in accordance with all Federal and State laws, regulations, policies, and the HHSC Contract in effect during the time covered in the report. Contractor further certifies that it will retain and preserve all documents as required by law or by the Contract, submit all or any part of the same, or permit access to same for audit purposes, as required by HHSC or any agency of the federal government, or their representatives. Document access and retention extends to source documents needed to verify any costs billed to or assessed to the Contractor by the Contractor's parent or any other Affiliate;  such source documents may include parts of the books and records of the parent or other Affiliate.

181. Collins as DQ USA's CFO signed the FSR (recall DQ USA has "0" employees")



   <u>James E. Collins, Chief Financial Officer</u>
         *Printed Name and Title of CEO, CFO, or equivalent (no delegates)*

   DentaQuest USA Insurance Co
         *On behalf of (legal name of Contractor)*

   Legal Signature of officer named above

         *Legal Signature of officer named above*

### (b)    DQ USA's False Representations in its FSR

182. Attached hereto as Exhibit "F" and incorporated by reference is an FSR of DQ USA's administrative expenses FSR for the period from September 2018 to August 2019.  It reveals several misrepresentations as discussed below.

183. The following were Material false representations in the FSR:

1.  <u>Line item 1</u>: DQ USA falsely claimed expenses for employees when it had no employees, and submitted salary, wages, and benefits expenses for approximately $ 7 million in the fiscal year.

    -   For the years 2012-2017, DQ USA reflected that it paid salaries of over $29 Million during the period 2012-2017, and this is a company that had **NO employees**! (technically it submitted expenses for "Ghost" employees).

2.  <u>Line item # 19 and 20</u>: DQ USA which had "0" employees and "0" experience falsely represented that it did not "outsource". How can DQ USA perform services on its own with no employees and no experience? It obviously had to outsource! DQ USA did so to conceal outsource to DQ LLC, who unlawfully provided services to the contract without a license. DQ USA also did not want to provide information of how much its payments to DQ LLC were to perform the services, when the contract required DQ USA to provide the information of how much DQ USA paid to its Material Subcontractor.

3.  <u>Line item 24</u>: DQ USA falsely claimed about $17 million in expenses for corporate under "Corporate Allocations". This was false because DQ USA did not have any DQ corporate entity and/or a DQ affiliate identified as a Subcontractor in its "Respondent Information and Disclosures" form it submitted with the RFP to fulfil the requirements of the contract as per HHSC definitions.

4.   DQ USA submitted claims in the FSR for services it never rendered because DQ LLC provided all its services.

**(c)      DQ USA's Over inflation of Administrative Expenses
Compared to MCNA who Has the Same Role as
DQ USA in the Texas Medicaid Contract**

184. Attached hereto as Exhibit "G" and incorporated by reference is an FSR of MCNA's administrative expenses for the period from September 2018 to August 2019.  In comparison to DQ USA's FSR from Exhibit "F" and incorporated by reference for the same fiscal year, the over inflation of DQ USA is explicit and gross:

1.  Line item # 13: MCNA's Marketing, PR and outreach (excl Salaries) expense was $158,840 versus DQ USA's $2,125,403

2.  Line item # 16: MCNA's Depreciation and Amortization expense was $112,466 versus DQ USA's $4,329,864

3.  Line item # 24: MCNA's Corporate Allocations was $4,233,322 versus DQ USA's $17,642,325

4.  Line item # 1: MCNA's salaries, wages and benefits (excl. bonuses) was $6,272,729 versus DQ USA's $7,279,385

185. It is to be noted that in line item # 19, MCNA identified its outsourced services followed by line item # 27 where MCNA disclosed its outsourced services was to its parent and Material Subcontractor- Managed Care of North America (**TPA**) for $ 33,355,395, and to Media Riders Inc. for $1,566,892. This contrasts with DQ USA as discussed above, that did not identify its outsourced services.

186. Relator contends that DQ USA should not claim expenses for salaries and corporate allocations for the DQ organization and/or DQ LLC since they were not a party to the Texas Medicaid Contract and did not have a license to provide the services. However, even if they were a party to the contract, an analysis and comparison of DQ USA's administrative expenses for line items # 1, 13, 16 and 24 with that of MCNA for the period from 2012-2017 as noted in the chart below reveals the over-inflation by DQ USA when compared with the

**same number of members** of MCNA. These are the same line items referenced above in exhibits "F" and "G" that were over inflated, depicting a pattern of DQ USA's over inflation over last 8 years.

| YEAR | ADMINISTRATIVE EXPENSES | DQ USA | MCNA | DQ Overinflation |
|---|---|---|---|---|
| **2012 Mar-2013 Aug** | SALARIES | 6,058,950 | 2,930,70 | 3,128,247 |
| | MARKETING | 3,528,280 | 255,181 | 3,273,099 |
| | AMORTIZATION | 1,812,253 | 237,396 | 1,574,857 |
| | CORPORATE ALLOCATIONS | 16,884,334 | 8,012,298 | 8,872,036 |
| 2012-2013 Total DQ Over inflation | | | | 16,848,239 |
| **2013-2014** | SALARIES | 5,629,193 | 2,295,098 | 3,334,095 |
| | MARKETING | 2,304,042 | 64,783 | 2,239,259 |
| | AMORTIZATION | 1,463,853 | 189,556 | 1,274,297 |
| | Corporate Allocations | 11,920,606 | 4,982,884 | 6,937,722 |
| 2013-2014 Total DQ Over inflation | | | | 13,785,373 |
| **2014- 2015** | SALARIES | 6,190,749 | 2,652,694 | 3,538,055 |
| | MARKETING | 1,262,056 | 74,117 | 1,187,939 |
| | AMORTIZATION | 2,139,005 | 212,245 | 1,926,760 |

| | | | | |
|---|---|---|---|---|
| | CORPORATE ALLOCATIONS | 13,475,053 | 4,631,195 | 8,843,858 |
| 2014-2015 Total DQ Over inflation | | | | 15,496,612 |
| 2015-2016 | SALARIES | 6,133,237 | 4,608,947 | 1,524,290 |
| | MARKETING | 1,564,480 | 130,192 | 1,434,288 |
| | AMORTIZATION | 2,973,024 | 225,700 | 2,747,324 |
| | CORPORATE ALLOCATIONS | 12,791,481 | 5,067,445 | 7,724,036 |
| 2015-2016 Total DQ Over inflation | | | | 13,429,938 |
| 2016-2017 | SALARIES | 5,781,977 | 4,249,287 | 1,532,690 |
| | MARKETING | 1,465,142 | 132,185 | 1,332,967 |
| | AMORTIZATION | 3,466,131 | 154,192 | 3,311,939 |
| | CORPORATE ALLOCATIONS | 12,907,729 | 4,143,139 | 8,764,590 |
| 2016-2017 Total DQ Over inflation | | | | 14,942,156 |
| 2012-2017 Total DQ Over inflation | | | | 74,502,318 |
| Adding for 2018 and 2019 | | | | 104,502,318 |

187. The over-inflation in the other categories of Marketing, and amortization/depreciation is just as egregious, the result being that DQ USA over-inflated these 4 categories compared to MCNA by approximately $74.5 Million from 2012-2017, and over $100 Million extrapolating two more years since the Texas Medicaid Contract was awarded.

Where did that money go? To DQ LLC, of course, to support its operations in other states in violation of HHSC requirements that the expenses must only be incurred to support Texas operations.

### (2)    OIG in its January 9, 2020 Report Had Similar Findings as Relator in DQ USA's 2017 FSR

188. The Texas Office of Inspector General ("OIG") audited DQ USA ("DentaQuest" as OIG referred to it) in its FSR's and issued a report on January 9, 2020. The audit scope included DentaQuest policies, practices, and activities related to (a) claims processing and (b) financial and performance reporting for the period of September 2016 through February 2018, and other relevant activities through April 2019.

### (a)    What OIG Found (Relevant to Relator's claims)

189. OIG found that DQ USA in 2017 had "Unallowable, Unsupported, and Overstated Expenses". Per the OIG report:

1. DentaQuest's 2017 Administrative Expenses FSR included unallowable costs that were not related to Texas Medicaid and CHIP, such as communication and postage costs, **sales and marketing costs, and amortization costs**.
2. It also **overstated its salary expenses** and did not have support for some **depreciation costs**. **(emphasis added)**

### (b)    What OIG Recommended

190. OIG stated in its report that: "Medicaid and CHIP Services (MCS) through its contract oversight responsibility, including the use of tailored remedies as appropriate, should require DentaQuest to:

1. Address and **correct unallowable and overstated expenses** reported on the FSR
2. **Ensure corporate allocations are effectively tracked**, appropriately recorded in its financial system, and accurately reported to HHSC.

3. Timely disable individuals' access to its claims and financial system upon termination of employment. **(emphasis added)**

191. OIG refers to DQ USA as "DentaQuest" in its report, but did not discuss DQ USA's fraudulent conduct in the FSRs that Relator has alleged such as claiming expenses for employees it did not have, or claiming expenses for DQ Corporate that is not a party to Texas Medicaid Contract.

## 5. DQ USA False Statements in Certifying Compliance to Contractual Terms

192. Relator reincorporates the facts by reference as set forth above in section VI C 1 (4) (a) of HHSC's contractual elements in its initial contract and subsequent amendments and realleges that DQ USA had a continuing duty to be compliant with the terms and conditions of its contract with HHSC. This is because the contract terms and conditions that also included the RFP terms and conditions were the same at the initial contract award and at each amendment A, B, C, D, E, F, G, H, I, J, K and so forth. By DQ USA's signature at the initial contract award and the amendments thereof, DQ USA certified it would be compliant with each contractual provision. This compliance was material to HHSC because it set forth assurances in Section 1.03 entitled "Inducements", which HHSC relied upon in making the award of the contract and renewals thereof.

193. Attached hereto as Exhibit "H" and incorporated by reference is a chart which describes in detail DQ USA's false statements in certifying compliance with the Texas Medicaid Contract's terms and conditions. These false statements were knowingly committed by DQ USA and DQ LLC which permitted them to receive payments under the Medicaid

program and/or receive a benefit under the Medicaid program that was unauthorized or greater than the payment authorized.

### 6. DQ LLC Caused CDC to Commit Unlawful Acts in Violation of TMFPA

194. Section 36.001 (9)(A) defines "Provider" as a management company that manages, operates, or controls another provider. DQ LLC operated as a provider to CDC and caused CDC to commit unlawful acts in violation of TMFPA 36.002 (1).

### (a) DQ LLC Caused CDC to Upcode Simple Extractions to Surgical Extractions

195. CDC, at the direction of DentaQuest LLC, routinely up-coded simple extractions to surgical extractions as simple extractions (ADA code D 7140) were being performed routinely by the CDC dentists, but they were billed as surgical extractions (D 7210, D 7250). Relator specifically observed these violations during the time period October 2014 until November 2015 when she was wrongfully terminated. Examples of what Relator personally observed are as follows:

(f)    Relator had a few Garland patients that she referred to Dentist Dr. Sauter for extractions at the Saturday Deharo clinic and CDC billed a higher fee where the clinical notes of the dentist did not reflect a surgical procedure being performed and the patient interview did not corroborate a surgical procedure as defined by ADA CDT codes;

(g)    Dentist Dr. Shenoy had also noted that her patients whom she referred to Sauter at the Saturday Deharo clinic for extractions were charged a surgical extraction fee where she believed that the extractions were simple and should have been billed a simple extraction fee;

(h)    Relator saw a patient from the CDC Vickery clinic week of August 17th of 2015 where an extraction was performed, and the patient related to Relator the extraction

procedure that led to Relator's conclusion that the patient had only a simple extraction, but she paid a surgical extraction fee;

(i)     Dental Assistant Lopez assisted Relator during weekdays at CDC's Garland clinic and assisted Sauter on Saturdays at CDC's Deharo clinic had seen Relator perform simple extractions and surgical extractions.  He stated to Relator several times that Sauter billed almost every extraction as surgical. Lopez mentioned to Relator that he felt bad for the patients; and

(j)     On August 21, 2015, Dental Assistant Salazar, recoded a simple extraction procedure Relator performed to a surgical extraction when Relator and her chairside assistant Dental Assistant Carmona had billed the root tip extraction as simple. When Relator confronted Salazar about changing the procedure code to surgical without her knowledge or authorization, she stated: " I have assisted the primary Dental Director, several times and she always bills Root tips as surgical extractions"

### (b)     DQ LLC Caused CDC to Bill Services of a Non-Credentialed Dentist Under the Provider ID of a Credentialed Dentist

196. Per HHSC, "Credentialing means the process of collecting, assessing, and validating qualifications and other relevant information pertaining to a dental provider to determine eligibility and to deliver medically necessary Covered Dental Services".

197. State Medicaid programs require that each dental practice obtain a provider number. Each dentist who will be performing dental services on Medicaid patients must be individually credentialed and admitted as a participating provider. The credentialing process for a new dentist may take up to 90 days or longer.

198. Parker hired several new dentists at CDC and became aware that the process of credentialing the dentist would take 90 days or longer, during which CDC could not submit claims to Medicaid for services performed by the new dentist. Therefore, CDC, at the direction of DQ LLC management, submitted claims for Unlawful Acts for dental services performed by a non-credentialed dentist under the provider number of a credentialed dentist, when the

credentialed dentist never rendered services on the patient. This is a violation of TMFPA section 36.002(1) because (a) it is a material misrepresentation that the credentialed dentist performed the procedure on the patient when they never did; and (b) it is a material misrepresentation that the non-credentialed dentist is a participating provider in the Medicaid program by using another person's billing ID .

     199. Examples of same observed by Relator are as follows:

(a)    CDC's Board of Director Minutes of a meeting on September 24, 2013 reflecting that CEO Sharon- Fulcher Estes stated: "We have learned that we can bill DentaQuest whether or not the provider has been credentialed, which can take anywhere between six to nine months. Claims will be back paid once the provider is credentialed";

(b)    As a Dental Director of CDC, Relator raised concerns in February 2014 to Mr. Jeff Parker, Chairman of the Board of Directors for CDC, after Sharon Fulcher-Estes, CEO, informed her that that Jeff Parker from DentaQuest management planned on billing un-credentialed dentist prophylaxis procedures under the ID of credentialed dentists. Relator called Mr. Parker on February 24, 2014, and had a discussion with him stating it was illegal and not to do so;

(c)    Dental Assistant McFarland stated to Relator that she "walked away" from her job to protect her license when in June of 2014 she noticed un-credentialed Dentist Dr. Rice's treatment procedures being billed under credentialed Dentist Dr. Pena's Medicaid ID and she raised a concern to the office manager Manuela Deleon at the CDC Irving clinic. Per Dental Assistant McFarland, Manuela called Parker, chairman of CDC, who showed up immediately to the Irving clinic and told her to "stop that drama" but never addressed the billing fraud McFarland brought up. McFarland decided to quit instantly as she did not want her DA license to be affected. HR Zimmer got involved to investigate McFarland's quitting, but Chris Haugen, VP of business development, essentially told HR to mind her business thereby thwarting any Medicaid fraud investigation;

(d)    Dental Assistant Clark a CDC Medicaid biller, on October 24, 2015 had a conversation with Relator and stated that she quit CDC as she was asked by Sarrell Dental (who is also operated by DQ LLC) to perform illegal activities of billing un-credentialed dentist procedures under ID credentialed dentists;

(e)    Relator had a conversation in October of 2015 with Clark wherein she stated that because Relator was the dental director credentialed at multiple locations,

DentaQuest wanted new dentists that were not credentialed to be billed under Relator's Medicaid ID when she did not see the patient. She stated: "I can guarantee you they would have billed your ID under another doctor's when you actually did not see the patient";

(f)   CDC HR Zimmer quit CDC on July 30, 2014 citing intolerable conditions at CDC stating that she had witnesses who several times observed DentaQuest bill un-credentialed dentists under credentialed dentists' ID's;

(g)   Dentist Dr. Pena on January 6, 2015 sent an email to Relator stating her concern that "Patients seen by other doctors may be using my name when they were assigned to me via Medicaid at offices where I am currently not working. Do you know if it is true, and if it is legal?" Dr. Pena's second email stated: "I got the suspicion when Maria Rodriguez (DA) called me and said she had made an appointment at East Dallas for her child. She said that I was the provider assigned for her child but she knew I wasn't working at that location, so she called me to inquire". To Relator's knowledge, Dr. Pena had Medicaid credentials at all CDC locations;

(h)   On September 10, 2015 a procedure performed by another provider on a DentaQuest patient was billed under Relator's ID when she had the day off and did not see the patient. On September 11, 2015 when she went back to work, she notifed Nadia Dorise, operation manager's log in ID that billed the procedures fraudulently, and sent her and Kevin Sutton, CDC's Executive Director, an email where Nadia stated that it was an error and that she had provided her ID to the front desk at Garland that day. Sutton ignored the issue and said he would have finance correct it, but as of Relator's last day at CDC, no action was taken;

(i)   Mandy Holland, from CDC's licensing and credentialing department, emailed Relator on January 28, 2015, asking her to fill out her MCNA application and contract since Relator's credentials expired in December of 2014. Mandy's email stated that the application once approved would reinstate her and go back and cover all her procedures since January 1, 2015. In April 2015, Relator noted in one of her patient's ledgers where MCNA would not pay due to Relator's lack of credentials, CDC noted in the ledger as "Charitable Contributions"; and

(j)   Relator was credentialed with DentaQuest in June 2015 at the new East Dallas location using her existing DentaQuest credentials without her authorization. Relator was also credentialed with Dental Health Alliance ("DHA"), Aetna, United, Concordia and Assurant at four of CDC's outside of Dallas locations (Abilene, Corpus Christi, Temple and Texas City) using her existing DHA credentials and without her authorization.

### D.      FACTS PERTAINING TO RELATOR'S RETALIATION AND WRONGFUL TERMINATION

200. Relator reincorporates the facts by reference above in section VI A "Overview of Relator's Original Source Knowledge in Uncovering DentaQuest fraud".

201. For facts leading to Relator's retaliation and wrongful termination, Relator will focus on events after February 26, 2015 that led to her retaliation and wrongful termination.

#### 1.      Relator's MCNA Medicaid Contract Was Forged by DQ Management

202. Relator's contract with Medicaid administrator MCNA was up for renewal in early 2015. However, in March of 2015, Relator notified Kevin Sutton ("Sutton") who was the operations manager at that time, that she was refusing to sign the MCNA contract renewal due to CDCs' non-compliance with its terms and conditions. MCNA required the provider to follow Federal and State regulations, and not participate in any fraud and abuse, both of which CDC was in violation of, as evidenced by Relator's complaints.

203. On April 7, 2015, Relator found out that CDC was ready to submit her Medicaid contract renewal to MCNA. Surprised since she had not signed the contract, Relator opened the MCNA contract attachment that was inadvertently sent to her email by Sutton. Relator was shocked to find out that the contract ready for submission contained her forged initials (30 times on 30 pages) and contained her signature from a previously submitted MCNA document, with the date now altered.

204. Thereafter, Relator retained counsel Bob Goodman, who on May 1, 2015 sent a letter to CDC with complaints of Relator's employment issues, MCNA contract forgery and CDC's Medicaid and Federal Grants fraud involving upcoding of non-surgical extractions,

billing of uncredentialed dentists under credentialed dentists, overtreatment, pressure to produce, and non-compliance with Federal Grant terms and conditions falsely certifying them at renewal, invoking the FCA Sec. 3730 (h) and TMFPA Sec. 36.115 anti-retaliation provisions.

205. Since CDC did not address nor attempt to correct her complaints, Relator continued her complaints of Medicaid and Federal Grants fraud to CDC Executive Director Sutton via emails dated July 15, 2014, August 5, 2015, September 23, 2015, September 25, 2015 and October 7, 2015, stating that the issues from her counsel's May 1, 2015 letter were not being addressed.

### 2. Relator's Retaliation and Unlawful Termination on November 6. 2015 After Letter Sent Complaining of Medicaid and Federal Grants Fraud

206. Relator was subjected to the following retaliatory events after her Counsel's May 1, 2015 letter complaining of Medicaid Fraud and Federal Grants Fraud:

(a) <u>Executive Director bullying to move Relator out of Garland clinic</u>: CDC's Executive Director Kevin Sutton on June 18, 2015 pressured Relator to sign the MCNA credentialing application that she had refused to sign due to forgery of her initials and non-compliance with the contract's terms and conditions. Sutton threatened to move Relator out of her Garland clinic location to grant funded locations since she did not have MCNA Medicaid credentials;

(b) <u>Additional Executive Director pressure for Relator to sign MCNA contract</u>: Sutton showed up in the Parkland lunch room on July 6, 2015 where Relator was clocked out for lunch and in front of other Parkland staff, asked to speak to Relator. When Relator got back to the clinic, Sutton was waiting for Relator with Suzanne Peterson (from HR) and pressured Relator to sign the MCNA contract, stating that the issues she raised in her counsel's letter occurred before he came on board with CDC and to put all of it behind and move forward. Relator let him know that she would not sign the MCNA credentialing application until the issues she raised in her counsel's letter were addressed and asked Sutton to email her documentation of his conversation so she could show to her counsel. This request was unprofessional and an attempt to bully Relator to sign the Medicaid contract without attempting CDC compliance;

(c) <u>Lack of appropriate staff for Garland clinic</u>: From July 2015 until Relator's termination, she was not provided with full time staff to operate the clinic. She complained by email that she needed to be provided with full time staff to take care of the clinic responsibilities and patient care, but was ignored;

(d)   Garland clinic closings: From June 2015 until her termination, there was an unwarranted shutting down of the Garland clinic without providing reasoning which resulted in complaints from several patients. Relator sent several emails with concerns about the clinic shutting down as she was concerned for the safety and welfare of her patients, but her concerns were again ignored. In addition, Relator's front desk stated: "I don't know why they are not filling Garland appointment book, they are doing it for other clinics";

(e)   Inappropriate After-Hours Call Policy: CDC singled Relator out on August 14, 2015 by Co-Dental Director providing her with a difficult and unwarranted after-hours policy to answer patient calls in the middle of night and within 15 minutes of the answering service contacting Relator. Relator sent emails to Co-Dental Director copying Sutton questioning the after-hours policy that was provided only to Relator, but she was ignored;

(f)   Singled out for Chart Audit by DentaQuest LLC's Medicaid Administrator: DQ LLC sent Relator a chart audit letter on August 21, 2015 by Fed-Ex delivery instead of regular mail and addressed it to Relator instead of CDC, which was the provider per her DentaQuest contract and which should have been the addressee. DentaQuest, LLC accused Relator of billing fraud when she practiced dentistry with highest plane of integrity and honesty;

(g)   DQ LLC attorneys contacting Relator directly without approaching her counsel and without revealing their identity: On August 21, 2015, Ron Price emailed Relator copying DentaQuest, LLC attorneys Nicholas Messuri and Kara Rutledge, for the purpose of investigating CDC compliance issues. His signature showed that he was the chief compliance and privacy officer with an address of 465 Medford Street, Boston MA 02129 from an email ID "greatdentalplans" and did not reveal his identity as an attorney, knowing that Relator had counsel representing her who had sent a letter on May 1, 2015 with her complaints of CDC Medicaid and Federal Grants fraud that he wanted to speak to her about. Relator found out a month later that Mr. Price, Messuri and Ms. Rutledge were all DentaQuest LLC attorneys;

(h)   Email from Sutton pressuring Relator to sign MCNA contract: Relator had sent an email to Nadia Dorise, operation manager, copying Sutton, complaining of the unwarranted Garland clinic closure affecting patient care. Sutton then responded back making sarcastic remarks about Relator's passion for her patients, accusing her of not signing credentialing applications and the alleged difficulty of booking patients for her. Sutton then on September 23, 2015 stated that Relator had not given him any credentialing updates, and again pressured her to sign the MCNA credentialing contract. Relator responded back asking Sutton to substantiate his statements and stated that she had provided him plenty of updates on the MCNA credentialing application and again reminded him of her position of not being able to sign it because the issues she had raised in her counsel's letter were not corrected, but rather totally ignored by Sutton;

(i)   Shutting Relator out of CDC clinics blocking her access to patients: After Parkland shut nine CDC clinics down on September 25, 2015 citing OSHA and Infection Control Issues, there were still 4 CDC clinics open and CDC dentists from the shutdown clinics were redistributed to those 4 clinics locations with the result being that all dentists were

working at those 4 clinics except Relator. From that time until November 5, 2015, she was not scheduled to work at any of the CDC locations. Relator was concerned about her patients and not being able to provide continuity of care or tend to any emergencies, so she emailed the Co-Dental Director requesting access to the Garland clinic so she could access her patient charts and follow up, but she ignored Relator's requests and lied to her that the Garland clinic was closed to everyone when she was working out of that very location. In fact, another Dental assistant sent Relator a text that she was at the Garland clinic pulling her charts to send to DentaQuest for the chart audit request; and

(j)     Relator's access to Garland clinic and CDC was completely shut off until the day of her termination on November 6, 2015.

207.   Relator requested a copy of her 2011 DentaQuest contracts by a September 30, 2015 email to Sutton and follow up email on October 7, 2015, to understand its terms and conditions pursuant to patient records audit letters she received from DQ LLC on August 19, 2015 and September 10, 2015. In the letters, DQ LLC represented itself to her as the Texas Medicaid administrator, accusing Relator of billing fraud and asking Relator to send her patient records to its Wisconsin office.

208.   Relator received her DentaQuest contract on October 30, 2015 and upon reviewing it was shocked to find out that she signed her contract with the entity DQ USA on September 30, 2011, representing itself as "DentaQuest" and not with DQ LLC which had sent her the record audit letter on August 19, 2015. She was further confused because DQ LLC also represented itself as "DentaQuest", but DQ LLC was not a party to her contract with DQ USA (Provider service agreement between DQ USA and Texas Dentists) and would therefore be committing HIPAA violations auditing her patient records. However, on page 27 of the contract DQ LLC asked Texas Dentists for authorization to disburse funds without stating its relationship to DQ USA in the provider agreement.

209. Relator became suspicious of who "DentaQuest" and the "True" HHSC administrator was, suspecting that HHSC may not be aware. She was further concerned that HHSC may not have been aware that DentaQuest "LLC" was performing its contractual obligations, despite not being a party to the Texas Medicaid Contract, and also despite the fact that it had a conflict of interest with CDC.

210. Accordingly, on November 5, 2015, Relator sent an email to Sutton to investigate her DentaQuest contracts to find out who HHSC's "True" administrator was, invoking the TMFPA's anti-retaliation provision 36.115. Relator's email stated:

> "Mandy emailed me my DentaQuest Medicaid documents last week. I had a chance to review them and have questions and concerns with the documents. Could you provide me the contact information (Name, email ID and Ph#) of the DentaQuest staff person I need to contact to address my questions and concerns? I want to reiterate as per my counsel's 5/1/15 letter "Dr. Rajan is specifically invoking the protection of the Texas Medicaid Fraud Prevention Act, including section 36.115".

211. Relator's email access was cut off on November 6, 2015, less than 24 hours after she sent the above email to Sutton. The next day, on November 7, 2015, Relator received a termination letter on CDC letter head, stating that her position had been allegedly eliminated, citing "clinic closures". Todd Cruse, DQCG's President, was copied on the letter. (Cruse was also a DQ LLC employee). The termination package included a proposed "Release of Claims" offering Relator money for a release of all claims which Relator did not sign. CDC retained several other dentists who were younger and less qualified than Relator.

212. Relator experienced severe emotional and physical distress from her retaliation in 2015 and after her termination, for which she has had to seek psychological counseling and put on anti-anxiety and sleep medications by her physician as well as several sessions of physical therapy and hospitalization for steroid shots to relieve her aggravated neck and back pain.

213. The anti-retaliation provision of the FCA and TMFPA protects employees, contractors or other agents of a company from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer" because the employee, contractor, or agent investigated, reported or sought to stop a company from engaging in practices which defraud the United States government.

214. Relator would show that CDC in this case retaliated against Relator in violation of 31 U.S.C. §3730(h) and TMFPA § 36.115, because Relator has demonstrated that: (1) she engaged in protected activity; and (2) that she was discriminated against because of her protected activity. An employee, contractor, or other agent engages in "protected activity" in the context of FCA and TMFPA retaliation when he or she opposes the company's attempt to get a false or fraudulent claim paid or approved by the Government, and where that opposition to fraud "reasonably could lead to a viable FCA and/or TMFPA action," or when litigation is a reasonable possibility. Investigatory efforts (such as those undertaken by Relator) short of filing suit constitute protected activity for purposes of the anti-retaliation provision. Relator was discriminated against "because of" conduct in furtherance of a FCA and TMFPA suit, as Relator has shown that CDC had knowledge of the protected activity and that its retaliation was motivated, at least in part, by Relator engaging in protected activity.

## E. FALSE CLAIMS SUBMITTED AFTER DENTAQUEST
## OBTAINED THE COLORADO MEDICAID CONTRACT

215. DentaQuest USA made false statements that it was providing the services and incurring the expenses to submit claims, knowing that the services rendered, and expenses incurred were by its unlicensed parent DentaQuest, LLC, which was not a party to the contract and was not identified as a Subcontractor in DentaQuest USA's proposal despite the requirement to do so in the RFP, which further caused HIPAA violations.

216. DentaQuest, USA's response to a RFP in the State of Nevada provides confirmation that DentaQuest, USA could not perform services on its own, but DentaQuest, LLC was providing administrative and management services in Colorado since the contract inception. In its response, unlike in Colorado, DentaQuest USA disclosed that DentaQuest, LLC (whom it identified as a subcontractor) performed its administrative and management services, as well as for other DentaQuest entities for the past 10 years. In its March 29, 2017 response to RFP in Nevada, it disclosed the following:

> "All references herein to "DentaQuest" or the "DentaQuest enterprise" shall mean Vendor and all entities that Vendor is controlled by, controls, or is under common control with. **DentaQuest USA** Insurance Company, Inc., which is a direct, wholly owned subsidiary of DentaQuest, LLC, **is the Vendor** and bidding entity that will execute the contract ("Contract") with the Nevada Division of Health Care Financing and Policy resulting from the Request for Proposal 3290 for Dental Benefits Administrator (the "RFP") . **DentaQuest, LLC**—which is currently the DentaQuest enterprise's primary operations entity—**will be providing typical administrative and management services under the Contract as a subcontractor to Vendor"**

> "**For more than ten years, DentaQuest entities contracting with state agencies, commercial clients, and health plans all over the country have subcontracted with DentaQuest, LLC (whether as a subsidiary, affiliate, or parent) to provide typical administrative and management services**. The examples of DentaQuest capabilities and success stories described in detail throughout this RFP proposal are due to the expertise,

ingenuity, entrepreneurship, and hard-work of the employees of DentaQuest, LLC, which is currently the DentaQuest enterprise's primary operations entity".

217. In addition, DentaQuest Office Reference Manual ("ORM") for Colorado Medicaid Program confirms that Authorizations, Paper claims and Electronic claims are processed by DentaQuest, LLC. Specifically, "Health First Colorado" DentaQuest ORM asks providers to submit authorizations and claims to DentaQuest, LLC address-- PO box # 2906, Milwaukee, WI 53201-2906, and Electronic Claims via Clearinghouse - Payer ID CX014.  The fact that the address above and Payor ID is that of DentaQuest, LLC is confirmed by:

  (a)   "Smiles for Children" Virginia Medicaid Program ORM, where DentaQuest, LLC is the Contractor, displaying the above DentaQuest, LLC address for Authorizations, Claims and specifically Electronic Claims to be sent via Clearinghouse - Payer ID CX014, and address to be included in the Electronic Claims: DentaQuest, LLC PO box # 2906, Milwaukee, WI 53201-2906.

  (b)   DentaQuest, LLC who is the Subcontractor to DSM in Massachusetts to administer the MassHealth Medicaid program has the same address PO box # 2906, Milwaukee, WI 53201-2906, as evidenced by Massachusetts Executive Office of Health and Human Services ("EOHHS") website directing dentists to submit their material to the above DentaQuest, LLC address.

218. Since the inception of the Contract in December of 2014 until present, DentaQuest has billed the State of Colorado Medicaid program approximately $25.7 Million. It is Relator's position that the value of damages is three times that amount per existing case law given that the Contract was procured by fraud, thus making each and every claim submitted to Medicaid fraudulent for the entirety of the Contract.

## F.  FALSE CLAIMS SUBMITTED AFTER DENTAQUEST
## OBTAINED THE TENNESSEE MEDICAID CONTRACT

219. DentaQuest USA made false statements that it was providing the services and incurring the expenses to submit claims, knowing that the services rendered, and expenses incurred were by its unlicensed parent DentaQuest, LLC, which was not a party to the contract and was not identified as a Subcontractor in DentaQuest USA's proposal despite the requirement to do so in the RFP, which further caused HIPAA violations.

220. DentaQuest, USA's response to a RFP in the State of Nevada provides confirmation that DentaQuest, USA could not perform services in its own, but DentaQuest, LLC was providing administrative and management services in Tennessee since the contract inception. In its response, unlike in Tennessee, DentaQuest USA disclosed that DentaQuest, LLC (whom it identified as a subcontractor) performed its administrative and management services, as well as for other DentaQuest entities for the past 10 years. In its March 29, 2017 response to RFP in Nevada, it disclosed the following.

"All references herein to "DentaQuest" or the "DentaQuest enterprise" shall mean Vendor and all entities that Vendor is controlled by, controls, or is under common control with. **DentaQuest USA** Insurance Company, Inc., which is a direct, wholly owned subsidiary of DentaQuest, LLC, **is the Vendor** and bidding entity that will execute the contract ("Contract") with the Nevada Division of Health Care Financing and Policy resulting from the Request for Proposal 3290 for Dental Benefits Administrator (the "RFP") . **DentaQuest, LLC**—which is currently the DentaQuest enterprise's primary operations entity—**will be providing typical administrative and management services under the Contract as a subcontractor to Vendor"**

"**For more than ten years, DentaQuest entities contracting with state agencies, commercial clients, and health plans all over the country have subcontracted with DentaQuest, LLC (whether as a subsidiary, affiliate, or parent) to provide typical administrative and management services**. The examples of DentaQuest capabilities and success stories described in detail throughout this RFP proposal are due to the expertise,

ingenuity, entrepreneurship, and hard-work of the employees of DentaQuest, LLC, which is currently the DentaQuest enterprise's primary operations entity".

221. In addition, DentaQuest Office Reference Manual ("ORM") for Tennessee Medicaid Program confirms that Authorizations, Paper claims and Electronic claims are processed by DentaQuest, LLC. Specifically, "TennCare" DentaQuest ORM asks providers to submit authorizations and claims to DentaQuest, LLC address-- PO box # 2906, Milwaukee, WI 53201-2906, and Electronic Claims via Clearinghouse - Payer ID CX014. The fact that the address above and Payor ID is that of DentaQuest, LLC is confirmed by:

(a)    "Smiles for Children" Virginia Medicaid Program ORM, where DentaQuest, LLC is the Contractor, displaying the above DentaQuest, LLC address for Authorizations, Claims and specifically Electronic Claims to be sent via Clearinghouse - Payer ID CX014, and address to be included in the Electronic Claims: DentaQuest, LLC PO box # 2906, Milwaukee, WI 53201-2906; and

(b)    DentaQuest, LLC who is the Subcontractor to DSM in Massachusetts to administer the MassHealth Medicaid program has the same address PO box # 2906, Milwaukee, WI 53201-2906, as evidenced by Massachusetts Executive Office of Health and Human Services ("EOHHS") website directing dentists to submit their material to the above DentaQuest, LLC address.

## VII.    CAUSES OF ACTION

### A.  COUNT ONE-- SUBSTANTIVE VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
[31 U.S.C. §§ 3729(a)(A), (B),(D) and  (G)]]

222. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

223. This is a claim for treble damages, civil penalties and forfeitures under the FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *et seq.*, as amended ("FCA").

224. Through the acts described above, the Defendants, by and through their officers, agents, and employees: (i) knowingly presented, or caused to be presented, to the United States Government, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government. The corporate Defendants listed above authorized and ratified all the violations of the FCA committed by their respective officers, agents, and employees.

225. Through the acts described above and otherwise, defendants knowingly used false records and statements to conceal, avoid, and/or decrease the Defendants' obligations to repay money to the United States Government that the Defendants improperly and/or fraudulently received. Defendants also failed to disclose to the United States Government material facts that would have resulted in substantial repayments by the Defendants to the United States Government.

### 1. Summary of False Claims

226. The term "claim" as defined in Section 3730 of the FCA:

> (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--
>
>> (i) is presented to an officer, employee, or agent of the United States; or
>>
>> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property.

227.  A "False Claim" under Section 3729 of the FCA is defined as follows:

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property…or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,000 [currently approximately $10,781.40] and not more than $ 10,000 [currently approximately $21,562.80], as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

228. Additionally, Plaintiff/Relator on behalf of the U.S. Government is entitled to recover civil monetary penalties pursuant to the following statutes:

42 U.S.C. §1320a–7a. Civil Monetary Penalties

(A) IMPROPERLY FILED CLAIMS

Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that—

> (1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency (as defined in subsection (i)(1) of this section), a claim (as defined in subsection (i)(2) of this section) that the Secretary determines—

>> (A) is for a medical or other item or service that the person knows or should know was not provided as claimed, including any person who engages in a pattern or practice of presenting or causing to be presented a claim for an item or service that is based on a code that the person knows or should know will result in a greater payment to the person than the code the person knows or should know is applicable to the item or service actually provided,

>> (B) is for a medical or other item or service and the person knows or should know the claim is false or fraudulent,
>> (C)  is presented for a physician's service (or an item or service incident to a physician's service) by a person who knows or should know that the individual who furnished (or supervised the furnishing of) the service—

>>>  (i) was not licensed as a physician,
>>> (ii) was licensed as a physician, but such license had been obtained through a misrepresentation of material fact (including cheating on an examination required for licensing), or
>>> (iii) represented to the patient at the time the service was furnished that the physician was certified in a medical specialty by a medical specialty board when the individual was not so certified,

>> (D) is for a medical or other item or service furnished during a period in which the person was excluded from the Federal are program (as defined in section 1320a–7b(f) of this title) under which the claim was made pursuant to Federal law.

(E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary;

(2) knowingly presents or causes to be presented to any person a request for payment which is in violation of the terms of (A) an assignment under section 1395u(b)(3)(B)(ii) of this title, or (B) an agreement with a State agency (or other requirement of a State plan under subchapter XIX of this chapter) not to charge a person for an item or service in excess of the amount permitted to be charged, or (C) an agreement to be a participating physician or supplier under section 1395u(h)(1) of this title, or (D) an agreement pursuant to section 1395cc(a)(1)(G) of this title;

(3) knowingly gives or causes to be given to any person, with respect to coverage under subchapter XVIII of this chapter of inpatient hospital services subject to the provisions of section 1395ww of this title, information that he knows or should know is false or misleading, and that could reasonably be expected to influence the decision when to discharge such person or another individual from the hospital;

(4) in the case of a person who is not an organization, agency, or other entity, is excluded from participating in a program under subchapter XVIII of this chapter or a State health care program in accordance with this subsection or under section 1320a–7 of this title and who, at the time of a violation of this subsection—

(A) retains a direct or indirect ownership or control interest in an entity that is participating in a program under subchapter XVIII of this chapter or a State health care program, and who knows or should know of the action constituting the basis for the exclusion; or

(B) is an officer or managing employee (as defined in section 1320a–5(b) of this title) of such an entity;

(5) offers to or transfers remuneration to any individual eligible for benefits under subchapter XVIII of this chapter, or under a State health care program (as defined in section 1320a–7(h) of this title) that such person knows or  should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under subchapter XVIII of this   chapter, or a State health care program (as so defined);

(6) arranges or contracts (by employment or otherwise) with an individual or entity that the person knows or should know is excluded from participation in a Federal health care program (as defined in section 1320a–7b(f) of this   title), for the provision of items or services for which payment may be made under such a program;

(7) commits an act described in paragraph (1) or (2) of section 1320a–7b(b) of this title;

(8) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program; or

(9) fails to grant timely access, upon reasonable request (as defined by the Secretary     in regulations), to the Inspector General of the Department of Health and Human Services, for the purpose of audits, investigations, evaluations, or other statutory functions of the Inspector General of the Department of Health and Human Services;

(8) orders or prescribes a medical or other item or service during a period in which the person was excluded from a Federal health care program (as so defined), in the case where the person knows or should know that a claim for such medical or other item or service will be made under such a program;

(9) knowingly makes or causes to be made any false statement, omission, or misrepresentation of a material fact in any application, bid, or contract to participate or enroll as a provider of services or a supplier under a Federal health care program (as so defined), including Medicare Advantage organizations under part C of subchapter XVIII, prescription drug plan sponsors under part D of subchapter XVIII, Medicaid managed care organizations under subchapter XIX, and entities that apply to participate as providers of services or suppliers in such managed care organizations and such plans;

(10) knows of an overpayment (as defined in paragraph (4) of section 1320a–7k(d) of this title) and does not report and return the overpayment in accordance with such section;

> shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $10,000 for each item or service (or, in cases under paragraph (3), $15,000 for each individual with respect to whom false or misleading information was given; in cases under paragraph (4), $10,000 for each day the prohibited relationship occurs; in cases under paragraph (7), $50,000 for each such act, in cases under paragraph (8), $50,000 for each false record or statement, or in cases under paragraph (9), $15,000 for each day of the failure described in such paragraph; or in cases under paragraph (9), $50,000 for each false statement or misrepresentation of a material fact). In addition, such a person shall be subject to an assessment of not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or State agency because of such claim (or, in cases under paragraph (7), damages of not more than 3 times the total amount of remuneration offered, paid, solicited, or received, without regard to whether a portion of such remuneration was offered, paid, solicited, or received for a lawful purpose; or in cases under paragraph (9), an assessment of not more than 3 times the total amount claimed for each item or service for which payment was made based upon the application containing the false statement or misrepresentation of a material fact).

229. Defendants in violation of the FCA and 42 U.S.C. Section 1320 knowingly made false statements material to a fraudulent claim.

230. Relator realleges and reincorporates by reference paragraphs under Section VI B "Federal Grants FCA Violations" and Exhibits "A" and "B" of this Complaint for causes of action below alleging violation of FCA provisions. A summary of the categories of False Statements submitted by the Defendants that Relator is aware of include, but are not limited to the following:

(a) CDC, at the direction of DQ LLC, made false statements to the grant funders (Title 5, HIV Ryan White, Irving, Garland and McKinney grants) material to fraudulent claims, of the entity providing administrative and management services to CDC, concealing that DQ LLC which had a controlling interest in CDC unlawfully provided administrative and management services to CDC without being registered as a DSO in the State of Texas which is required of DSO's and that DQ LLC processed CDC claims and submitted fraudulent claims to the grants.

(b) CDC, at the direction of DQ LLC, made false statements material to fraudulent claims in Title 5 grant and Ryan White HIV grant contracts, in response to grant question of CDC's controlling interest, concealing that DQ LLC had the controlling interest in CDC, performed management services for CDC and controlled its operations, causing CDC to commit fraud and abuse.

(c) CDC, at the direction of DQ LLC, made false statements in certifying compliance material to fraudulent claims to Title 5 grant contracts regarding use of grant funds, because the grant funds provided to non-profit CDC to treat indigent children and pregnant women were being misused by DQ LLC which had a controlling interest in CDC, to pay incentive bonuses to unlawful DQ LLC management employees, who were also CDC board members. DQ LLC management employees caused CDC to commit fraud and abuse and received bonuses based on their individual performance and CDC's performance. Funders if became aware would consider this as misuse of their funds, program abuse and illegal expenditure in violation of their contract terms and determine it to be a breach imposing a remedy ranging from contract termination to withholding funds as per their terms and conditions.

(d) CDC, at the direction of DQ LLC, made false statements in certifying compliance material to fraudulent claims to Ryan White HIV grant contract requirements, non-compliance of which would be regarded by the grant as Material breach resulting in disallowance of funds and withholding future contracts. The false certifications of compliance with grant terms and conditions included, but were not limited to:

(i) CDC board members being volunteers- however Parker, Chairman of CDC Board of Directors and Haugen, Secretary of the board were hired by CDC to provide management services, got paid by CDC for the services and even more

egregious, got paid bonuses based on CDC's performance, thereby not serving on CDC board in the "volunteer" capacity

(ii) Assigning rights to third parties and a 3rd party being the beneficiary- because Ryan White grant was unaware that DQ LLC was a third -party beneficiary of the contract and CDC assigned its administrative and management duties to DQ LLC personnel, who unlawfully provided DSO services to CDC, without being registered in Texas as one.

(iii) No profit being made at CDC- however CDC's controlling entity was DQ LLC and CDC board members Parker and Haugen were hired by CDC for management, pushed CDC for production and made profits to pay their bonuses

(e)     CDC, at the direction of DQ LLC, made false statements in certifying compliance to several grants terms and conditions, incorporated by reference in the chart under Federal grants FCA Violations (6) where CDC was non-complaint with several grants terms and conditions and the grants would have regarded non-compliance with their terms material and would consider it as breach of their contract imposing remedies as discussed in the chart.

(f)     CDC, at the direction of DQ LLC, submitted false claims for upcoding simple extraction to surgical extractions in federal grant claims, and upcoding denture treatment procedures.

231. With regard to each of the foregoing allegations (1) there were false statements by the Defendants involved; (2) made with the requisite scienter; (3) that were material; and (4) that caused the government to pay out money or to forfeit moneys due (*i.e.*, that involved a claim). Further, in connection with each of the foregoing allegations, there were (1) false or fraudulent claims; (2) which were presented, or caused to be presented, by the defendants in question to the United States for payment or approval; (3) with knowledge that the claims were false. In the alternative, these claims were submitted by the Defendants to Medicare for payment with reckless disregard for the truth or falsity of the claims submitted.

### 2.   Liability of Additional Defendants for FCA Violations

### (a)  DQ LLC Liable
### for FCA Violations of CDC

232. Relator realleges and reincorporates by reference paragraphs under Section VI B "Federal Grants FCA Violations" and Exhibits "A" and "B" of this Complaint and causes of action above, alleging violation of FCA provisions. DQ LLC had a controlling interest in CDC and it exercised such control over CDC's internal business and operations that the corporate separateness of the two entities should be disregarded.

### 3.   FCA Damages

233. The damages for this Count One for the value of the Federal Grants awarded is approximately $11 Million as set forth in the charts attached hereto and incorporated by reference.

### 4.   Relator's Award

234. The United States Government and its citizens have been damaged as a result of the Defendants' violations of the FCA. Accordingly, Relator requests that she be awarded 25% --30% of the recovery because the Government has elected not to intervene at this time, plus all attorneys' fees, costs and expenses incurred pursuant to the FCA which provides in pertinent part:

§ 3730. Civil Actions for False Claims

(d) AWARD TO QUI TAM PLAINTIFF

… (2) If the Government does not proceed with an action under this section, the person bringing the action or settling the claim shall receive an amount which the

court decides is reasonable for collecting the civil penalty and damages. The amount shall be not less than 25 percent and not more than 30 percent of the proceeds of the action or settlement and shall be paid out of such proceeds. Such person shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant.

### B. COUNT TWO -- RETALIATION UNDER
### THE FEDERAL FALSE CLAIMS ACT

235. Relator realleges and reincorporates the facts by reference as set forth above in sections VI D "Facts pertaining to Relator's retaliation and wrongful termination" for causes of action below, alleging violation of FCA anti-retaliation provision.

236. Relator discovered CDC Medicaid and Federal Grants fraud and was terminated by CDC on November 6, 2015 after a letter and series of emails complaining about CDC Medicaid and Federal grants fraud was received by DQ LLC and CDC. Prior to that time, Relator had always received exemplary reviews during her lengthy tenure until she began complaining about Medicaid and Federal grants fraud.

237. In a letter dated May 1, 2015, received by CDC and DQ LLC, Relator's counsel addressed several issues involving CDC's Medicaid and Federal Grants fraud and specifically invoked her anti-retaliation rights pursuant to TMFPA Section 36.115 and FCA Section 3730 (h). Relator in July through October of 2015 emails, complained to CDC Executive Director Sutton that the issues concerning fraud she raised in the May 1, 2015 letter were not addressed. Additionally, 24 hours prior to her termination, on November 5, 2015, Relator had sent an email to Sutton to investigate her DQ contracts and investigate the "True" administrator to Texas Medicaid Contract, invoking TMFPA anti-retaliation provision 36.115. Relator received a letter of termination by Fed-Ex on CDC letterhead stating that her position was allegedly eliminated.

238. The anti-retaliation provision of the False Claims Act protects employees, contractors or other agents of a company from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer" because the employee, contractor, or agent investigated, reported or sought to stop a company from engaging in practices which defraud the United States government.

239. CDC in this case retaliated against Relator in violation of 31 U.S.C. §3730(h), because Relator has demonstrated that: (1) she engaged in protected activity, (2) her employer, knew about the protected activity, and (3) she was retaliated against because of her protected activity. An employee, contractor, or other agent engages in "protected activity" in the context of FCA retaliation when he or she opposes the company's attempt to get a false or fraudulent claim paid or approved by the Government, and where that opposition to fraud "reasonably could lead to a viable FCA action," or when litigation is a reasonable possibility. Investigatory efforts short of filing suit (such as conducted by Relator in this case) constitute protected activity for purposes of the anti-retaliation provision. Relator was discriminated against and discharged while performing lawful acts "because of" conduct in furtherance other attempts to stop one or more violations of the FCA. Her employer CDC had knowledge of the protected activity.

240. Notice can be accomplished any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility. Relator submits that invoking her anti-retaliation rights under the FCA and/or TMFPA on two separate occasions (among the other facts set forth herein) constitutes "notice" by her employer CDC.

At a very minimum Relator notifying CDC that she was invoking the anti-retaliation provisions of the FCA and TMFPA on two separate occasions put her employer, CDC, on constructive notice of the fact that litigation was a reasonable possibility. CDC's retaliation against Relator was motivated, at least in part, by Relator engaging in protected activity.

241. While Relator contends that she has done so, Relator no longer has to show that her employer CDC was on notice of the "distinct possibility" of qui tam litigation. The "distinct possibility" standard is no longer the law, as cases decided after the anti-retaliation provisions in the 2010 amendment to the FCA have now adopted an "objective reasonableness" standard. Congress expanded the scope of the FCA's anti-retaliation provision in 2010 to include additional protection for "efforts to stop 1 or more violations of [the FCA]". Recent authority after the 2010 Amendment now hold that the "distinct possibility" test does not apply to the "efforts to stop" prong., and instead have held that an employee engages in protected activity under this prong when his "efforts are motivated by an **objectively reasonable belief that the . . . employer is violating, or soon will violate, the FCA."** The above facts demonstrate that Relator's efforts were indeed motivated by her **objectively reasonable** belief that CDC was or soon would be violating the FCA. (emphasis added).

### 1. Relief Requested Per FCA Anti-Retaliation Provision

242. The FCA protects whistleblowers such as the Relator in this case from retaliation and provides the following remedy for such discrimination:

§ 3730(h) Civil actions for false claims: RELIEF FROM RETALIATORY ACTIONS.

(1)    IN GENERAL.—Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because

of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

(2)     RELIEF.—Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

243. Relator seeks all remedies available under the FCA anti-retaliation provisions which are generally designed to "make the employee whole." Relator seeks as damages under this cause of action (a) reinstatement with the same seniority status that she would have had but for the discrimination; (b) two times the amount of back pay and interest on the back pay; and (c) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, plus compensatory damages.

244. Specifically, as damages for Relator being retaliated against in violation of the FCA and the TMFPA, she is entitled to the following as damages:

1. Twice Relator's backpay, amounting to $1,400,000 not including interest on the backpay as of the time of filing the Third Amended Complaint. Relator's annual salary was $150,000 at the time of her November 6. 2015 termination.
2. Compensation due to special damages sustained as a result of the discrimination, including but not limited to pain and suffering from physical distress. Relator suffered physical distress from aggravated neck and back pain since she was discriminated against by being overworked as a dental director and afterwards as a clinical dentist. Also due to the stress Relator faced from retaliation through her termination, her neck and back pain continued to be aggravated, for which she had to seek intense physical therapy and physician visits through 2016;
3. Pain and suffering from Emotional Distress as Relator suffered emotional distress on multiple occasions (i) after demotion, through the date of her termination due to retaliation and bullying by company management; and (ii) after Relator's November 6, 2015 termination when she, being the most qualified dentist, despite taking lawful action, was unlawfully terminated. Relator has had to seek intense counseling which she is still seeking as of the time of filing this Complaint. Relator's physician had to

put Relator on anti-anxiety, anti-depressant and other medications to help her sleep which Relator has never had to take until the discrimination from her employer; and

4. Litigation costs and reasonable attorney fees per the FCA's provisions allowing recovery for same.

### C.  COUNT THREE-- SUBSTANTIVE VIOLATIONS OF THE TEXAS MEDICAID FRAUD AND PREVENTION ACT [Texas Human Resources Code §§ 36.002 (1), (6), (10) & (12)]

245. Plaintiff re-alleges and incorporates the foregoing paragraphs as if set forth herein in full.

246.  A "Claim" as defined in Chapter 36.001 of the Texas Medicaid Fraud Prevention Act ("TMFPA") as follows:

(1) "Claim" means a written or electronically submitted request or demand that:

(A) is signed by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a Medicaid recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid, or

(B) states the income earned or expense incurred by a provider in providing a product or a service and that is used to determine a rate of payment under the Medicaid program.

247. A "Provider" is defined in Chapter 36.001(9) of TMFPA as follows:

(9)  "Provider" means a person who participates in or who has applied to participate in the Medicaid program as a supplier of a product or service and includes:
(A) a management company that manages, operates, or controls another provider;
(B)  a person, including a medical vendor, that provides a product or service to a provider or to a fiscal agent;
(C)  an employee of a provider;
(D)  **a managed care organization**; and
(E)  a manufacturer or distributor of a product for which the Medicaid program provides reimbursement. **(emphasis added).**

248.Chapter 36.002 of the Texas Medicaid Fraud Prevention Act provides that an unlawful act (hereinafter "Unlawful Act") is committed under the following conditions, among others:

A person commits an unlawful act if the person:

(1) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not  authorized or that is greater than the benefit or payment that is authorized…"

(3) knowingly applies for and receives a benefit or payment on behalf of  another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received....;

(5) except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(6) knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who:

> (A) is not licensed to provide the product or render the service,
>  if a license is required; or
> (B) is not licensed in the manner claimed;

(7) knowingly makes a claim under the Medicaid program for:

> (A) a service or product that has not been approved or
>  Acquiesced in by a treating physician or health care practitioner;
> (B) a service or product that is substantially inadequate or
> inappropriate when compared to generally recognized standards
> within the particular discipline or within the health care industry;
> or
> (C) a product that has been adulterated, debased, mislabeled, or
> that is otherwise inappropriate...;

(9) knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent...;

 (10) is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:

> (A) fails to provide to an individual a health care benefit or service that the
> organization is required to provide under the contract;
> (B) fails to provide to the commission or appropriate state agency information
> required to be provided by law, commission or agency rule, or contractual
> provision; or

(C) engages in a fraudulent activity in connection with the enrollment of an individual eligible under the Medicaid program in the organization's managed care plan or in connection with marketing the organization's services to an individual eligible under the Medicaid program;

(11) knowingly obstructs an investigation by the attorney general of an alleged unlawful act under this section;
(12) knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program..."

**\*Payment of a claim by Medicaid or the Government is not required pursuant to ANY of the foregoing Unlawful Acts in order to establish liability against the Defendants herein.**

### 1. DENTAQUEST'S UNLAWFUL ACTS AFTER CONTRACT PROCUREMENT

249. Relator realleges and reincorporates the facts by reference as set forth above in sections VI C "Unlawful Acts in violation of TMFPA after DQ USA obtained the Texas Medicaid Contract" and Exhibits "C", "D", "E". "F", "G", and "H" attached hereto in support of her allegations below, alleging violations of multiple TMFPA Section 36.002 provisions. All of the following Unlawful Acts were knowingly committed by DQ USA, DQ LLC and CDC. Under the TMFPA, a person acts "knowingly" with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. TEX. HUM. RES. § 36.0011.  For every allegation in this Count Three that Unlawful Acts were knowingly committed by the Defendants, Relator relies upon this definition in the TMFPA for its meaning.

250. The following were the violations of TMFPA Section 36.002 provisions:

### (1)       TMFPA Section 36.002(1)

251. Sec. 36.002(1) of the TMFPA provides that "a person commits an Unlawful Act if the person knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized".

252. The following are violations of Section 36.002(1) of the TMFPA after DQ USA's contract award knowingly committed by DQ USA and DQ LLC which permitted them to receive payments under the Medicaid program and/or receive a benefit under the Medicaid program that was unauthorized or greater than the payment authorized:

1. **False representations in the FSRs from 2012-present by Jim Collins, DQ USA CFO signature, certifying that the data was accurate and truthful:**
   a. DQ USA which had "0" employees, knowingly made material false representations that it had employees and claimed salaries, wages and benefit expenses for "ghost" employees, which permitted DQ USA to receive payment under the Medicaid program that was not authorized for DQ LLC employees which was not a party to the Texas Medicaid contract;
   b. DQ USA which had "0" employees and "0" experience knowingly made material false representations that it did not "outsource" its services, to conceal DQ LLC providing services unlawfully to the Texas Medicaid Contract which permitted DQ USA to receive payment under the Medicaid program that is not authorized;
   c. DQ USA which did not identify any of its corporate entities as a party to the Texas Medicaid Contract (Subcontractor), knowingly made material false representations in the FSRs that its corporate entity was a party to the Texas Medicaid Contract by claiming expenses under "Corporate Allocations" which permitted DQ USA to receive payment for its corporate affiliates under the Medicaid program that was not authorized; and
   d. DQ USA which had no employees and no experience to perform services for the Texas Medicaid Contract knowingly submitted claims for unlawful acts for services it never rendered because DQ LLC unlawfully provided all its services, which permitted DQ USA to receive payments under the Medicaid program that were not authorized.

**2. Over inflation of expenses in FSRs from 2012-present:**

DQ USA knowingly made material misrepresentations of expenses incurred in areas of salaries, marketing, amortization and depreciation and corporate allocations and overinflated them, which permitted DQ USA to receive payment under the Medicaid program that is greater than the payment authorized.

OIG's January 9, 2020 report had similar findings stating DQ USA had "Unallowable, Unsupported, and Overstated Expenses" in its 2017 FSR.

**3. False Statements in certifying compliance with contractual terms and conditions from 2012-present that were Material:**

DQ USA knowingly made several false statements in certifying compliance with Texas Medicaid Contract terms and conditions and its amendments thereof, when they were not compliant, which was material because it violated HHSC's contract inducement criteria and the required certifications document that DQ USA signed in 2011. The false certifications representing that DQ USA was compliant with contractual terms permitted DQ USA to receive payments from Medicaid program that was not authorized.

**4. Misrepresentations with CDC's billing from 2014-2015:**

a. CDC, Relator's ex-employer, at the direction of DQ LLC, knowingly routinely upcoded simple extraction procedures to surgical extractions and submitted claims for unlawful acts for the upcoded procedures to receive payments under the Medicaid program that is greater than the payment authorized; and

b. CDC, Relator's ex-employer at the direction of DQ LLC, knowingly submitted claims for unlawful acts for dental services performed by a non-credentialed dentist under the provider number of a credentialed dentist, when the credentialed dentist never rendered services on the patient, which is a violation of TMFPA section 36.002 (1) because (a) it is a material misrepresentation that the credentialed dentist performed the procedure on the patient when they never did; and (b) a material misrepresentation that the non-credentialed dentist is a participating provider in the Medicaid program by using another person's billing ID .

253. DQ USA knowingly made the foregoing material false statements and/or misrepresentations which permitted DQ USA to receive payments under the Medicaid program and/or receive a benefit under the Medicaid program that was unauthorized or greater than the payment authorized. DQ LLC is likewise liable for theses Unlawful Acts as it was the entity

unlawfully performing the services for the Texas Medicaid Contract. DQ LLC received payments under the Medicaid program and/or received a benefit under the Medicaid program that was unauthorized or greater than the payment authorized because it received benefits in the form of corporate allocations that went to it instead of DQ USA, the "party" to the Texas Medicaid Contract.

### (2)   TMFPA Section 36.002 (6)(A)

254. Subsection (6) of TMFPA Section 36.002 states that a person commits an Unlawful Act if the person "knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who (A) is not licensed to provide the product or render the service, if a license is required". Violations of this subsection can be summarized as follows:

> Defendants DQ LLC and DQ USA from 2012-present violated TMFPA Section 36.002(6)(A), because DQ USA knowingly presented approximately $5.2 billion in claims for Unlawful Acts for payment under the Medicaid program for services rendered by DQ LLC which is not licensed to render these services, because a license issued by the TDI is required by both Texas Medicaid Contract and the TDI to be the administrator for Texas Medicaid Contract. The claims presented are estimated to be $5.2 billion simply by virtue of the fact that the income earned by DQ USA per year is about $650 million and the income earned or expense incurred by DQ USA as a Provider was used by the State to determine a rate of payment under the Medicaid program as per the TMFPA 36.001(1)(B) definition of a claim. DQ USA had a continuing duty to but failed to disclose to HHSC after the award of the Texas Medicaid Contract that its parent performing the services in Texas was not licensed to do so.

### (3)   TMFPA Section 36.002 (10)(B)

255. Subsection (10) of TMFPA Section 36.002 states that it is an Unlawful Act if the person is a managed care organization that contracts with the commission or other state agency to provide or arrange to provide health care benefits or services to individuals eligible under the Medicaid program and knowingly:… "(B) fails to provide to the commission or appropriate

state agency information required to be provided by law, commission or agency rule, or contractual provision".

256. After DQ USA signed the Texas Medicaid Contract on August 17, 2011, it signed several amendments thereafter as reflected in Exhibit "C" hereto. The contract and each of the amendment signed through the present required DQ USA to provide to HHSC information as described below that was required to be provided by the contractual provision, however DQ USA violated its contractual obligations and failed to provide them in violation of TMFPA Section 36.002(10) (B), which can be can be summarized as follows.

257. DQ USA, an MCO contracted with the Health and Human Services Commission ("HHSC"), after signing and agreeing to the terms and conditions set forth in the Texas Medicaid Contract and subsequent amendments thereof from 2012-present:

a. Knowingly failed to provide to HHSC information of its Subcontractor DQ LLC that was required by its contractual provision "Respondent Information and Disclosures, Part 3 Subcontractor information";

b. Knowingly failed to provide to HHSC information of its Material Subcontractor DQ LLC, that was required to be provided by its contractual provision "4.2.4 Section 4- Material Subcontractor Information";

c. Knowingly failed to provide to HHSC a "signed letter of commitment" from GTESS whom DQ USA identified as its Material Subcontractor in its May 10, 2011 proposal that was required by contractual provision "4.2.4 Section 4- Material Subcontractor Information" item # 8 "A signed letter of commitment from each Material Subcontractor";

d. Knowingly failed to provide to HHSC in its contract amendments information of DSM's letter of deficiency, corrective action plan and fine of $2,928,000 issued by Executive Office of Health and Human Services ("EOHHS") on August 10, 2012, which was required to be provided by the contractual provision "4.2.3 Section 3 – Corporate Background and Experience" and Section III (3) UMCM Chapter 5.8 "Report of Legal and Other Proceedings and Related Events".

e. Knowingly failed to provide to HHSC information of a 2014 class action lawsuit in Massachusetts pertaining to the Orthodontic Medicaid program, where the named defendants were DQ LLC and DSM (parents of DQ USA), that was required per the

Uniform Managed Care Manual Contractual provision-- Section II "Matters pertaining to the MCO or Affiliates" and Section VIII "Notice requirements".

f.  Knowingly failed to provide to HHSC information required to be provided by the contractual provision of financials of its wholly owned parent DQ LLC; instead DQ USA provided financials of DSM. This information was required by contractual provision 'Section 4.2.3.4 Financial Report of Parent Organization and Corporate Guarantee"; and

g.  Knowingly failed to provide to HHSC information of its organizational conflict of interest with CDC through its parent DQ LLC that was required of its contractual provision "13.03 Organizations Conflicts of Interest- Section C Continuing duty to disclose"

### (4)    TMFPA Section 36.002 (12)

258. Subsection (12) of TMFPA Section 36.002 states that it is an Unlawful Act if the person "knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program". Violations of this section which improperly avoided or decreased an obligation to pay or transmit money or property to this state under the Medicaid program are as follows:

> DQ USA knowingly violated this subsection by its CFO Jim Collins signing DQ USA's FSRs and making false statements which were material that DQ USA incurred all expenses reported in the FSRs in support of the Texas Medicaid/CHIP operations material to an obligation to transmit the overinflated and unallowable expenses back to the State under the Medicaid program.

### 2.    Defendants Liable for the Violations of the TMFPA

259. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Third Amended Complaint as to the liability of each Defendant.

### (a)     DSM

260. DSM knowingly caused material false representations to be made to HHSC to permit DQ USA to receive the Texas Medicaid Contract in 2011 and payments pursuant thereto from 2012 until present that were unauthorized, by its unconditional and irrevocable continuing guarantee of DQ USA's performance of the Texas Medicaid contract in 2011. Specifically, DSM affirmed to HHSC the full and faithful performance by DQ USA of all of the obligations undertaken by DQ USA pursuant to the Contract. DSM also consented to all of the terms and conditions of the Texas Medicaid Contract. DSM was aware that DQ USA could not perform its obligations because it had no employees and no experience and that DQ LLC would be performing the services for DQ USA unlawfully without a license and without being a party to the Texas Medicaid Contract. DSM, which is and was the Contractor in Massachusetts, has DQ LLC as its Subcontractor to perform its administrative and management services and should have known that DQ USA should have identified DQ LLC as its Subcontractor for the Texas Medicaid Contract.  DSM committed an Unlawful Act in violation of the TMFPA because it never corrected this misperception that DQ USA was and would be performing its obligations pursuant to the contract.

### (b)     DQ USA

261. As an MCO, DQ USA (assisted by DQ LLC) has knowingly presented approximately $5.2 billion in claims for Unlawful Acts from 2012 March when contract inception took place to present, for services rendered by DQ LLC which is not licensed by the TDI to provide services, in violation of TMFPA section (6)(A), simply by virtue of the fact that the income earned or expense incurred by it as a Provider was used by the State to determine a rate of payment to it under the Medicaid program..

262. DQ USA as an MCO contracted with HHSC committed seven different Unlawful acts in violation of TMFPA Sec. 36.002(10)(B) MCO provision incorporated by reference as set forth above in the section VI C "Unlawful Acts in Violation of TMFPA after DQ USA obtained the Texas Medicaid Contract".

263. DQ USA made material false representations and overinflated expenses in its Financial Statistical Reports ("FSR's") which permitted them to receive payments under the Medicaid program and/or receive a benefit under the Medicaid program that was unauthorized or greater than the payment authorized.

264. DQ USA knowingly made several false statements in certifying compliance with Texas Medicaid Contract terms and conditions and its amendments thereof, when they were not compliant, which was material because it violated HHSC's contract inducement criteria and the required certifications document that DQ USA signed in 2011. The false certifications representing that DQ USA was compliant with contractual terms permitted DQ USA to receive payments from Medicaid program that was not authorized.

265. DQ USA knowingly violated subsection TMFPA 36.002(12) by its CFO Jim Collins signing DQ USA's FSRs and making false statements which were material that DQ USA incurred all expenses reported in the FSRs in support of the Texas Medicaid/CHIP operations material to an obligation to transmit the overinflated and unallowable expenses back to the State under the Medicaid program.

### (c)    DQ LLC

266. Defendant DQ LLC is the wholly owned parent company of Defendant DQ USA that knowingly and intentionally caused claims for unlawful acts to be submitted to the State of Texas for approximately $5.2 billion after the contract award by performing HHSC's

contractual obligations without a license issued by the TDI in violation of TMFPA Section 36.002(6)(A). Relator reincorporates facts by reference to Section VI C 3 "DQ USA Violated Section 36.002 (6)(A) and has presented approximately $ 5.2 billion in claims for unlawful acts" and to Section VII C 1 (2) "TMFPA Section 36.002 (6) (A)".

267. By covertly controlling and operating Defendant CDC, Relator's ex-employer and a non-profit dental service provider, DQ LLC caused CDC to commit Unlawful Acts in violation of the TMFPA by upcoding and billing uncredentialed dentists under credentialed dentists incorporated the facts by reference to section VI C 7.

268. DQ LLC also had a conflict of interest with CDC, the facts by reference as set forth in sections VI C 2 (7) that HHSC would have regarded as a material breach of the Texas Medicaid contract and failure to disclose same caused HHSC to renew the contract with DQ USA to permit it to receive payments that were not authorized.

### 3.  REMEDIES AND CIVIL MONETARY PENALTIES

269. Accordingly, Relator requests that all civil remedies and civil monetary penalties allowed under the Texas Medicaid Fraud Prevention Statute be awarded and/or reimbursed to the State of Texas against the Defendants, jointly and severally, as set forth in Section 36.052 thereof as follows:

#### i.   36.052. Civil Remedies

(a) Except as provided by Subsection (c), a person who commits an unlawful act is liable to the state for:

(1) the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the

unlawful act, including any payment made to a third party;

(2) interest on the amount of the payment or the value of the benefit described by Subdivision (1) at the prejudgment interest rate in effect on the day the payment or benefit was received or paid, for the period from the date the benefit was received or paid to the date that the state recovers the amount of the payment or value of the benefit;

(3) a civil penalty of:

(A) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $15,000, for each unlawful act committed by the person that results in injury to an elderly person, as defined by Section 48.002(a)(1), a person with a disability, as defined by Section 48.002(a)(8)(A), or a person younger than 18 years of age; or

(B) not less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $5,500, and not more than $11,000 or the maximum amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000, for each unlawful act committed by the person that does not result in injury to a person described by Paragraph (A); and

(4) two times the amount of the payment or the value of the benefit described by Subdivision (1).

270.   Relator requests that the State of Texas be reimbursed for (a) the amount of claims for all such Unlawful Acts, (b) civil penalties be assessed in the amount of two times the amount of the claims per Chapter 36.052(a)(4); and (c) civil penalties of $5,500-$11,000 per Unlawful Act be assessed as set forth in Chapter 36.052(a)(3) above for the time period 2011 until July 31, 2016. For the time period August 1, 2016 until time of trial the civil penalties are $10,781.40 to $21,562.80 per claim.

271. In total, for purposes of Section 36.052 (a)(1), the amount of payment or the value of any monetary or in kind benefit provided under the Medicaid program, directly or indirectly, to DQ USA and DQ LLC, as a result of the Unlawful Acts described above in this Count Four

and incorporated by reference, including payments made to a third party, is approximately **$5.2 billion** after contract procurement.

### 4. Relator's Award

272.  Relator further requests that she be paid a percentage of the overall recovery ranging from 25-30% of the recovery given that the State of Texas did not intervene in accordance with Section 36.110 which provides as follows:

### ii.   36.110. Award to Private Plaintiff

> … (a-1) If the state does not proceed with an action under this subchapter, the person bringing the action is entitled, except as provided by Subsection (b), to receive at least 25 percent but not more than 30 percent of the proceeds of the action. The entitlement of a person under this subsection is not affected by any subsequent intervention in the action by the state in accordance with Section 36.104(b).

273. Relator requests that she be paid from the proceeds of the action in accordance with the above provisions. Additionally, Relator requests that she be awarded from the Defendants an amount for reasonable expenses, reasonable attorney's fees, and costs that the court finds to have been necessarily incurred in accordance with TMFPA Section 36.110(c) after the Defendants have been found liable in or reached a settlement of the action.

### D.   COUNT FOUR—UNLAWFUL TERMINATION UNDER ANTI-RETALIATION PROVISIONS OF THE TMFPA

274. Relator realleges and reincorporates the facts by reference as set forth above in sections VI D "Facts pertaining to Relator's retaliation and wrongful termination" for causes of action below, alleging violation of TMFPA 36.115 provision.

275. Relator discovered CDC's Medicaid and Federal Grants fraud and was terminated by CDC on November 6, 2015 after a letter and series of emails complaining about CDC Medicaid and Federal Grants fraud was received by DQ LLC and CDC. Prior to that time, Relator had always received exemplary reviews during her lengthy tenure until she began complaining about Medicaid and Federal grants fraud.

276. In a letter dated May 1, 2015, received by CDC and DQ LLC, Relator's counsel addressed several issues involving CDC's Medicaid and Federal Grants fraud and specifically invoked her anti-retaliation rights pursuant to TMFPA Section 36.115 and FCA Section 3730 (h). Relator in July through October of 2015 emails, complained to CDC Executive Director Sutton that the issues concerning fraud she raised in the May 1, 2015 letter were not addressed. Additionally, 24 hours prior to her termination, on November 5, 2015, Relator sent an email to Sutton to investigate her DQ contracts and investigate the "True" administrator to Texas Medicaid Contract, invoking TMFPA anti-retaliation provision 36.115. Relator received a letter of termination by Fed-Ex on CDC letterhead stating that her position was allegedly eliminated.

277. The anti-retaliation provision of the TMFPA protects employees, contractors or other agents of a company from being discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee, contractor, or agent investigated, reported or sought to stop a company from engaging in practices which defraud the government. The anti-retaliation provision of the TMFPA further prevents a person's employer from discharging her or discrimination against her while she is taking a lawful action while investigating an action to

be filed under the TMFPA and/or while she is attempting to stop one or more violations of the TMFPA.

278. Relator's employer CDC retaliated against Relator in violation of TMFPA § 36.115, because Relator has demonstrated that: (1) she engaged in protected activity, (2) her employer knew about the protected activity, and (3) she was retaliated against because of her protected activity. An employee, contractor, or other agent engages in "protected activity" in the context of TMFPA retaliation when he or she opposes the company's attempt to commit Unlawful Acts in violation of the TMFPA or to get a false or fraudulent claim paid or approved by the Government, and where that opposition to fraud "reasonably could lead to a viable TMFPA action," or when litigation is a reasonable possibility. Investigatory efforts short of filing suit (such as conducted by Relator in this case) constitute protected activity for purposes of the anti-retaliation provision.

279. Notice can be accomplished any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility.  Relator submits that invoking her anti-retaliation rights under the FCA and/or TMFPA on two separate occasions (among the other facts set forth herein) constitutes "notice" by her employer CDC. At a very minimum Relator notifying CDC that she was invoking the anti-retaliation provisions of the FCA and TMFPA on two separate occasions put her employer, CDC, on constructive notice of the fact that litigation was a reasonable possibility.

280. Relator was discriminated against "because of" conduct in furtherance of a potential TMFPA suit (after she had invoked her anti-retaliation rights directly to her employer

on at least 2 occasions), and CDC had knowledge of the protected activity. CDC's retaliation against Relator was motivated, at least in part, by Relator engaging in protected activity.

281. While Relator contends that she has done so, Relator no longer has to show that her employer CDC was on notice of the "distinct possibility" of qui tam litigation. The "distinct possibility" standard is no longer the law, as cases decided after the anti-retaliation provisions in the 2010 amendment to the FCA have now adopted an "objective reasonableness" standard. Congress expanded the scope of the FCA's anti-retaliation provision in 2010 to include additional protection for "efforts to stop 1 or more violations of [the FCA]". Recent authority after the 2010 Amendment now hold that the "distinct possibility" test does not apply to the "efforts to stop" prong., and instead have held that an employee engages in protected activity under this prong when his "efforts are motivated by an **objectively reasonable belief that the . . . employer is violating, or soon will violate, the FCA."** The above facts demonstrate that Relator's efforts were indeed motivated by her **objectively reasonable** belief that CDC was or soon would be violating the TMFPA. (emphasis added).

### 1.  Relief Requested Per TMFPA's Anti-Retaliation Provision

282. Relator seeks all remedies available under the TMFPA anti-retaliation provisions which are generally designed to "make the employee whole." Relator seeks as damages under this cause of action (a) reinstatement with the same seniority status that she would have had but for the discrimination; (b) two times the amount of back pay and interest on the back pay; and (c) compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees, plus compensatory damages.

283. The TMFPA protects whistleblowers such as the Relator in this case from retaliation and provides the following remedy for such discrimination:

§ 36.115. Retaliation Against Person Prohibited

(a)     A person, including an employee, contractor, or agent, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of a lawful act taken by the person or associated others in furtherance of an action under this subchapter, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this subchapter, or other efforts taken by the person to stop one or more violations of Section 36.002 is entitled to:

   (1) reinstatement with the same seniority status the person would have had but for the discrimination; and

   (2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

(b)     A person may bring an action in the appropriate district court for the relief provided in this section.

(c)     A person must bring suit on an action under this section not later than the third anniversary of the date on which the cause of action accrues, For purposes of this section, the cause of action accrues on the date the retaliation occurs.

284. Specifically, as damages for Relator being retaliated against in violation of the FCA

and the TMFPA, she is entitled to the following as damages:

1. Twice Relator's backpay, amounting to $1,400,000 not including interest on the backpay as of the time of filing the Third Amended Complaint. Relator's annual salary was $150,000 at the time of her November 6. 2015 termination.

2. Compensation due to special damages sustained as a result of the discrimination, including but not limited to pain and suffering from physical distress. Relator suffered physical distress from aggravated neck and back pain since she was discriminated against by being overworked as a dental director and afterwards as a clinical dentist.  Also due to the stress Relator faced from retaliation through her termination, her neck and back pain continued to be aggravated, for which she had to seek intense physical therapy and physician visits through 2016;

3. Pain and suffering from Emotional Distress as Relator suffered emotional distress on multiple occasions (i) after demotion, through the date of her termination due to retaliation and bullying by company management; and (ii) after Relator's November 6, 2015 termination when she, being the most qualified dentist, despite taking lawful action, was unlawfully terminated. Relator has had to seek intense counseling which she is still seeking as of the time of filing this Complaint. Relator's physician had to put Relator on anti-anxiety, anti-depressant and other medications to help her sleep which Relator has never had to take until the discrimination from her employer; and

4.  Litigation costs and reasonable attorney fees per the TMFPA's provisions allowing recovery for same.

### E. COUNT FIVE-– COLORADO FALSE CLAIMS ACT

285. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

286.This is a *qui tam* action brought by Relator and the State of Colorado to recover treble damages and civil penalties under the Colorado False Claims Act, Col. Rev. Stat. Ann. § 25.5-4-304 *et seq.*

287.Col. Rev. Stat. Ann. §25.5-4-305 provides as follows:

288.25.5-4-305. False Medicaid Claims

(1) Except as otherwise provided in subsection (2) of this section, a person is liable to the state for a civil penalty of not less than five thousand five hundred dollars and not more than eleven thousand dollars; except that these upper and lower limits on liability shall automatically increase to equal the civil penalty allowed under the federal "False Claims Act", 31 U.S.C. sec. 3729, et seq., if and as the penalties in such federal act may be adjusted for inflation as described in said act in accordance with the federal "Civil Penalties Inflation Adjustment Act of 1990", Pub. L. No. 101-410, plus three times the amount of damages that the state sustains because of the act of that person, if the person:

(a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

(c) Has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property;

(d) Authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(e) Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property;

(f) Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; or

(g) Conspires to commit a violation of paragraphs (a) to (f) of this subsection (1).

289. The Defendants knowingly violated Col. Rev. Stat. Ann. § 25.5-4-305 and knowingly presented false claims to the State of Colorado and/or caused false claims to be made, used and presented to the State of Colorado from at least 2014 to the present.

290. The Defendants have submitted and/or caused to be submitted claims to Colorado Medicaid programs and/or other state-administered government health plans that were false and/or fraudulent. Further, the Defendants have knowingly falsely certified, expressly and/or impliedly, and represented full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Finally, the Defendants have knowingly caused physicians to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations was a condition of payment.

291. The State of Colorado, by and through the Colorado Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

292. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Colorado's payment decision.

293. The ultimate submission by the Defendants of false claims, records, material omissions, and/or statements to the state programs was a foreseeable factor in the State of Colorado's loss, and a consequence of the scheme.

294. As a result of the Defendants' violations of Col. Rev. Stat. Ann. §25.5-4-305, the State of Colorado has been damaged.

295. There are no bars to recovery under Col. Rev. Stat. Ann. §25.5-4-306, and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Second Amended Complaint, who has brought this action pursuant to Col. Rev. Stat. Ann. §25.5-4-306(2) on behalf of herself and the State of Colorado. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Colorado. Relator has previously provided all material documentary evidence related to this case to the Attorney General of the State of Colorado contemporaneously with the filing of this Complaint. Contemporaneously with this filing, Relator has provided all documents related to this Complaint to the Attorney General of the State of Colorado. This Complaint alleges additional details regarding Defendants' fraudulent schemes and is supported by this documentary evidence.

296. This Court is requested to accept pendent jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of Colorado in the operation of its state programs.

## 1. Damages and Penalties

297. Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF COLORADO:

(1) Three times the amount of actual damages that the State of Colorado has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Colorado for the time period 2011 until July 31, 2016. For the time period August 1, 2016 until time of trial the civil penalties are $10,781.40 to $21,562.80 per claim.;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to Col. Rev. Stat. Ann. §25.5-4-306 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## 2. Defendants Liable for Violations of Colorado False Claims Act

298. In addition to DentaQuest USA, the Defendants who are liable to Relator pursuant to this Count five include DentaQuest, LLC and DSM, the ultimate parent signed a statement affirming DSM's willingness to guarantee the performance of DentaQuest, USA.

## F. COUNT SIX - TENNESSEE MEDICAID FALSE CLAIMS ACT

299. Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

300. This is a *qui tam* action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* Section 71-5-182(a)(1) provides liability for any person who-

> (a) presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;
> (b) makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;
> (c) conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent;
> (d) makes, uses, or causes to be made or used, a record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the state, relative to the Medicaid program, knowing such record or statement is false.

301. The Defendants knowingly violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly presented false claims to the State of Tennessee and/or caused false claims to be made, used and presented to the State of Tennessee from at least 2011 to the present.

302. The Defendants have submitted to the Tennessee Medicaid programs and/or other state-administered government health plans that are false and/or fraudulent. Further, the Defendants have knowingly falsely certified, expressly and/or impliedly, and represented full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting. Finally, the Defendants have knowingly caused physicians to falsely certify, expressly and/or impliedly, and represent full compliance with all federal and state laws and

regulations prohibiting fraudulent acts and false reporting. Compliance with federal and state laws and regulations was a condition of payment.

303. The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, paid the false and/or fraudulent claims.

304. Given the structure of the health care systems, the false claims, statements, representations, material omissions, and/or records made by the Defendants had the potential to influence the State of Tennessee's payment decision.

305. The ultimate submission by the Defendants of false claims, records, material omissions, and/or statements to the state programs was a foreseeable factor in the State of Tennessee's loss, and a consequence of the scheme.

306. As a result of the Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged.

307. There are no bars to recovery under Tenn. Code Ann. § 71-5-183(e)(2), and, or in the alternative, Relator is an original source as defined therein. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of herself and the State of Tennessee. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions. Relator has voluntarily provided information, oral and/or written, and has sent disclosure statement(s) describing all material evidence and information related to this Complaint, both before and contemporaneously with filing, to the Attorney General of the State of Tennessee. Relator has previously provided all material documentary evidence related to this case to the Attorney General of the State of Tennessee

contemporaneously with the filing of this Complaint. Contemporaneously with this filing, Relator has provided all documents related to this Complaint to the Attorney General of the State of Tennessee. This Complaint alleges additional details regarding Defendants' fraudulent schemes and is supported by this documentary evidence.

308. This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its state programs.

### 1. Damages and Penalties

309. Relator respectfully requests this Court to award the following damages to the following parties and against the Defendants:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages that the State of Tennessee has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim that the Defendants presented or caused to be presented to the State of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4)  Such further relief as this Court deems equitable and just.

## 2.        Defendants Liable for Violations of Tennessee False Claims Act

310. In addition to DentaQuest USA, the Defendants who are liable to Relator pursuant to this Count Six include DentaQuest, LLC and Dental Service of Massachusetts, Inc. d/b/a Delta Dental of Massachusetts.

## VIII.        PRAYERS FOR RELIEF

## A.        US GOVERNMENT PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Relator, on behalf of herself and the United States Government, prays that this Third Amended Complaint be received and filed, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

(a) That this Court enter a judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the FCA; and

(b) that this Court enter a judgment against the Defendant for a civil penalty of $11,000 for each of Defendants' violations of the Section 3729 of the FCA for each such claim submitted or paid up through July 31, 2016, and for the time period August 1, 2016 until time of trial civil penalties of $10,781.40 to $21,562.80 per claim; and

(c) that Relator recovers all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action; and

(d) that Relator be awarded all reasonable attorneys' fees, costs and expenses in bringing this action; and

(e) that Relator be awarded the maximum amount for bringing this action of 25% --30% of the proceeds of the action pursuant to Section 3730(d) of the FCA and/or other statutes permitting recovery of same; and

(f) that Relator be awarded pre-judgment and post-judgment interest; and

(g) that defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.*; and

(h) that Relator and the United States government be awarded all damages  and        Civil Monetary Penalties to which the U.S. Government is entitled 42 U.S.C. §1320a–7a; and

(i) that a trial by jury be held on all issues so triable; and

(j) that Relator and the United States receive all relief to which either or both may be entitled at law or in equity as the Court deems just and proper.

### For Relator's FCA Retaliation Claims:

As damages for Relator being retaliated against in violation of the FCA, she is entitled to the following as damages:

1. Twice Relator's backpay, amounting to $1,400,000 not including interest on the backpay as of the time of filing this Third Amended Complaint. Relator's annual salary was $150,000 at the time of her November 6. 2015 termination.
2. Compensation due to special damages sustained as a result of the discrimination, including but not limited to pain and suffering from physical distress. Relator suffered physical distress from aggravated neck and back pain since she was discriminated against by being overworked as a dental director and afterwards as a clinical dentist.  Also due to the stress Relator faced from retaliation through her termination, her neck and back pain continued to be aggravated, for which she had to seek intense physical therapy and physician visits through 2016;
3. Pain and suffering from Emotional Distress as Relator suffered emotional distress on multiple occasions (i) after demotion, through the date of her termination due to retaliation and bullying by company management; and (ii) after Relator's November 6, 2015 termination when she, being the most qualified dentist, despite taking lawful action, was unlawfully terminated. Relator has had to seek intense counseling which she is still seeking as of the time of filing this Complaint. Relator's physician had to put Relator on anti-anxiety, anti-depressant and other medications to help her sleep which Relator has never had to take until the discrimination from her employer; and

4. Litigation costs and reasonable attorney fees per the FCA's provisions allowing recovery for same.

**B.      STATE OF TEXAS PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Relator, on behalf of herself and the State of Texas, pray that this Complaint be received and filed in camera under seal until further Order of the Court, and would pray unto the Court for the following relief and Judgment upon a trial by jury:

(a) That the State of Texas be reimbursed for all monies paid, directly or indirectly, due to the Unlawful Acts committed by the Defendants; and

(b) that civil remedies be assessed in the amount of two times the amount of each Unlawful Act per Chapter 36.052(a)(4) of the Texas Medicaid Fraud Prevention Act; and

(c)  that civil penalties of $5,500-$11,000 per Unlawful Act be assessed as set forth in Chapter 36.052 (a) (3) of the Texas Medicaid Fraud Prevention Act for each such claim submitted or paid up through July 31, 2016, and for the time period August 1, 2016 until time of trial civil penalties of $10,781.40 to $21,562.80 per claim.; and

(d) that pre- and - post judgment interest be awarded from the date of submission of each Unlawful Act until the date of Judgment; and

(e) that the Court award reasonable attorneys' fees, costs, and expenses which the Relators reasonably incurred in bringing and pursuing this case; and

(f) that the Court award to Relators the maximum amount allowed to them as Relators pursuant to Chapter 36.110 of the Texas Medicaid Fraud Prevention Act and any other laws of the State of Texas permitting same, including but not limited to 25%-- 30% of the recovery given that the State of Texas did not intervene in the case, and

(g)  That defendants cease and desist from violating Texas Human Resources Code §§ 36.001 *et seq;* and

(h) That the Court award such other and further relief as it deems proper.

**For Relator's TMFPA Retaliation Claims:**

As damages for Relator being retaliated against in violation of the TMFPA, she is entitled

to the following as damages:

1. Twice Relator's backpay, amounting to $1,400,000 not including interest on the backpay as of the time of filing this Third Amended Complaint. Relator's annual salary was $150,000 at the time of her November 6. 2015 termination.
2. Compensation due to special damages sustained as a result of the discrimination, including but not limited to pain and suffering from physical distress. Relator suffered physical distress from aggravated neck and back pain since she was discriminated against by being overworked as a dental director and afterwards as a clinical dentist. Also due to the stress Relator faced from retaliation through her termination, her neck and back pain continued to be aggravated, for which she had to seek intense physical therapy and physician visits through 2016;
3. Pain and suffering from Emotional Distress as Relator suffered emotional distress on multiple occasions (i) after demotion, through the date of her termination due to retaliation and bullying by company management; and (ii) after Relator's November 6, 2015 termination when she, being the most qualified dentist, despite taking lawful action, was unlawfully terminated. Relator has had to seek intense counseling which she is still seeking as of the time of filing this Complaint. Relator's physician had to put Relator on anti-anxiety, anti-depressant and other medications to help her sleep which Relator has never had to take until the discrimination from her employer; and
4. Litigation costs and reasonable attorney fees per the TMFPA's provisions allowing recovery for same.

### C.     STATE OF COLORADO PRAYER FOR RELIEF

To the STATE OF COLORADO:

(1) Three times the amount of actual damages that the State of Colorado has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of up to $11,000 for each false claim that the Defendants presented or caused to be presented to the State of Colorado for each such claim submitted or paid up through July 31, 2016, and for the time period August 1, 2016 until time of trial civil penalties of $10,781.40 to $21,562.80 per claim.;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to Col. Rev. Stat. Ann. §25.5-4-306 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just. .

## E.    STATE OF TENNESSEE PRAYER FOR RELIEF

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages that the State of Tennessee has sustained as a result of the fraudulent and illegal practices of the Defendants;

(2) A civil penalty of not less than $5,000 and not more than $25,000 for each false claim that the Defendants presented or caused to be presented to the State of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses that Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## IX.    JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

DATED, this the 24th day of August 2020.

RESPECTFULLY SUBMITTED

**LAW OFFICES OF JAMES R. TUCKER, P.C.**

**/s/ James R. Tucker**

**JAMES "RUSTY" TUCKER**
**LAW OFFICES OF JAMES R. TUCKER, P.C.**
**STATE BAR NO. 20272020**
**6414 DEL NORTE LANE**
**DALLAS, TX 75225**
**214-505-0097 (PHONE)**
**214-599-8874 (FACSIMILE)**
**rusty@rustytuckerlaw.com**

## X.      EXHIBITS

### A.      EXHIBIT A

False Statements by CDC and DQ LLC in Federal Grant Contracts

# EXHIBIT "A"

**FALSE STATEMENTS IN FEDERAL GRANT CONTRACTS**

### TITLE V CHILD DENTAL AND TITLE V PRENATAL DENTAL

HHSC FY 2018 RENEWAL, DSHS 2016. 2014 RENEWAL

**AMOUNT AWARDED:**

Child Dental: $1,015,000 for 2016 and 2018 and $1,1000,000 for 2015

Prenatal Dental: $175,690 for 2018 and $188,914.00 for 2016

**False Representations by Signatories:**

Todd Cruse, DQ LLC 3/6/17, 5/12/17

CDC Executive Director Kevin Sutton 5/21/15.  8/21/15, 11/13/15

CDC CEO Sharon Fulcher Estes 8/29/14

| QUESTIONS ASKED IN CONTRACT | CDC RESPONSE | WHY WAS THE RESPONSE FALSE? |
|---|---|---|
| List organizations having direct or indirect ownership or a controlling interest in the entity | DentaQuest Care Group | Per Title 5 Grant definition, DQ LLC which appointed CDC board had controlling interest in CDC, which was not disclosed |
| Are any owners of the disclosing entity also owners of other Medicare/Medicaid facilities? (Example: sole proprietor, partnership or members of Board of Directors) | No | DQCG is the sole member of not only CDC, but also Sarrell Dental in Alabama and Community Dental in Kentucky, which was not disclosed |
|  | No | CDC was operated by DQ LLC which unlawfully provided administrative and |

| Is this facility operated by a management company, leased in whole or part by another organization? | | management services (DSO) to CDC without being registered as a DSO, which was not disclosed |
|---|---|---|

### Dallas County Ryan White HIV Grant

### March 1, 2017 to February 28, 2018

### AMOUNT AWARDED: ABOUT $ 700,000

**False Representations by Signatories:**

May 31, 2016 Todd Cruse, DQ LLC

December 5, 2016 Contract extension signed by CDC Executive Director Dorothy Jones

December 8, 2016 Mary Rebecca Mix, Attorney, DQ LLC sworn and subscribed

| Name of interested Party:<br><br>    Nature of interest: | DentaQuest Care Group<br><br>Controlling | DQ LLC which appointed CDC board had controlling interest in CDC, which was not disclosed |
|---|---|---|
| Contractor may not assign its rights and duties under said Contract without the prior written consent of County and approval of the County Commissioners Court, if such assignment is due to a change in ownership or affiliation. | | CDC assigned its duties to DQ LLC for administrative and management services, who unlawfully performed these services as a DSO to CDC without being registered in Texas |

### City of Irving Community Development Block Grant (CDBG) 2014

### AMOUNT AWARDED: $ 30,000

**False Representations by Signatories:**

| CDC CEO Sharon Fulcher Estes 6/24/14 Letter to City of Irving | | |
|---|---|---|
| Letter from Ms. Vicki Ebner, Assistant Director Community Resources Housing and Human Services Department, City of Irving letter to CDC CEO<br><br>"Dear Ms. Fulcher-Estes, On June 16, 2014, an onsite monitoring visit of your Community Development Grant funded activities was conducted by the **City of Irving's Housing and Human Services staff**".<br><br>Ms. Ebner then listed Findings and Concerns stating:<br><br>Concern # 1<br><br>"The partnership with Sarrell Dental Center and DentaQuest Care Group is not clear" | CDC CEO Fulcher-Estes response on 6/24/14:<br><br>"Care Group affiliated with Community Dental Care in December of 2013. Community Dental Care remains its own company with its own payroll, federal tax id number, and IRS determined non-profit status. Nothing in that regard has changed. Care Group simply offers us support and aid in executing their mission, To Improve the Oral Health of All.<br><br>Community Dental Care does not owe Care Group any loan payments, nor do we transfer money to them for anything other than administrative support". | CDC transferred money to DQ LLC and not to DQCG for administrative support. DQCG tax returns show "0" employees.<br><br><br>CDC hired DQ LLC for administrative and management services, who unlawfully performed these services as a DSO to CDC without being registered in Texas and this was not disclosed to the Irving grant |

|  | | |
|---|---|---|
| **City of Garland Community Development Block Grant:**<br><br>October 1,2014 to September 30, 2015<br><br>**AMOUNT AWARDED: $ 38, 248** | | |

| **False Representations by Signatories:** October 1, 2014 CDC CEO Sharon Fulcher-Estes | | |
|---|---|---|
| Information about the organization | As of December 2013, Community Dental Care became affiliated with nationally renowned Sarrell Dental Center | For the question on organization information and terms of no assignment, city of Garland was not informed that CDC |

| | | |
|---|---|---|
| Section 19. No Assignment<br><br>Neither party shall have the right to assign that party's interest in this Agreement without the prior written consent of the other party | under the DentaQuest Care Group Inc. | hired DQ LLC for administrative and management services, and that DQ LLC had a controlling interest in CDC |

**City of McKinney Community Development Block Grant (CDBG) Funding application for FY 2015**

**AMOUNT AWARDED: $ 21,071**

**False Representations by Signatories:** April 4, 2014 Sharon Fulcher-Estes, CDC CEO

| | | |
|---|---|---|
| Provide any other information that may be pertinent to this application that was not stated in previous questions"<br><br>Section XII<br><br>Non-Assignment<br><br>Agency shall not assign or otherwise transfer any of Agency's obligations or duties under this Agreement without first obtaining written consent from the City Council or City Manager, as appropriate<br><br>Improper use of funds awarded in the Grant may result in the termination of the Grant, forfeiture of any outstanding Grant award and/or recovery of previous payments. | Since December 2013, Community Dental Care has undergone a major restructuring and revitalization by affiliating with the nationally renowned dental non-profit "change maker" Sarrell Dental Canter of Alabama" | Grant stipulated not to assign or transfer duties under the contract, however, in response to other information about CDC, was not informed that CDC hired DQ LLC for administrative and management services, and that DQ LLC had a controlling interest in CDC<br><br>DQ LLC board members performing administrative and management services for CDC, propagating fraud and abuse and making bonus from CDC's performance was improper use of funds |

## B.      EXHIBIT B

False Statements by CDC and DQ LLC in Certifying Compliance of Federal Grant

Contracts

# EXHIBIT "B"

**CDC FALSE STATEMENTS TO FEDERAL GRANTS CERTIFYING COMPLIANCE**

### 1. TITLE V CHILD HEALTH SERVICES AND PRENATAL SERVICES FEDERAL GRANTS

    A.  Contract between Department of State health Services (DSHS) and Dental Health Programs Inc. (Contractor) for Title V <u>Child Health</u>

    **B.**  Contract between Department if State health Services (DSHS) and Dental Health Programs Inc. (Contractor) for Title V <u>Prenatal</u>

**Section 16.01: Actions Constituting Breach of Contract**

Action or inactions that constitute breach of contract include, but are not limited to, the following:

    (i)    failure to comply with any provision of this contract, including failure to comply with all applicable statutes, rules, or regulations

    (ii)    discovery of a material misrepresentation in any aspect of Contractor's application or response to the Solicitation Document

    (iii)    any misrepresentation in the assurances and certifications in Contractor's application or response to the Solicitation Document or in this Contract

**Section 16.02 General Remedies and Sanctions**

**If Contractor breaches this Contract by failing to comply with one or more of the terms of this Contract, including but not limited to compliance with applicable statutes, rules, or regulations, the Department may take one or more of the following actions:**

g)  Terminate this Contract

h)  Suspend all or part of this Contract

i)  Deny additional or future contracts with Contractor

j)  Reduce the funding

k)  Disallow costs and credit for matching fund

l)  **Temporarily withhold cash payments pending resolution of issues of noncompliance**

**False Statements in Certifying Compliance:**  Sharon Fulcher-Estes CDC CEO August 29, 2014, Kevin Sutton CDC Executive Director August 21, 2015

| TERMS AND CONDITIONS OF CONTRACT | CDC NON-COMPLIANCE CAUSED BY DQ LLC |
|---|---|
| **Section 2.07 Statutes and Standards of General Applicability**<br><br>Contractor is responsible for reviewing and complying with all applicable statutes, rules, regulations, executive orders, and policies. To the extent applicable to Contractor, Contractor shall comply with the following:<br><br>- The Occupational Safety and Health Administration (OSHA) Regulations on Blood Borne Pathogens, 29 CFR §1910.1030, or Title 25 Tex, Admin Code Chapter 96 regarding safety standards for handling blood borne pathogens | CDC was not compliant with OSHA regulations as complained by Relator through her August 5, 2014, August 6, 2014 and her counsel's May 1, 2015 letter to CDC. Parkland hospital that housed 9 CDC clinics closed them initially on September 23, 2015 and afterwards permanently shut them down on November 6, 2015 due to OSHA and Infection control violations, leaving several indigent and homeless patients without dental care, who were funded by federal grants.<br><br> A May 2016 Parkland hospital board briefing document stated: "During the final lease negotiations, the joint commission cited the in-place operator Community Dental Care, for violations which potentially could have effected Parkland's accreditation".<br><br>**Materiality to Funders:**<br><br>**The OSHA violation by CDC was so significant** that Parkland, a governmental entity terminated their lease contract with CDC and therefore violation of this provision of the contract would be material to the funders to consider it a breach to impose remedies and sanctions on CDC, because indigent patients were affected by it. |
| **Section 2.10: Licenses, Certifications, Permits, Registrations and Approvals:**<br><br>Contractor shall ensure that all its employees, staff and volunteers obtain and maintain active status all licenses, certifications, permits, registrations and approvals required to perform their duties under this contract and shall prohibit any person who does not hold a current, active required license, certification, permit, registration or approval from performing services under this Contract. | Dr. Terry Watson, a retired dentist who served as CDC's Dental Director from August 14, 2014 to December 31, 2014 **did not have a Texas State Board issued dental license, yet audited CDC dentists patient records to satisfy grant requirements**, controlled and influenced licensed dentist professional judgement, thereby practicing dentistry without a license.<br><br>**Materiality to Funders:**<br><br>Title V procedures and policy manual states: "The Title V Dental Director must be a U.S. |

| | licensed dentist" and they would revoke their funds had they known. |
|---|---|
| **Section 4.03: Use of Funds:**<br><br>Contractor shall expend department funds only for the provision of approved services and for reasonable and allowable expenses related to those services<br><br>**Section 12.06: Misuse of funds and Performance Malfeasance**<br><br>Contractor shall report to the contract manager assigned to the Program Attachment, any knowledge of debarment, suspected fraud, program abuse, possible illegal expenditures, unlawful activity, or violation of financial laws, rules, policies, and procedures related to perform services under this Contract. | **Grant funds were misused:**<br><br>**Materiality to Funders:**<br><br>DQ LLC, who were also board members, provided management services to CDC, caused CDC to commit fraud and abuse and used the profits to pay their bonuses<br><br>Relator though her counsel's May 1, 2015 letter to CDC **complained of CDC Federal grants fraud and abuse,** however no steps were taken to address her complaint, instead CDC terminated Relator. |
| **Section 12.01: Child Abuse Reporting requirements**<br><br>Contractor shall develop, implement and enforce a written policy that includes at a minimum the Department's Child Abuse Screening, Documenting, and Reporting Policy for Contractors/Providers and train all staff on reporting requirements. | CDC did not develop, implement or enforce any written policy for child abuse reporting. Relator's emails dated August 5, 2014 and August 6, 2014 complained to CDC CEO Fulcher-Estes and CDC chairman Jeff Parker and Defendant Haugen of lack of child abuse training to CDC staff in addition to lack of other grants required training. |
| **Section 14.18 Notice of Organizational Change:**<br><br>Contractor shall submit written notice to the contract manager assigned to the Program Attachment within ten (10) business days of any change to the Contractor's name; contact information, key personnel, officer, director or partner; organizational structure such as merger, acquisition or change in form of business; legal standing; or authority to do business in Texas. | **Material Misrepresentation**: CDC did not disclose organizational change that DQ LLC had a controlling interest in CDC, and the key personnel performing administrative and management services were DQ LLC employees who were also board members. DQ LLC was unlawfully performing services for CDC as a DSO without being registered as one |

## 2. DALLAS COUNTY HIV RYAN WHITE GRANT

Contract for HIV Services Delivery between Dallas County ("County") on behalf of Dallas County Health and Human Services ("DCHHS") AND Dental Health Programs Inc. ("Contractor")

Failure to comply with any of these assurances or any other requirements specified within this Contract shall put Contractor in default and material breach of said Contract and may result at the sole and absolute discretion of County in the disallowance of funds and the withholding of future awards to Contractor, in addition to any other remedies available to County as permitted by law.

**False Statements in Certifying Compliance:**

Fulcher-Estes CEO-: May 30, 2014, April 28, 2015 Dorothy Jones Executive Director: September 28, 2016

| TERMS AND CONDITIONS OF CONTRACT | CDC NON-COMPLIANCE CAUSED BY DQ LLC |
|---|---|
| **7. Contractual Obligations** **38. Prevention of Fraud and Abuse** Contractor shall establish, maintain, and utilize internal management procedures sufficient to provide for the proper, effective management of all activities funded under said Contract. Any known or suspected incident of fraud or program abuse involving Contractor's employees or agents shall be reported immediately by the County to the Office of the Inspector General for appropriate action. | Relator though her counsel's May 1, 2015 letter to CDC complained of CDC Federal grants fraud and abuse, however no steps were taken to address her complaint, instead CDC terminated Relator. |
| **44. Assurances:** In providing Services required by said Contract, Contractor agrees to observe and comply with all grant requirements, licenses, legal certifications, or inspections required for the Services, facilities, equipment, or materials, and all applicable federal, state and local statutes, ordinances, rules, and regulations. Contractors failure to comply with this assurance shall be treated as a default or material breach of said Contract. | DQ LLC caused CDC to Violate Texas Statute-Non-Profit Business Code Section 22.052 that required CDC board to have nine Texas licensed dentists, however there were no Texas licensed dentists on CDC's board. |

| | |
|---|---|
| **44. Assurances:**<br><br>**Contractor, by acceptance of the terms of said Contract, agrees and ensures** that its personnel providing the Services hereunder are duly licensed and qualified to perform the required Services**.** | Dr. Terry Watson, a retired dentist who served as CDC's Dental Director from August 14, 2014 to December 31, 2014 **did not have a Texas State Board issued dental license required to provide services in his role, yet audited CDC dentists patient records to satisfy grant requirements.** |
| **44. Assurances:**<br><br>Contractor expressly states and assures County that no person will, on the grounds of race, age, creed, color, handicap, disability, national origin, sex, religion, political affiliation or beliefs, be excluded from, be denied the benefit of or be subjected to discrimination under any activity funded in whole or part under said Contract. Contractor agrees to comply with all federal and state statutes relating to nondiscrimination, | On November 6, 2015, Relator was discriminated and terminated based primarily upon retaliation against her for complaining about Medicaid and federal grant fraud and trying to take steps to rectify same. To a lesser extent, the company also discriminated against her due to age in violation of federal grant requirements given that when she was terminated the company kept younger doctors with much less experience than her. |
| **44. Assurances**<br><br>Contractor will comply with the OSHA Regulations on Blood Borne Pathogens, 56 CFR 64175 (1991), 29 FR 1910.1030, which set safety standards for those workers and facilities who may handle Blood Borne Pathogens. | CDC's non-compliance with OSHA regulations was so severe to the extent that Parkland shut them down and terminated their lease with CDC (discussed above) |

### 3. <u>STATE OF TEXAS COUNTY OF DALLAS CDBG GRANT</u>

"This Agreement made and entered into by and between the city of Dallas, a municipal corporation of Dallas, Dallas County, Texas ("City") and Dental Health Programs, Inc. (a non-profit corporation organized and existing under the laws of the State of Texas) dba Community Dental Care ("Contractor") with its principal place of business at 801 Conover Drive, Grand Prairie, Texas 75051-1519"

**General Provisions:  Breach or Violation**

If Contractor breaches or violates this Agreement, the city shall direct in writing that such violation be corrected or abated which order shall be complied with by Contractor within the time period specified by the city in such notice. Failure or refusal of Contractor to comply within the time period established by any such order shall authorize the City to give immediate notice of cancellation of this agreement.

| False Statements in Certifying Compliance: Executive Director Kevin Sutton July 30, 2015 | |
|---|---|
| **TERMS AND CONDITIONS OF THE CONTRACT** | **CDC NON-COMPLIANCE CAUSED BY DQ LLC** |
| **14. Non-Discrimination**<br><br>During the term of this Agreement, Contractor shall not discriminate against any employee or applicant for employment because of race, age, color, religion, sex, ancestry, national origin, place of birth or handicap not related to job performance; nor shall any person be denied admittance to, prevented from participating in, or denied the benefits of any program or activity funded in whole or part with funds received by the city under this Agreement because of race, age, color, religion, sex, ancestry. National origin, place of birth, or handicap. Additionally, Contractor shall comply with the clauses to the Standard Assurances to Title VI of the Civil Rights Act of 1964, in Attachment II | On November 6, 2015, Relator was discriminated and terminated based primarily upon retaliation against her for complaining about Medicaid and federal grant fraud and trying to take steps to rectify same. To a lesser extent, the company also discriminated against her due to age in violation of federal grant requirements given that when she was terminated the company kept younger doctors with much less experience than her. |

## 4. CITY OF GARLAND COMMUNITY DEVELOPMENT BLOCK GRANT

"This Agreement is made and entered into on the this the 1st day of October 2014, by and between City of Garland, Texas ("City") and Community Dental Care ("Subrecipient")"

**Section 9: Nonperformance, Suspension and Termination:**

In the event that City makes a determination that the subrecipient has not performed the provisions of this Agreement, the City may terminate this Agreement in writing.

| False Statements in Certifying Compliance: CEO Sharon Fulcher Estes October 1, 2014 | |
|---|---|
| **TERMS AND CONDITIONS OF THE CONTRACT** | **CDC NON-COMPLIANCE AFTER THE CONTRACT AWARD** |
| **Section 16. Nondiscrimination Clause**<br><br>The services provided under this Agreement shall be available to all otherwise eligible applicants without regard to race, color, creed, religion, age, sex, national origin or handicap status. Subrecipient agrees that it shall take affirmative action to ensure that | On November 6, 2015, Relator was discriminated and terminated based primarily upon retaliation against her for complaining about Medicaid and federal grant fraud and trying to take steps to rectify same. To a lesser extent, the company also discriminated against |

| | |
|---|---|
| applicants are employed and that employees are treated during employment without regard to race, color, creed, religion, age, sex, national origin, or handicap status. Such action shall include, but not limited to, the following: employment, upgrading, demotion or transfer, recruitment or recruitment advertising, lay-off or termination, rates of pay or other forms of compensation, selection for training , as well as access to all facilities necessary for any of the above/ Subrecipient agrees to post in conspicuous places, available to employees and applicants for employment, notice setting forth the provisions of this nondiscrimination clause. | her due to age in violation of federal grant requirements given that when she was terminated the company kept younger doctors with much less experience than her. |

## C.    EXHIBIT C

Amendments A Through K Signatories and Date of Certification

# EXHIBIT "C"

| | |
|---|---|
| **CONTRACTUAL DOCUMENT (CD)** | |
| Responsible Office: HHSC Office of General Counsel (OGC) | |
| Subject: HHSC Managed Care Contract Document for the HHSC Medicaid/CHIP Dental Services | |
| **PARTIES TO THE CONTRACT:** | |
| Texas Health and Human Services Commission and DentaQuest USA Insurance Co., Inc. | |
| Signed by Steven Pollock on August 17, 2011 | |

| AMENDMENTS | SIGNATORY | DATE | Certification to Terms and Conditions of Alleged Contractual Provision Violations |
|---|---|---|---|
| A | Steven Pollock, President | February 6, 2012 | YES |
| B | Steven Pollock, President | July 27, 2012 | YES |
| C | Steven Pollock, President | January 29, 2013 | YES |
| D | James Hawkins, Secretary Corporate Clerk | August 27, 2013 | YES |
| E | Steven Pollock, President | October 23, 2013 | YES |
| F | Steven Pollock, President | December 22, 2013 | YES |
| G | Steven Pollock, President | June 12, 2014 | YES |
| H | Steven Pollock, President | January 6, 2015 | YES |
| I | Robert Lynn, Sr. VP Market Development | March 10, 2015 | YES |
| J | Robert Lynn, EVP | June 30, 2015 | YES |
| K | Brett Bostrack, SVP | December 29, 2015 | YES |

### D.     EXHIBIT D

DQ USA's Business Specifications Binder Attachment List

# EXHIBIT "D"

| | Tab | Attachment |
|---|---|---|
| 1 | | Business Specifications Binder Attachments List |
| 2 | Tab | Attachment |
| 3 | A | Structure of DentaQuest Companies Organizational Chart |
| 4 | B | Certificate of Authority |
| 5 | C | TDI Authority Table |
| 6 | D | Texas Compliance Certificate |
| 7 | E | DentaQuest Client List |
| 8 | F | Organizational Charts |
| 9 | | Chart A |
| 10 | | Chart B |
| 11 | | Chart C |
| 12 | | Material Subcontractor - GTESS |
| 13 | G | Member Advocate Job Description |
| 14 | H | 2010 Audited Financials |
| 15 | | 2009 Audited Financials |
| 16 | I | TDI Financial Documents |
| 17 | | TDI Quarterly Financial Statement |
| 18 | | TDI Annual Financial Statement |
| 19 | | Statement of Actuarial Opinion |
| 20 | | TDI Supplemental Filing |
| 21 | J | TDI Examination ReportDentaQuest Client List |
| 22 | | DentaQuest Response to the TDI Examination Report |
| 23 | | TDI Examination Report |
| 24 | K | Form B Registration Statement |
| 25 | L | Financial Report of Parent Organization |
| 26 | | 2010 DSM Audited Financials |
| 27 | | IRS Form 990 |
| 28 | M | Signed Letters from Material Subcontractor |
| 29 | N | Child Support Certification |
| 30 | O | Certification Regarding Debarrment, Suspension, Ineligibility and Voluntary Exclusion |
| 31 | P | Certification Regarding Federal Lobbying |
| 32 | Q | Non-disclosures Statement |
| 33 | R | Certification Letter |
| 34 | S | Respondent Information and Disclosures |
| 35 | T | HUB Subcontracting Plan |
| 36 | | HSP |
| 37 | | Correspondence to Solicit Vendor Information |
| 38 | | Correspondence to Trade Organizations |
| 39 | | Quote Request Emails |
| 40 | | Quote Receipt Emails |
| 41 | | Notification/Denial Emails to Vendors |

Business Specifications        ⊕

**E.     EXHIBIT E**

DQ USA's Summary Income Statement FSR from September 2018-August 2019

# EXHIBIT "E"

**HHSC FINANCIAL STATISTICAL REPORT / FSR**

| Dental Contractor: | DentaQuest USA Insurance Co | Program: | Medicaid Dental |
| State Fiscal Year 2019 | | Service Area: | Statewide |
| Submission Date: 12/30/2019 | | Rptg Period End Date 8/31/2019 | |
| Submission Type: Yr-End 90-Day | | | |

Note: Except where stated otherwise, reporting is on an incurred basis (that is, reported in the period corresponding to dates of service, rather than to date paid). All prior quarters' data must be updated to reflect the most recent revised IBNR estimates.

**Part 1:   Summary Income Statement   presented in US Dollars, except for Member Months count**

| HHSC Managed / Contract costs | Incurred Months | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Member Months | | 1,645,426 | 1,643,300 | 1,650,334 | 1,649,380 | 1,636,577 | 1,631,664 | 1,627,134 | 1,665,601 | 1,601,661 | 1,597,363 | 1,591,874 | 1,603,766 | 19,484,080 |
| 2 Average Monthly Member Months | | | | | | | | | | | | | | 1,623,673 |
| **Revenues:** | | | | | | | | | | | | | | |
| 3 Dental Premiums | | 55,068,959 | 55,051,271 | 55,260,147 | 55,248,786 | 54,847,399 | 54,629,679 | 54,501,234 | 53,730,422 | 53,508,844 | 53,356,293 | 53,206,622 | 53,586,000 | 652,009,466 |
| 4 Investment Income | | 102,957 | 97,323 | 89,027 | 88,511 | 88,459 | 89,600 | 92,088 | 89,045 | 79,491 | 87,295 | 52,423 | 140,323 | 1,091,459 |
| 5 Health Insurer Fee Reimbursement | | 17,659,542 | | | | | | | | | | | | 17,659,542 |
| 6 Other Revenue | | | | | | | | | | | | | | |
| 7 Total Gross Revenues | | 72,851,069 | 55,148,594 | 55,349,274 | 55,337,297 | 54,935,858 | 54,719,299 | 54,593,320 | 53,819,467 | 53,588,335 | 53,437,588 | 53,259,045 | 53,726,323 | 670,760,467 |
| 8 Health Insurance Providers Fee & Related Costs | | 17,350,497 | | | | | | | | | | | | 17,350,497 |
| 9 Premium Taxes | | 1,273,092 | 963,397 | 967,066 | 969,854 | 969,829 | 966,019 | 963,772 | 940,282 | 938,405 | 933,735 | 931,011 | 937,755 | 11,719,208 |
| 10 Maintenance Taxes | | 22,035 | 22,021 | 22,104 | 22,100 | 21,939 | 21,852 | 21,800 | 21,492 | 21,404 | 21,343 | 21,280 | 21,434 | 260,004 |
| 11 Net Revenues | | 54,205,444 | 54,163,176 | 54,360,104 | 54,348,344 | 53,954,090 | 53,741,428 | 53,617,748 | 52,857,692 | 52,638,527 | 52,482,510 | 52,300,754 | 52,767,134 | 641,429,960 |
| **Dental Expenses:** | | | | | | | | | | | | | | |
| 12 Fee-For-Service | | 45,235,851 | 53,894,313 | 48,083,183 | 41,945,599 | 54,325,788 | 45,308,499 | 50,258,853 | 48,266,989 | 44,606,895 | 46,001,427 | 51,425,494 | 53,508,246 | 582,861,117 |
| 13 Net Reinsurance Cost | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 14 IBNR Accrual | | 0 | 0 | 0 | 109 | 445 | 2,077 | 3,730 | 7,428 | 13,593 | 23,670 | 61,098 | 0 | 349,474 |
| 15 Quality Improvement | | 112,362 | 113,801 | 113,948 | 112,278 | 123,726 | 121,845 | 121,348 | 122,095 | 124,509 | 50,403 | 102,143 | 101,859 | 1,320,317 |
| 16 Capitated Services | | 140,220 | 147,858 | 147,448 | 165,688 | 161,652 | 158,186 | 156,773 | 118,114 | 127,038 | 120,395 | 119,300 | 132,588 | 1,695,240 |
| 17 Value-Based Purchasing | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18 Other Dental Expenses | | (20,627) | (146,401) | (94,154) | (222,041) | (257,180) | (244,507) | 25,045 | 46,688 | 77,622 | (39,448) | (82,158) | (100,940) | (1,058,699) |
| 19 Total Dental Expenses | | 45,467,806 | 54,009,571 | 48,250,425 | 42,001,033 | 54,354,403 | 45,346,100 | 50,565,749 | 48,561,324 | 44,949,657 | 46,156,447 | 51,625,877 | 53,879,057 | 585,167,449 |
| 20 Administrative Expenses | | 1,611,278 | 2,054,270 | 2,043,022 | 2,731,473 | 1,938,566 | 1,937,474 | 2,944,080 | 2,346,172 | 2,458,355 | 2,888,726 | 3,338,159 | 2,878,384 | 29,179,961 |
| 21 Total Expenses | | 47,079,084 | 56,063,841 | 50,293,448 | 44,732,506 | 56,292,969 | 47,283,574 | 53,509,828 | 50,907,496 | 47,408,012 | 49,065,174 | 54,964,036 | 56,757,441 | 614,347,493 |
| 22 Net Income Before Taxes | | 7,126,360 | (1,900,665) | 4,067,656 | 9,615,838 | (2,338,879) | 6,457,854 | 107,920 | 1,950,196 | 5,222,515 | 3,427,336 | (2,663,282) | (3,990,307) | 27,082,551 |
| 23 % Dental Exp to Net Revenues | | 83.9% | 99.7% | 88.8% | 77.3% | 100.7% | 84.4% | 94.3% | 91.9% | 85.4% | 87.9% | 98.7% | 102.1% | 91.2% |
| 24 % Admin Exp to Net Revenues | | 3.0% | 3.8% | 3.8% | 5.0% | 3.6% | 3.6% | 5.5% | 4.4% | 4.7% | 5.5% | 6.4% | 5.5% | 4.5% |

## F.      EXHIBIT F

DQ USA's Administrative Expenses FSR from September 2018-August 2019

# EXHIBIT "F"

**HHSC FINANCIAL STATISTICAL REPORT (FSR)** — Note: Unless an item is specifically stated otherwise, reporting of all amounts is on an incurred basis (that is, reported in the period corresponding to dates the services were incurred, rather than to date paid). All prior quarters' data must be updated to reflect the most recent actuals.

| MCO Name | DentaQuest USA Insurance Co. | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State Fiscal Year | 2019 | Program | All | | | | | | | | | | |
| Submission Date | 12/20/2019 | Service Area | All | | | | | | | | | | |
| Submission Type | Yr-End 90-Day | Rptg Period End Date | 8/31/2019 | | | | | | | | | | |

**Admin Part 1:**

**Administrative Expenses presented in US Dollars, does not include MMP costs**

| HHSC Managed Care | Contract Costs | Incurred Months | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Salaries, wages, and benefits (excl. bonuses) | | $600,544 | $641,778 | $597,774 | $579,298 | $667,953 | $551,098 | $598,932 | $600,264 | $595,368 | $480,921 | $793,860 | $577,906 | $7,279,386 |
| 8 | 2 Bonuses | | $4,000 | $2,500 | $0 | $70,000 | $0 | -$2,000 | $0 | $0 | | | | | $6,500 |
| 9 | 3 Rent, Lease, or Mortgage Payment for Office Space | | | | | | | | | | | | | | $0 |
| 10 | 4 Utilities (if not incl. in rent), excl. Phone/Telecom | | | | | | | | | | | | | | $0 |
| 11 | 5 Phone / Telecom (Cell phones) T1 / Broadband | | $15,116 | $27,510 | $14,897 | $21,524 | $5,792 | $4,736 | $35,748 | $31,446 | $13,026 | $2,761 | $12,042 | $17,353 | $171,951 |
| 12 | 6 Equipment Lease of Rent, excl. Phone/Telecom | | | | | | | | | | | | | | $0 |
| 13 | 7 Computer hardware/Software purch., uncapitalized | | $1,619 | $844 | $1,904 | -$539 | $0 | $40 | $0 | $6,682 | $1,400 | | $6 | $3,104 | $15,048 |
| 14 | 8 Furniture, Fixtures, and other Equipment Purchased, uncapitalized | | | | | | | | | | | | | | $0 |
| 15 | 9 Maintenance, Repairs, Custodial, and Security | | | | | | | | | | | | | | $0 |
| 16 | 10 Supplies, Postage, Freight, Printing | | $16,195 | $1,532 | $13,865 | $9,610 | $4,499 | $45,877 | $2,520 | $1,594 | $74,918 | $17,700 | $13,074 | $32,921 | $177,987 |
| 17 | 11 Legal & Prof. Services, incl. External Audit, Tax, Con | | $70,111 | $0 | $0 | $48,807 | $45 | $16 | $0 | $0 | $0 | $0 | $0 | $0 | $118,798 |
| 18 | 12 Travel Expenses | | $32,619 | $17,497 | $12,010 | $11,365 | $14,989 | $12,087 | $9,921 | $16,264 | $19,224 | $8,760 | $7,638 | $32,625 | $185,979 |
| 19 | 13 Marketing, PR, and Outreach (excl. Salaries) | | $192,784 | $54,885 | $277,608 | $199,920 | $99,023 | $407,472 | $129,905 | $258,899 | $99,903 | $139,180 | $168,930 | $196,004 | $2,125,493 |
| 20 | 14 Taxes (excl. income taxes & premium taxes) & Licensing | | | | | | | | | | | | | | $0 |
| 21 | 15 Insurance | | | | | | | | | | | | | | $0 |
| 23 | 16 Depreciation & Amortization | | $258,109 | $262,339 | $288,570 | $325,065 | $371,284 | $348,462 | $400,199 | $379,325 | $696,065 | $509,976 | $274,182 | $115,208 | $4,329,864 |
| 24 | 17 Other Administrative Expenses | | $494 | $121 | -$9,372 | $1,727 | $45 | $16 | $38 | $0/7 | $0 | $1,379 | $20,072 | $59 | $225,500 |
| 25 | 18 Subtotal (specified in-house services) | | $1,117,591 | $1,108,996 | $1,197,286 | $1,196,057 | $1,153,595 | $1,367,808 | $1,146,661 | $1,296,141 | $1,499,894 | $1,160,677 | $1,474,494 | $946,255 | $14,636,415 |
| 26 | 19 Outsourced services (Non-Capitated Arrangements) | | | | | | | | | | | | | | $0 |
| 27 | 20 Outsourced services (Capitated Arrangements) | | | | | | | | | | | | | | $0 |
| 28 | 21 PBM Admin Fees - Fees based on SPM/PM | | | | | | | | | | | | | | $0 |
| 29 | 22 PBM Admin Fees - Fees based on transaction volume | | | | | | | | | | | | | | $0 |
| 30 | 23 PBM Fees - Other | | | | | | | | | | | | | | $0 |
| 31 | 24 Corporate Allocations | | $668,681 | $1,164,547 | $1,092,960 | $1,826,733 | $1,010,059 | $776,173 | $2,109,481 | $1,300,733 | $1,232,046 | $2,045,433 | $2,213,659 | $2,231,820 | $17,642,325 |
| 32 | **25 Total Administrative Expenses** | | **$1,786,272** | **$2,273,533** | **$2,280,246** | **$3,022,790** | **$2,143,624** | **$2,143,981** | **$3,256,142** | **$2,596,874** | **$2,731,940** | **$3,206,110** | **$3,688,153** | **$3,178,075** | **$32,278,740** |

**Not Included in Total Administrative Above:**

| 33 | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34 | 26 Total Administrative Value Added Services | | $440 | $878 | $378 | $0 | $1,811 | $300 | $11 | $348 | $810 | $329 | $318 | $0 | $4,923 |
| 35 | 27 Description of outsourced services from Line 19 Non-Capitated | | | | | | | | | | | | | | |
|  | Arrangements by vendor and YTD dollar amount. | | | | | | | | | | | | | | |
| 36 | 28 Description of outsourced services included in Line 20 Capitated | | | | | | | | | | | | | | |
|  | Arrangements by vendor and YTD dollar amount. | | | | | | | | | | | | | | |
| 37 | End of Worksheet | | | | | | | | | | | | | | |

## G.     EXHIBIT G

MCNA's Administrative Expenses FSR from September 2018-August 2019

# EXHIBIT "G"

**HHSC FINANCIAL STATISTICAL REPORT / FSR**

| | |
|---|---|
| MCO Name | |
| MCNA Insurance | Program: All |
| State Fiscal Year | 2019 |
| Submission Date | 12/24/2019 | Service Area: All |
| Submission Type | Yr-End 90-Day | Rptg Period End Date: 8/31/2019 |

**Admin Part I:**

Administrative Expenses presented in US Dollars, does not include MMP costs

Note: Unless an item is specifically stated otherwise, reporting of all amounts is on an incurred basis (that is, reported in the period corresponding to dates the services were incurred, rather than to date paid). All prior quarters' data must be updated to reflect the most recent actuals.

| Contract Costs | Incurred Months | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HHSC Managed Care** | | | | | | | | | | | | | | |
| 1 Salaries, wages, and benefits (excl. bonuses) | | $439,931 | $519,314 | $492,761 | $487,757 | $472,375 | $563,072 | $618,357 | $514,719 | $546,739 | $500,604 | $551,882 | $680,016 | $6,272,729 |
| 2 Bonuses | | $85,518 | $85,684 | $185,736 | $501,515 | $119,144 | $130,886 | $131,191 | $131,233 | $131,108 | $131,108 | $131,108 | -$29,508 | $1,734,723 |
| 3 Rent, Lease, or Mortgage Payment for Office Space | | $64,000 | $65,771 | $65,340 | $64,225 | $64,147 | $64,188 | $64,985 | $59,118 | $64,329 | $65,703 | $63,941 | $64,694 | $770,039 |
| 4 Utilities (if not incl. in rent), excl. Phone/Telecom | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 5 Phone / Telecom / Cell phones / T1 / Broadband | | $37,977 | $40,645 | $38,960 | $41,738 | $36,502 | $24,881 | $35,845 | $34,121 | $33,496 | $33,539 | $34,100 | $36,565 | $426,071 |
| 6 Equipment Lease or Rent, excl. Phone/Telecom | | $1,329 | $1,248 | $0 | $2,577 | $1,329 | $0 | $3,833 | $1,410 | $1,248 | $1,248 | $1,248 | $1,248 | $16,718 |
| 7 Computer hardware/Software purch., uncapitalized | | $0 | $2,645 | $0 | $486 | $243 | $486 | $435 | $6,754 | $0 | $1,432 | $0 | $0 | $12,480 |
| 8 Furniture, Fixtures, and other Equipment Purchase | | $1,389 | $27 | $169 | $169 | $169 | $169 | -$350 | $0 | $150 | $0 | $0 | $285 | $2,158 |
| 9 Maintenance, Repairs, Custodial, and Security | | $0 | $0 | $184 | $0 | $0 | $0 | $576 | $0 | $1,639 | $0 | $1,959 | $1,959 | $6,457 |
| 10 Supplies, Postage, Freight, Printing | | $83,925 | $72,984 | $36,489 | $78,844 | $80,432 | $98,745 | $52,092 | $93,109 | $65,619 | $73,830 | $124,621 | $77,504 | $905,392 |
| 11 Legal & Prof. Services, incl. External Audit, Tax, C... | | $244,406 | $246,610 | $248,985 | $256,252 | $281,778 | $294,991 | $279,188 | $268,728 | $322,863 | $268,012 | $272,345 | $299,632 | $3,251,789 |
| 12 Travel Expenses | | $8,544 | $14,744 | $10,438 | $10,066 | $14,718 | $11,714 | $15,808 | $12,785 | $3,883 | $3,228 | $4,111 | $9,694 | $117,232 |
| 13 Marketing, PR, and Outreach (excl. Salaries) | | $15,009 | $27,619 | $10,907 | -$4,666 | $15,759 | $11,140 | $20,966 | $24,425 | $22,098 | $18,996 | $16,400 | $16,400 | $158,840 |
| 14 Taxes (excl. income taxes & premium taxes) & Li... | | $555 | $555 | $438 | $1,083 | $1,083 | $1,083 | $1,083 | $1,625 | $1,083 | $2,035 | $1,083 | $1,083 | $12,146 |
| 15 Insurance | | $18,721 | $16,924 | $420 | $17,666 | $17,102 | $17,902 | $18,187 | $18,187 | $17,771 | $19,710 | $18,925 | $19,835 | $221,440 |
| 16 Depreciation & Amortization | | $8,478 | $7,254 | $7,005 | $7,211 | $8,207 | $28,606 | $8,366 | $11,606 | $11,606 | $10,626 | $11,116 | $11,116 | $112,469 |
| 17 Other Administrative Expenses | | $35,620 | $30,072 | $91,705 | $38,659 | $30,268 | $30,170 | $34,181 | $30,260 | $37,424 | $30,170 | $32,550 | $30,550 | $793,137 |
| 18 Subtotal (specified in-house services) | | $1,060,769 | $1,161,898 | $1,152,885 | $1,503,081 | $1,244,603 | $1,159,703 | $1,186,009 | $1,227,608 | $1,281,857 | $1,216,897 | $1,355,495 | $1,241,402 | $14,813,817 |
| 19 Outsourced services (Non-Capitated Arrangemen... | | $3,087,586 | $3,080,267 | $3,008,906 | $2,938,305 | $2,927,346 | $2,760,721 | $2,948,025 | $2,990,197 | $2,805,486 | $2,798,444 | $2,730,977 | $2,910,919 | $34,922,087 |
| 20 Outsourced services (Capitated Arrangements) | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 21 PBM Admin Fees - Fees based on $PM/PM | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 22 PBM Admin Fees - Fees based on transaction volume | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 23 PBM Fees - Other | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 24 Corporate Allocations | | $256,358 | $400,121 | $385,342 | $419,445 | $420,929 | $280,237 | $295,334 | $321,285 | $343,695 | $246,928 | $391,294 | $326,964 | $4,233,322 |
| **25 Total Administrative Expenses** | | **$4,400,133** | **$4,652,276** | **$4,577,143** | **$4,960,830** | **$4,592,878** | **$4,236,662** | **$4,441,368** | **$4,458,089** | **$4,431,028** | **$4,261,769** | **$4,477,766** | **$4,479,285** | **$53,969,226** |
| **Not Included in Total Administrative Above:** | | | | | | | | | | | | | | |
| 26 Total Administrative Value Added Services | | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $31,919 | $383,025 |
| 27 Description of outsourced services from Line 19 Non-Capitated Arrangements by vendor and YTD dollar amount | | Managed Care of North America (TPA) $33,356,395 and Media Riders Inc. $1,566,692 | | | | | | | | | | | | |
| 28 Description of outsourced services included in Line 20 Capitated Arrangements by vendor and YTD dollar amount | | | | | | | | | | | | | | |

End of Worksheet

## H.    EXHIBIT H

DQ USA's False Statements in Certifying Compliance to Texas Medicaid Contract

# EXHIBIT "H"

**Contractual document Attachment A-HHSC Medicaid/CHIP Dental Services**

**<u>Terms & Conditions</u>**

**Certified at the Initial Contract and at Each Amendment through present**

---

**Section 1.03 Inducements**

**In making the award of this Contract, HHSC relied on Dental Contractor's assurances of the following:**

(1) Dental Contractor is an established dental indemnity insurance provider or DMO that arranges for the delivery of Dental Services, that is: (1)  currently licensed as such in the State of Texas and is fully authorized to conduct business in the Service Area, or (2) will be fully authorized by TDI to conduct business in the Service Area no later than 120 days after the Contract's Effective Date;

(2) **Dental Contractor and its Material Subcontractors have the skills, qualifications, expertise, financial resources and experience necessary to provide the Services and Deliverables described in this Contract** in an efficient, cost-effective manner, with a high degree of quality and responsiveness, and has performed similar services for other public or private entities;

(3) Dental Contractor **has thoroughly reviewed, analyzed, and understood the RFP**, has timely raised all questions or objections to the RFP, and **has had the opportunity to review and fully understand HHSC's current Dental Program and operating environment** for the activities that are the subject of the Contract and the needs and requirements of the State during the Contract term;

(**4**) Dental Contractor has had the opportunity to review and understand the State's stated objectives in entering into this Contract and, based on such review and understanding, **Dental Contractor currently has the capability to perform in accordance with the terms and conditions of this Contract;**

(5) Dental Contractor also has reviewed and understands the risks associated with the Dental Program as described in the RFP, including the risk of non-appropriation of funds

> **Accordingly, on the basis of the terms and conditions of this Contract, HHSC desires to engage Dental Contractor to perform the Services and provide the Deliverables described in this Contract under the terms and conditions set forth in this Contract.**

In the **"Required Certifications"** form that DQ USA signed on May 5, 2011, it certified provisions of Contractual Document Attachment B-1- Medicaid/CHIP Dental Services RFP as follows:

By Submitting a proposal, the respondent agrees and certifies the following:

1. **The Respondent accepts the RFP terms and conditions**, including Uniform Contract Terms and Conditions, and other RFP requirements unless specifically noted on the Respondent information and Disclosure Form. HHSC reserves the right to reject any or all of the respondent's proposed exceptions.
2. **The Respondent guarantees that the proposal complies with all RFP requirements,** at the costs outlined in the proposal. The respondent further guarantees that the terms specified in the proposal will remain firm and binding through the contract termination date, unless the parties agree to modify such terms in the contract.

---

**False Statements in Certifying Compliance**

Steven Pollock, Fay Donohue, Robert Lynn, Brett Bostrack, James Hawkins and Collins

---

| HHSC CONTRACTUAL TERMS AND CONDITIONS | DQ USA NON-COMPLIANCE | MATERIALITY: Violation of HHSC Contract Inducement Criteria & Certifications of RFP terms |
| --- | --- | --- |
| **Section 7.02 Dental Contractor responsibility for compliance with laws and regulations**<br><br>(e) Dental Contractor is responsible for ensuring each of its employees, agents, or Subcontractors who provide Services or Deliverables under the Contract is properly licensed, certified, and/or has proper permits to perform any activity related to the Services or Deliverables. | DQ LLC performed administrative and management services for Texas Medicaid Contract and supplied all the key personnel and employees, however DQ LLC is not licensed by the TDI | **Section 1.03 (3, 4) & Violation of basis of terms and conditions of the contract** |

| | | |
|---|---|---|
| **Section 1.03 Inducements**<br><br>(2) Dental Contractor and its Material Subcontractors have the skills, qualifications, expertise, financial resources and experience necessary to provide the Services and Deliverables described in this Contract in an efficient, cost-effective manner, with a high degree of quality and responsiveness, and has performed similar services for other public or private entities; | DQ USA and its Material Subcontractor GTESS did not have the skills, qualifications, expertise, financial resources and experience necessary to provide the Services and Deliverables described in this Contract | **Section 1.03 (2, 4) & Violation of basis of terms and conditions of the contract** |
| **Section 4.03 Executive Director**<br><br>(a) The Dental Contractor must employ a qualified individual to serve as the Executive Director for the Dental Program. **Such Executive Director must be employed full-time by the Dental Contractor, b**e primarily dedicated to the Dental Program, and must hold a Senior Executive or Management. position in the Dental Contractor's organization, except that the Dental Contractor may propose an alternate structure for the Executive Director position, subject to HHSC's prior review and written approval<br><br>(b) The Executive Director must be authorized and empowered to represent the Dental Contractor regarding all matters pertaining to the Contract prior to such representation. | Steven Pollock, the current CEO of DSM and DQ LLC was also the CEO of DQ USA (per OIG 2016 and 2017 reports) and could not be a full time Executive Director to DQ USA | **Section 1.03 (3, 4) Violation of basis of terms and conditions of the contract** |
| **Section 4.04 Dental Director**<br><br>(a) **The Dental Contractor must have a qualified full-time individual to serve as the Dental Director for the Dental Program. The Dental Director must be currently licensed in Texas as a Doctor of Dentistry ("dentist,")** with no restrictions or other licensure limitations. The Dental Director must | There was no full time Dental Director in Texas, because Relator's August 19, 2015, September 10, 2015, and other CDC Garland | **Section 1.03 (3, 4) & Violation of basis of terms and conditions of the contract** |

| | | |
|---|---|---|
| comply with applicable federal and state statutes and regulations.<br>(b) The Dental Director, or his or her designee meeting the qualifications described in Section 4.04(a), must be available during normal business hours for Utilization Review decisions, and must be authorized and empowered to represent the Dental Contractor regarding clinical issues, Utilization Review and quality of care inquiries. | dentists chart audit letter from DQ LLC directed patient charts to be sent to Wisconsin and not to DQ USA's office in Austin, Texas | |
| **Section 10.11 Restriction on assignment of fees**<br><br>During the Contract Term, Dental Contractor may not, directly or indirectly, assign to any third party any beneficial or legal interest of the Dental Contractor in or to any payments to be made by HHSC pursuant to this Contract.  This restriction does not apply to fees paid to Subcontractors. Section | DQ USA assigned HHSC payments to DQ LLC because DQ LLC disbursed funds to Texas dentists as per the dentist contract | **Section 1.03 (3, 4) & Violation of basis of terms and conditions of the contract** |
| **Section 4.07 Conduct of Dental Contractor personnel and Subcontractors**.<br><br>While performing the Services, Dental Contractor's personnel and Subcontractors must:<br>(1) Comply with applicable State laws, rules, and regulations and HHSC's requests regarding personal and professional conduct generally applicable to the service locations; and<br>(2) **Otherwise conduct themselves in a businesslike and professional manner**. | CDC compliance officers Ron Price and Nick Messuri (who were also compliance officers for DQ USA), were DQ LLC attorneys who emailed Relator on August 21, 2015 to investigate CDC compliance issues, however failed to reveal to Relator they were attorneys, knowing Relator had counsel representing her, thereby demonstrating unprofessional behavior. | **Section 1.03 (3, 4) & Violation of basis of terms and conditions of the contract** |

| | | |
|---|---|---|
| **Section 13.02 Conflicts of Interest**<br><br>(a) Representation.<br><br>Dental Contractor agrees to comply with applicable state and federal laws, including 41 U.S.C. § 423, rules, and regulations regarding conflicts of interest in the performance of its duties under this Contract. Dental Contractor warrants that it has no interest and will not acquire any direct or indirect interest that would conflict in any manner or degree with its performance under this Contract.<br><br>(b) General duty regarding conflicts of interest.<br><br>Dental Contractor will establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain. Dental Contractor will operate with complete independence and objectivity without actual, potential or apparent conflict of interest with respect to the activities conducted under this Contract. | DQ USA acquired conflicts of interest through its parent DQ LLC's control of CDC that put DQ USA at an unfair advantage at future procurement; facts incorporated by reference to section VI C 2 (7). | **Section 1.03 (3, 4) & Violation of basis of terms and conditions of the contract** |
| **3.19 No Joint Proposals**<br><br>HHSC will not consider joint or collaborative proposals that require it to contract with more than one (1) Respondent. | DQ USA provided a joint proposal<br><br>"Because of the common administration and management of the DentaQuest companies by one management organization, in this Response, we provide information with respect to the qualifications of DentaQuest Group, Inc. and its subsidiaries, referred to in this Response as "DentaQuest" or the | **Section 1.03 (3) & Required Certifications, & Violation of basis of terms and conditions of the contract** |

| | "DentaQuest organization" to perform the services and meet the requirements described in the RFP". | |
|---|---|---|
| **3.20 Use of Subcontractors**<br><br>Subcontractors providing services under the Contract must meet the same requirements and level of experience as required by the Contract. A Subcontract cannot relieve the Respondent of the responsibility for ensuring the requested services are provided. **Respondents planning to Subcontract all or a portion of the work to be performed must identify the proposed Subcontractors and describe the subcontracted functions in their proposals.**<br><br>Subcontract means any written Contract between the Dental Contractor and another party to fulfill the requirements of the Contract. | DQ USA which had "0" employees and "0" experience did not identify DQ LLC as a Subcontractor. whom it claimed as providing administrative and management services<br><br>In the "Respondent Information and Disclosures" form which required name of the respondent and its subcontractors, DQ USA identified 5 subcontractors-GTESS Corporation, Apple Specialty Advertising, Marfield Corporate Stationery, Harp enterprises Inc. and Trachmar, however DQ LLC was not one of them. | **Section 1.03 (3) & Required Certifications, & Violation of basis of terms and conditions of the contract** |
| **HHSC Required Certification in FSR's**<br><br>By signature below, Contractor certifies that the data or documents so recorded and submitted as input data or information, based on its best knowledge, information, and belief: are in | DQ USA's FSR's had false representations and overinflated | **Section 1.03 (1, 2, 3, 4, 5) & Violation of basis of terms and** |

| | | |
|---|---|---|
| compliance with Subpart H of the Balanced Budget Act Certification requirements; are **complete, accurate, and truthful**; and are in accordance with all Federal and State laws, regulations, policies, and the HHSC Contract in effect during the time covered in the report. Contractor further certifies that it will retain and preserve all documents as required by law or by the Contract, submit all or any part of the same, or permit access to same for audit purposes, as required by HHSC or any agency of the federal government, or their representatives. Document access and retention extends to source documents needed to verify any costs billed to or assessed to the Contractor by the Contractor's parent or any other Affiliate;  such source documents may include parts of the books and records of the parent or other Affiliate. | expenses as discussed herein under section 5 (1)(a) overinflated expenses, signed by Jim Collins representing as CFO, DQ USA (recall that DQ USA had "0" employees) | **conditions of the contract** |
| **Attachment D Corporate Guarantee**<br><br>In consideration of the execution by the Texas Health and Human Services Commission ("Beneficiary") of the HHSC Contract Non. 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-00002, as amended, hereinafter the ("Contract") with DentaQuest USA Insurance Company Inc. ("Subsidiary"), Dental Service of Massachusetts, Inc. ("Parent") **unconditionally and irrevocably guarantees to Beneficiary, on the terms and conditions herein, the full and faithful performance by Subsidiary** of all of the obligations undertaken by Subsidiary pursuant to the Contract and as it may hereafter be amended, modified, or extended from time to time, by work authorizations or otherwise.<br><br>If subsidiary fails or refuses to complete any of its obligations, Parent shall complete or cause to be completed, the obligation that Subsidiary failed or refused to complete, or be considered to be in breach of the Contract to the same extent as Subsidiary, pursuant to the terms and conditions of the Contract. | DSM the ultimate parent and Fay Donohue President and CEO, of DSM by her signature unconditionally guaranteed DQ USA's full and faithful performance, making false certifications that DQ USA would perform pursuant to the contract, however breached the contract by being non-compliant with several terms and conditions as discussed herein and in violation of several provisions | **Section 1.03 (1, 2, 3, 4, 5) & Violation of basis of terms and conditions of the contract** |

| | of TMFPA unlawful acts. | |
| --- | --- | --- |