IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA and the   §
STATES OF TEXAS, ILLINOIS,   §
COLORADO and TENNESSEE ex rel.   §
DR. SUJATHA GOVINDARAJAN,   §
  §
      Plaintiffs,   §
  §
v.   §      Civil Action No. 3:18-cv-00463-E
  §
DENTAL HEALTH PROGRAMS, INC. d/b/a  §
COMMUNITY DENTAL CARE, et al.,   §
  §
      Defendants.   §

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Dismiss the Corrected Third Amended Complaint for Failure to State a Claim (Doc. 108). Having carefully considered the motion, the parties' briefing, the State of Texas's Second Statement of Interest (Doc. 113), and applicable law, the Court concludes the motion should be GRANTED in part and DENIED in part.

### BACKGROUND

The following allegations come from Relator Sujatha Govindarajan's Corrected Third Amended Complaint (CTAC) (Doc. 107). Relator, a dentist, was employed by Defendant Dental Health Programs, Inc. d/b/a Community Dental Care (CDC) from 1999 to 2015. CDC, a non-profit dental service provider, received a majority of its funding from Medicaid and federal grants. In 2013, CDC discussed a possible affiliation with another non-profit dental service provider, Sarrell Regional Dental Center for Public Health, Inc. (Sarrell). Instead, both CDC and Sarrell became affiliated with DentaQuest Care Group (DQCG), a non-profit subsidiary of

1

Defendant Dental Service of Massachusetts d/b/a Delta Dental of Massachusetts (DSM), "the ultimate parent of all DQ entities."

According to Relator's complaint, Sarrell employees Jeff Parker (CEO), Chris Haugen (General Counsel), and Jeremy Slayton (CFO) then took over control and operations of CDC. Parker served as Chairman of the CDC Board of Directors; Haugen served as the Board's Secretary and also VP of Business Development. According to the CTAC, Parker, Haugen, and Slayton also were employees of Defendant DentaQuest, LLC (DQ LLC), a for-profit dental benefits administrator, and, thereafter, CDC hired DQ LLC to provide administrative and management services.

During this transition, Relator served as CDC's Dental Director. She was moved to a general dentist position on August 14, 2014, about a week after raising "several violations and non-compliance of Federal Grants terms and conditions." She later learned of "additional Medicaid and Federal Grants fraud in the form of upcoding of non-surgical extractions, billing of uncredentialed dentists under credentialed dentists, overtreatment, and non-compliance with Federal Grant terms and conditions, falsely certifying them at the time of renewal."

On May 1, 2015, Relator complained through counsel to CDC regarding employment issues, Medicaid and federal grant fraud, and forgery on Relator's MCNA Medicaid Contract, which Relator refused to sign because CDC was not compliant with the contract's terms. CDC offered to mediate. After Relator complained that the issues she raised were not being addressed, Tom Bixby, a compliance counsel hired by DQ LLC, contacted her to investigate the CDC compliance issues.

2

On August 21, 2015, Relator received an email from Ron Price, CDC Compliance Officer, asking to discuss CDC compliance issues. Relator later learned Price was a DQ LLC attorney and also a compliance officer for Defendant DentaQuest USA Insurance Company (DQ USA), a DQ LLC subsidiary that procured Medicaid contracts in Texas, Colorado, and Tennessee. Also in August 2015, DQ LLC, "representing itself to be the Texas Medicaid administrator," sent Relator a chart audit letter asking her to send her patient records to DentaQuest, Inc. a/k/a DentaQuest Group Inc. (DQ Inc.), DQ LLC's parent company.

Based on these events, Relator became aware "CDC was covertly controlled and operated by DQ LLC" and suspicious whether DQ LLC was disclosed as a controlling entity to CDC's federal grant funders. Relator requested a copy of her provider contracts and learned that she had signed her September 30, 2011 provider service agreement with DQ USA. As a result, she became suspicious as to which entity had contracted with the Texas Health and Human Services Commission (HHSC) for the Texas Medicaid Contract and whether HHSC was aware that DQ LLC was performing obligations under the contract.

On November 5, 2015, Relator emailed CDC Executive Director Kevin Sutton to investigate her contracts further and invoked section 36.115 of the Texas Medicaid Fraud Prevention Act (TMFPA). *See* TEX. HUM. RES. CODE ANN. § 36.001 *et seq*. Her email access to CDC was "shut off" the next day and, on November 7, 2015, she received a termination letter from CDC.

After her termination, Relator confirmed her suspicion that DQ LLC "was the administrator to [the] Texas Medicaid Contract, without being a party to the contract." DQ LLC also provided services for the Colorado and Tennessee Medicaid Contracts without being

3

disclosed as a party to the contracts.  Further, DQ LLC did not hold licenses from the State of Texas, Colorado, or Tennessee departments of insurance.

Relator has amended her complaint three times.[1]  In five counts, the CTAC asserts violations of the False Claims Act (FCA), 36 U.S.C. § 3729 *et seq.*, the TMFPA, the Colorado Medicaid False Claims Act (CMFCA), COLO. REV. STAT. § 25.5-4-303.5 *et seq.*; and the Tennessee Medicaid False Claims Act (TMFCA), TENN. CODE ANN. § 71-5-181 *et seq.*  Relator alleges Defendants are liable for "(a) submission of false and fraudulent claims to the federal government and States of Colorado and Tennessee, (b) committing Unlawful Acts and overinflating expenses in Texas, and (d) [sic] making false statements to the funders of Federal Grants after the grants were awarded" (Doc. 107, p. 9).  Relator also asserts retaliation claims. Defendants move to dismiss all of the claims against them under Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint alleging fraud also must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Fed. R. Civ. P. 9(b); *see United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (applying Rule 9(b) to FCA claims); *United States ex rel. Foster v. BristolMyers Squibb Co.*, 587 F. Supp.2d 805, 827 (E.D. Tex. 2008) (applying Rule 9(b) to TMFPA and other state FCA claims).

---

[1] On a previous motion (Doc. 47), the Court dismissed Relator's claims except her claims for retaliation with respect to those retaliatory acts alleged after February 26, 2015 against CDC.  The Court dismissed Relator's state law fraudulent inducement claims with prejudice.  The Court granted leave for Relator to amend her complaint to replead the remaining claims (Doc. 92).

4

Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). The court's review generally is limited to the complaint, its proper attachments, and documents attached to the motion to dismiss that are central to the claim and referenced by the complaint. *See Lone Star Fund V (U.S.) v. Barclays Bank, N.A.*, 594 F.3d 383, 387 (5th Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is facially plausible if the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a claim "is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

## ANALYSIS

A. *Count One – Violations of the FCA*

In Count One, Relator alleges CDC made false statements in federal grant contracts or applications by misrepresenting and/or not disclosing matters related to DQ LLC's control and

5

operation of CDC and falsely certifying its compliance with certain contract provisions, statutes, and regulations (Doc. 107, pp. 32-38, 98-99).  Relator further alleges CDC submitted false claims by upcoding extraction and denture procedures (*Id.*).

The FCA is the federal government's "primary litigation tool for recovering losses resulting from fraud." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 (5th Cir. 2010) (internal quotation marks and citation omitted).  It "does not punish every type of fraud committed upon the government." *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp.2d 745, 765 (S.D. Tex. 2010).  The FCA authorizes actions by the United States or by a relator in a *qui tam* capacity against a person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A), (B).

These violations may be alleged under theories of fraudulent inducement or false certification.  *United States ex rel. Montes v. Main Bldg. Maintenance, Inc.*, No. 5-16-cv-00523-JKP-RBF, 2020 WL 7624936, at *2 (W.D. Tex. Dec. 22, 2020).  A relator alleges fraudulent inducement by facts showing submission of claims "pursuant to a contract that was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves."  *Id.* (internal quotation marks and citation omitted).  "False certification is alleged with facts that show either express misrepresentations made to the Government on a payment claim (express false certification theory) or omissions from such claims (implied false certification theory)."  *Id.* (citations omitted).

To properly plead a violation of subsections 3729(a)(1)(A) or (B), a complaint must allege: (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due. *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012) (quoting *U.S. ex rel. Longhi v. Lithium Power Tech. Inc.*, 575 F.3d 458, 467 (5th Cir. 2009)). The FCA "attaches liability, not to the underlying fraudulent activity ... but to the claim for payment." *Longhi*, 575 F.3d at 467. "Material" is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Thus, liability attaches when the misrepresentation is "material to the Government's payment decision." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, — U.S. ——, 136 S. Ct. 1989, 1996 (2016). The FCA's materiality requirement is "rigorous" and "demanding." *Id.* at 1996, 2003–04, n.6 (noting FCA is not "an all-purpose antifraud statute" or "a vehicle for punishing garden-variety breaches of contract or regulatory violations"). "Materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* at 2002 (internal quotation marks and citation omitted).

1. *False Statements in Federal Grant Contracts and Applications*

Relator first alleges that CDC made false statements in contracts and applications for certain federal grants[2] by failing to disclose that: (1) DQ LLC had a controlling interest in and operated CDC; (2) CDC had hired DQ LLC for administrative and management services; and

---

[2]  These federal grants are the Title V Child Dental and Title V Prenatal Dental Grant(Title V), the Dallas County Ryan White HIV Grant, the City of Irving Community Development Block Grant, the City of Garland Community Development Block Grant, and the City of McKinney Community Development Block Grant.

(3) CDC had assigned its duties under the grant contracts to DQ LLC.[3]

In a chart attached as Exhibit A to the CTAC, Relator identifies the applicable federal grant contracts and applications, questions from those contracts and applications, and CDC's responses (Doc. 107, pp 136-39).  Some questions inquire about CDC's ownership and whether any parties hold an interest, including a controlling interest, in CDC.  The contracts and applications also provide that CDC shall not have the right to assign or transfer its obligations or duties under the contract without the grantor's consent.

Relator alleges the following facts to show that DQ LLC "controlled" CDC: (1) "Dentaquest management moved all of CDC's books and financials to Sarrell … in Alabama"; (2) Parker, Haugen, and Slayton "push[ed] Relator (who was Dental Director at the time) aside and also CEO Sharon Fulcher-Estes aside"; (3) per CDC's tax returns, DQ LLC "has the authority to elect or appoint members of the governing body"; (4) CDC retained DQ LLC for administrative and management services after Parker and Haugen were appointed to the CDC Board of Directors; (5) Parker and Haugen exercised operational control at CDC, including control over clinic schedules, federal grant and Medicaid billing, grant audits and compliance monitoring, and hiring, firing, and paying dentists; and (6) Parker and Haugen pushed patient bookings and dentist production.

DQ LLC falls within the definition of a "controlling interest," at least with respect to one of the federal grants (Title V), because it had the ability or authority to nominate or name members of the CDC Board of Directors (Doc. 107, p. 23).  To the extent DQ LLC held a

---

[3]  Relator also appears to complain that CDC did not disclose that DQ LLC, a dental support organization (DSO), was not registered in Texas.  Beginning February 2016, DSOs are required to annually register with the Texas Secretary of State.  *See* TEX. BUS. & COM. CODE ANN. § 73.002.  Relator, however, alleges no facts to show that CDC was asked, or had any obligation to report, DQ LLC's registration status on any federal grant contract or application.

controlling or other interest in CDC that should have been disclosed in the federal grant contracts and applications,[4] she simply asserts that the information was "material" and, as support, points to her allegations that DQ LLC caused CDC to commit fraud. But Relator alleges no facts to show that the federal grant funders would not have awarded or renewed the contracts had they known of DQ LLC's "controlling interest," that DQ LLC was providing administrative and management services to CDC, and/or of DQ LLC's role in CDC operations. The CTAC's only allegations of materiality are conclusory; therefore, the Court finds that Relator fails to state a claim for violation of section 3729 based on CDC's statements in the federal grant contracts and applications.

### 2. False Certifications

Relator next asserts that CDC, at the direction of DQ LLC, knowingly made intentional misrepresentations by falsely certifying compliance with the terms and conditions of federal grants, statutes, and regulations. A claim may be false either because it makes a "legally false" certification or because it makes a "factually false" certification. *Bennett*, 747 F.Supp.2d at 765. A "factually false" certification "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* A "legally false" certification "includes a certification of compliance with a federal statute, regulation, or contract that is a prerequisite to obtaining the government benefit." *Id.* Legal falsity may be either express, when a party "affirmatively certifies compliance with a statute, regulation, or contract requirement that is a material condition of payment," or implied, when "a party submits a claim

---

[4] Relator does not allege facts to show that the agreement for DQ LLC to perform administrative and management services for CDC contained, or constituted, an assignment of CDC's rights, duties, or obligations under the federal grant contracts.

9

to the government and fails to disclose a violation of relevant statutes, regulations, or contract requirements that are material conditions of payment." *Waldmann v. Fulp*, 259 F. Supp.3d 579, 597 (S.D. Tex. 2016) (citing *Bennett*, 747 F.Supp.2d at 765–66; *Escobar*, 136 S. Ct. at 1993).

According to the CTAC, CDC was in violation of the terms and conditions of several federal grant contracts.  In a chart, attached as Exhibit B to the CTAC, Relator identifies federal grants contracts to which she asserts CDC and DQ LLC falsely certified compliance (Doc. 107, pp. 141-47).  According to Relator, those certifications were false due to the following acts and omissions:

(1)    failing to report knowledge of suspected fraud or program abuse, like that raised in Relator's May 1, 2015 letter to CDC;

(2)    failing to comply with OSHA and infection control regulations;

(3)    violations of Texas Non-Profit Business Code section 22.052, which required nine Texas-licensed dentists to serve on the CDC Board of Directors;

(4)    violations of the Texas Dental Practice Act (unlicensed dental director Terry Watson performed chart audit reviews);

(5)    failing to develop, implement, and enforce policies for child abuse reporting;

(6)    failing to disclose the organizational change whereby DQ LLC obtained a controlling interest in CDC;

(7)    terminating Relator "to a lesser extent" based on age discrimination;

(8)    paying Parker and Haugen for management services and performance bonuses despite CDC certifying that it "is governed by a volunteer board of directors";

(9)    assigning administrative and management duties to DQ LLC personnel despite CDC certifying that there were no third-party beneficiaries and it would not assign its obligations without the grantor's consent; and

(10)     DQ LLC, Parker, and Haugen pushing for dentist production and profits despite certifying that CDC was a non-profit community based organization.

Relator fails to allege facts sufficient to raise an inference that several of the acts were violative of the federal grant contract terms and conditions.  Relator alleges no facts to show that the agreement between DQ LLC and CDC confers third-party beneficiary status on DQ LLC or contains or constitutes an assignment.  Nor does the CTAC state any facts to show that CDC was not operated as a non-profit, there was an increase in CDC dentist production and, if so, it resulted in profit, or that CDC paid either Parker or Haugen for their services on the Board of Directors.  Relator also fails to sufficiently allege facts to show age discrimination, asserting only generally that CDC retained younger, less experienced doctors after she was terminated.  With respect to these acts, Relator fails to show that CDC's certifications of compliance were false.

A "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or if "the Government would have the option to decline to pay if it knew of a defendant's noncompliance."  *Escobar*, 136 S. Ct. at 2003; *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240–41 (5th Cir. 2020).  Instead, the Court must ask whether "a reasonable person would attach importance to" the misrepresented fact in making a payment decision.  *See Escobar*, 136 S. Ct. at 2003 & n.5.  According to *Escobar*, factors relevant to the materiality of a misrepresentation include: (1) "the Government's decision to expressly identify a provision as a condition of payment"; (2) "that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement"; and (3) whether the

"noncompliance is minor or insubstantial."  *Id.* at 2003–04; *see also United States ex rel Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 160–63 (5th Cir. 2019).  No one factor is dispositive.  *Escobar*, 136 S. Ct. at 2003.

Relator asserts the grantors would terminate the contracts and payments under the contracts if they knew about the alleged violations.  The federal grant contracts each provide generally that failure to comply with any provision, including the failure comply with applicable statutes, rules, or regulations, constitutes a breach and may result in termination and/or withholding payments.  This alone does not show that the alleged misrepresentations are material.  *See Escobar*, 136 S. Ct. at 2003.  However, in the context of CDC's obligations to provide dental services under the federal grant contracts, the Court finds that Relator's allegations, taken as true, regarding violations of (1) OSHA and state safety standards for handling blood borne pathogens, (2) contract provisions and state laws on dentist licensing, (3) contract provisions on child abuse reporting requirements, and (4) contract provisions requiring reporting on any knowledge of the "suspected fraud" brought to CDC's attention by Relator, raise a reasonable inference that the grantors would attach importance to the violations in considering their decisions on payment.  Accordingly, the Court finds that, with respect to these alleged violations, Relator alleges materiality and states a claim against CDC for FCA violations related to false certification of compliance with the applicable federal grant terms and conditions.

   3.  *False Claims*

Relator alleges CDC, at the direction of DQ LLC, submitted false federal grant claims related to upcoded extractions and denture procedures.  The CTAC states facts to show upcoding of several extractions performed by two dentists, Dr. Sauter and an unnamed "primary

Dental Director," and one denture procedure performed by Dr. Applewhite during the time period from October 2014 until November 2015  (Doc. 107, pp. 26, 37-38).  According to the CTAC, Relator complained to CDC of upcoding in a May 2015 email (*Id.*, pp. 83-84).

Relator does not allege the details of any false claim actually submitted by CDC. Therefore, she must "alleg[e] particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190; *United States ex rel. Colquitt v. Abbott Laboratories*, 858 F.3d 365, 371 (5th Cir. 2017) ("at a minimum, … a plaintiff [must] plead the "who, what, when, where, and how" of the alleged fraud"); *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893–95 (5th Cir. 2013) ("a relator could, in some circumstances, satisfy Rule 9(b) by providing factual or statistical evidence to strengthen the inference of fraud beyond mere possibility, without necessarily providing details as to *each* false claim").

The CTAC adds some details to Relator's previous allegations of false claims, providing some indicia that CDC submitted some claims improperly charging for upcoded procedures.  She does not allege, however, any particular details to support a CDC scheme to intentionally submit false claims.  *Compare Grubbs*, 565 F.3d at 190 (complaint satisfied Rule 9(b) by describing particular workings of a scheme communicated directly to the relator by those perpetrating the fraud, how nursing staff attempted to assist relator in recording physician visits that had not occurred, and specific dates each doctor falsely claimed to have provided services to patients and type of medical service or billing code that would have been used in the bill).  Therefore, the Court finds that Relator's allegations, taken as true, are insufficient to state a violation of section 3729 for submission of false claims.  *See, e.g., Colquitt*, 858 F.3d at 372; *United States ex rel. Park v.*

13

*Legacy Heart Care, LLC*, No. 3:16-cv-803-S, 2018 WL 5313884, at *7–8 (N.D. Tex. Oct. 26, 2018); *compare United States ex rel. Hernandez v. Team Finance, L.L.C.*, No. 2:16-cv-00432-JRG, 2020 WL 731446, at *9 (E.D. Tex. Feb. 13, 2020).

For the foregoing reasons, the Court finds Defendants' motion to dismiss must be (1) granted as to the alleged false statements in federal grant contracts and applications, (2) denied as to the alleged false certifications related to violations of (a) OSHA and state safety standards for handling blood borne pathogens, (b) contract provisions and state laws on dentist licensing, (c) contract provisions on child abuse reporting requirements, and (d) contract provisions requiring reporting on any knowledge of the "suspected fraud" brought to CDC's attention by Relator, but otherwise granted as to the alleged false certifications, and (3) granted as to the alleged false claims.[5]

Relator alleges that DQ LLC also should be liable for FCA violations because it had a controlling interest in CDC and it exercised such control over CDC's internal business and operations that the corporate separateness of the two entities should be disregarded (Doc. 107, p. 100). Although the CTAC does not specifically address the factors developed by the Fifth

---

[5] Relator also alleges violations of subsections 3729(a)(1)(D) (the "FCA conversion claim") and (G) (the "reverse FCA claim"). Relator does not make any allegations specific to these subsections. The Court assumes that, with respect to the claims, Relator contends that CDC knowingly retained payments it received for unauthorized claims and, therefore, possessed government property and/or failed to repay the government.

In cases where a plaintiff alleges a reverse [FCA] claim by claiming that the defendant fraudulently overcharged the government and then failed to repay the government, courts have consistently dismissed the claim as redundant of false statement and presentment claims." *United States v. Kinetic Concepts, Inc.*, No. 08-1885, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017); *see also United States ex rel. Ligai v. ETS-Lindgren, Inc.*, No. H-112973, 2014 WL 4649885, at *13 (S.D. Tex. Sept. 16, 2014), *aff'd*, 611 F. App'x 219 (5th Cir. 2019) ("This type of redundant false claim is not actionable under subsection [a(1)(G)].") (citation omitted). Because Relator alleges no additional facts specific to a reverse FCA claim or FCA conversion claim, the Court finds they are redundant of her claims for violations of subsections 3729 (a)(1)(A) and (B) and must be dismissed. *See, e.g., McClinton on behalf of United States v. Southerncare, Inc.*, No. 3:16-cv-128-CWR-FKB, 2021 WL 2587162, at *4 (S.D. Miss. June 23, 2021).

Circuit for a court to consider when determining whether an alter-ego situation exists,[6] the Fifth Circuit recognizes fraud as a basis for disregarding the corporate form. *U.S. ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp.2d 519, 546 (N.D. Tex. 2010) (citing *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir.1985)). The Court finds that Relator's allegations of DQ LLC control over CDC, including its operations, are sufficient to support Relator's theory, at least for purposes of the Rule 12(b)(6) motion, that the corporate separateness of CDC and DQ LLC should be disregarded and DQ LLC also may be liable for the viable section 3729 claims.

B. *Count Three – Violations of the TMFPA*

The TMFPA imposes penalties for thirteen unlawful acts affecting the Texas Medicaid program. *See* TEX. HUM. RES. CODE ANN. § 36.002(1)–(13). Relator alleges Defendants committed unlawful acts under subsections 36.002(1), (6), (10), and (12).

The TMFPA differs textually from the FCA, but the Fifth Circuit and several federal district courts have considered TMFPA claims analogous to claims brought under the FCA. *See, e.g.*, *Texas v. Caremark, Inc.*, 584 F.3d 655, 657 (5th Cir. 2009); *Waldmann*, 259 F. Supp.3d at 632–33; *United States ex rel. Williams v. McKesson Corp.*, No. 3:12-cv-0371-B, 2014 WL 3353247, at *4 (N.D. Tex. Jul. 9, 2014) (acknowledging the two statutes differ textually, but describing them as "analogous" and "depend[ent] on the same operative facts and legal requirements").

---

[6] These factors are: (1) common stock ownership; (2) common directors or officers; (3) common business departments; (4) consolidated financial statements and tax returns; (5) one corporation finances the other; (6) one corporation caused the incorporation of the other; (7) one corporation operates with grossly inadequate capital; (8) one corporation pays the salaries and other expenses of the other; (9) one corporation receives no business except that given to it by the other; (10) one corporation uses the other's property as its own; (11) the daily operations of the two corporations are not kept separate; and (12) one corporation does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings. *See Gundle Lining Constr. Corp. v. Adams Co. Asphalt, Inc.*, 85 F.3d 201, 208 (5th Cir.1996).

The Texas Supreme Court also has described the TMFPA as "analogous" to the FCA, recognizing the statutes "are similar in aim and tactic." *In re Xerox Corp.*, 555 S.W.3d 518, 535 (Tex. 2018). However, the Texas Supreme Court also has noted that the TMFPA's plain language controls with respect to claims brought under the statute. *Id.* Accordingly, the TMFPA's scope may "reach[] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process." *United States v. Catholic Health Initiatives*, 312 F. Supp.3d 584, 606–07 (S.D. Tex. 2018), *aff'd sub nom. United States ex rel. Patel v. Catholic Health Initiatives*, 792 F. App'x 296 (5th Cir. 2019). Even so, a relator must satisfy the Rule 9(b) pleading requirement and allege a false statement or misrepresentation of material fact, or concealment or nondisclosure of information, with particularity. *Williams*, 2014 WL 3303247, at *3.

    1.    *Violations of Subsection 36.002(1)*

Subsection 36.002(1) imposes penalties on a person who "knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized." HUM. RES. § 36.002(1). Under the TMFPA, "a person acts 'knowingly' with respect to information if the person: (1) has knowledge of the information; (2) acts with conscious indifference to the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." HUM. RES. § 36.0011. A fact is "material" if it has "a natural tendency to influence or to be capable of influencing." HUM. RES. § 36.001(5-a). Relator alleges DQ USA, DQ LLC, and DSM are liable for the following false statements or misrepresentations that occurred after DQ USA was awarded the Texas Medicaid

16

contract.

a. <u>False Representations in DQ USA Financial Statistical Reports (FSRs)</u>

Relator alleges that DQ USA's FSRs contain false information by (1) claiming expenses related to employee and claims salaries, wages, and benefits, (2) stating that DQ USA does not "outsource" services, and (3) claiming expenses under "Corporate Allocations" (Doc. 107, pp. 108-09).  Relator's allegations relate to DQ USA's failure to specifically disclose or designate DQ LLC as a subcontractor in DQ USA's responses to the 2011 HHSC Request for Proposal (RFP) to provide dental services under the Texas Medicaid Contract and its amendments.  However, the Court previously found that, although DQ USA did not designate DQ LLC as a subcontractor in the RFP, it clearly disclosed DQ LLC's role and that DQ LLC would be providing administrative and management services (Doc. 92, pp. 16-17).  The information in the FSRs is consistent with expenses incurred by DQ USA as a result of DQ LLC's having performed services for DQ USA.  Accordingly, the Court finds Relator does not allege facts to show DQ USA falsely represented or knowingly concealed material facts regarding expenses and outsourcing in order to receive unauthorized payments under the Texas Medicaid Contract.

b. <u>False Certifications</u>

Relator next alleges DQ USA falsely certified compliance with provisions of the RFP and Texas Medicaid Contract in amendments to the contract.  First, Relator alleges DQ USA falsely certified compliance with provisions (1) requiring that DQ USA subcontractors are identified and have the skills, qualifications, expertise, financial resources, and experience necessary to provide services under the contract,[7] and (2) precluding DQ USA from directly or indirectly

---

[7]  Relator also alleges that DQ USA falsely certified that its employees, agents, and subcontractors providing services

assigning any benefit or legal interest it has in, or payment made by HHSC, pursuant to the contract (Doc. 107, pp. 109, 159-66).  The basis for the alleged lack of compliance is again DQ USA's failure to disclose DQ LLC as a subcontractor, and, as discussed above, DQ USA's RFP disclosed that DQ LLC would be providing administrative and management services (Doc. 92, pp. 16-17).  Under these circumstances, the Court finds that Relator fails to allege that these certifications constituted false statements or misrepresentations that were material and made knowingly to permit DQ USA to receive unauthorized payments under the Medicaid program.

Second, Relator complains DQ USA falsely certified compliance with conditions that it employ a full-time Executive Director and have a qualified full-time Dental Director.  To show these certifications were false, Relator alleges that DQ USA's CEO Steve Pollock also served as CEO of DSM and DQ LLC in 2016 and 2017 and DQ USA could not have had a full-time Dental Director in Texas because audit letters directed patient charts to be sent to a Wisconsin address (and not DQ USA's Texas address).  The Court notes that DQ USA's RFP response, which is quoted throughout the CTAC, indicates that Pollock, DQ USA's President, was not the Executive Director and states, the "Texas executive director, who will be located in Texas, will report to" Pollock (Doc. 49-1, p. 17).  In any event, the Court finds the facts alleged are insufficient to show that DQ USA knowingly made false certifications regarding its Executive Director or Dental Director.

Third, Relator alleges DQ USA falsely certified compliance with the condition that its personnel and subcontractors conduct themselves in a professional manner (Doc. 107, pp. 18, 162).  As support, Relator relies on her allegation that Ron Price, a CDC compliance officer,

---

under the contract are properly licensed and certified.  The Court addresses this alleged unlawful act in connection with the alleged violation of subsection 36.002(6)(A).

emailed Relator, who was represented by counsel, to investigate CDC compliance issues without identifying himself as an attorney. Relator later learned that Price was a DQ LLC attorney and also a compliance officer for DQ USA. The Court finds this single incident involving CDC's attempt to investigate Relator's complaints is insufficient to raise an inference that DQ USA knowingly made a false certification of material fact regarding the professionalism of its employees and subcontractors.

Fourth, Relator alleges DQ USA falsely certified that it was complying with conflict of interest provisions in the Texas Medicaid contract (Doc. 107, pp. 61-64, 163).[8] Specifically, Relator asserts DQ LLC's submission of CDC Medicaid claims to its subsidiary DQ USA, while also serving DQ USA as an administrator of the Texas Medicaid Contract and processing CDC's claims for reimbursement from HHSC, constitutes an organizational conflict (*Id.*, pp. 62-63). According to Relator, the conflict prevented DQ USA from offering impartial advice to HHSC regarding CDC fraud and gave DQ USA an unfair advantage at future procurement because DQ LLC pushed CDC dentists for production (*Id.*, pp. 61, 163).

Relator, however, does not explain how the entities' corporate relationship necessarily "impairs or diminishes" DQ USA's "ability to render impartial or objective assistance or advice to HHSC" or creates "an unfair competitive advantage in future HHSC procurements." She simply speculates, without support, that Ron Price and Nick Messuri, who both served as DQ USA and CDC compliance officers, never investigated or reported to HHSC the compliance issues that

---

[8] According to the CTAC, HHSC defined an organizational conflict of interest is "a set of facts or circumstances, a relationship, or other situation under which the Dental Contractor or a Subcontractor has past, present, or currently planned personal or financial activities or interests that either directly or indirectly: i. Impairs or diminishes the Dental Contractor's or Subcontractor's ability to render impartial or objective assistance or advice to HHSC; or ii. Provides the Dental Contractor or Subcontractor an unfair competitive advantage in future HHSC procurements (excluding the award of this Contract)" (Doc. 107, p. 61).

19

Relator raised and that DQ LLC pressure to increase dentist production would benefit DQ USA when it negotiated future procurements. Furthermore, she provides no support for her assertion that HHSC was unaware of the relationships between CDC, DQ LLC and DQ USA. Therefore, the Court finds Relator does not allege facts sufficient to raise an inference that DQ USA made a knowingly false certification of compliance with the Texas Medicaid Contract's conflict of interest provision.

Finally, Relator asserts DQ USA falsely certified that FSR responses were complete, accurate and truthful when the responses included overinflated expenses (Doc. 107, pp. 70-71). Relator alleges DQ USA improperly submitted DQ LLC expenses as its own and also cites to a January 2020 OIG report, which found some overinflated expenses in the areas of salaries, marketing, amortization and depreciation, and corporate allocations in DQ USA's 2017 FSR. However, the fact that the 2017 FSR contained some unallowable expenses does not show that DQ USA knew its certifications were false. Nor does the fact that expenses were included for services provided by DQ LLC or its employees, services that DQ USA had disclosed that DQ LLC would perform, render the certification false.[9]

---

[9] Relator also alleges a violation of TMFPA subsection 36.002(12) related to the reporting of DQ USA expenses in FSRs:

> DQ USA knowingly violated this subsection by its CFO Jim Collins signing DQ USA's FSRs and making false statements which were material that DQ USA incurred all expenses reported in the FSRs in support of the Texas Medicaid/CHIP operations material to an obligation to transmit the overinflated and unallowable expenses back to the State under the Medicaid program.

(Doc. 107, p. 112). Subsection 36.002(12) provides that it is an unlawful act if a person "knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program" HUM. RES. § 36.002(12). For the same reason, because Relator alleges no facts to show DQ USA knowingly concealed that it was incurring expenses for services provided by DQ LLC, the Court also finds that Relator failed to state a claim for an unlawful act under subsection 36.002(12).

20

In sum, the Court finds Relator does not allege facts to show DQ USA's certifications of compliance with the terms and conditions of the Texas Medicaid Contract and/or RFP addressed above were knowingly false or material. Therefore, she fails to state a claim for an unlawful act arising from those certifications. *See* HUM. RES. § 36.002(1).

    c.  <u>CDC Billing</u>

Relator alleges that DQ LLC, operating as a "provider"[10] to CDC, caused CDC to commit unlawful acts in violation of subsection 36.002(1) (Doc. 107, pp. 79-82). Specifically, Relator complains about CDC billing for upcoded extractions and services performed by non-credentialed dentists under the provider IDs of credentialed dentists. The CTAC sets out a number of examples of this billing by CDC employees. And, according to the CTAC, a CDC dental assistant and Medicaid biller were asked by "Sarrell Dental" to bill non-credentialed dentist procedures and "Dentaquest" wanted new non-credentialed dentists to be billed under Relator's Medicaid ID. Relator also brought her concerns about the billing to Parker.

Relator does not tie the billing to any payment under the Texas Medicaid program, but the TMFPA's scope may "reach[] a broader range of false or fraudulent conduct less closely tied to the Medicaid claim submission process." *Catholic Health Initiatives*, 312 F. Supp.3d at 606–07. Having reviewed Relator's allegations, the Court finds she has stated a claim for unlawful acts related to billing for upcoded extractions and non-credentialed dentist procedures against DQ LLC under subsection 36.002(1).

---

[10] The TMFPA's definition of provider includes a "management company that manages, operates, or controls another provider." HUM. RES. § 36.001(9)(A).

21

2. *Violation of Subsection 36.002(6)(A)*

A person commits an unlawful act if the person "knowingly presents or causes to be presented a claim for payment under the Medicaid program for a product provided or a service rendered by a person who … is not licensed to provide the product or render the service, if a license is required." Hum. Res. § 36.002(6)(A).  Because the Texas Medical Contract and Texas Insurance Code require third-party administrators to hold a certificate of authority,[11] Relator alleges DQ LLC's providing services for DQ USA related to the Texas Medicaid Contract without a certificate constitutes an unlawful act (Doc. 170, p. 64).  Relator relies generally on the fact that DQ LLC provided administrative services to DQ USA and asserts, without factual support, that every expense reflected in DQ USA's FSRs "would be the amount presented in claims for Unlawful Acts for services rendered by DQ LLC" (*Id.*, p. 69).  But Relator also points to several chart audit letters she and other CDC dentists received in 2015 from DQ LLC reflecting that DQ LLC was performing quality improvement/utilization review functions related to the Texas Medicaid Contract (*Id.*, p. 64).

Taking Relator's allegations as true, the Court finds that she has stated facts to support a claim against DQ USA and DQ LLC for an unlawful act to the extent she has alleged facts to show DQ LLC performed quality improvement/utilization review functions pursuant to the Texas Medicaid Contract without a certification to do so.  A plaintiff, however, must set forth the

---

[11]  According to the CTAC, the Texas Medicaid Contract provides that DQ USA "is responsible for ensuring each of its employees, agents, or Subcontractors who provide Services or Deliverables under the Contract is properly licensed, certified, and/or has proper permits to perform any activity related to the Services or Deliverables" (Doc. 107, p. 160).  Under the Texas Insurance Code, "[a]n individual, corporation, organization, trust, partnership, or other legal entity may not act as or hold itself out as an administrator unless the entity is covered by and is engaging in business under a certificate of authority issued under this chapter."  Tex. Ins. Code Ann. § 4151.051; *see also* 28 Tex. Admin. Code § 7.1603.  Additionally, utilization review agents must have a certificate of registration.  Ins. Code § 4201.101.

factual basis for her information and belief to the extent her allegations are not based upon her personal knowledge. *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) ("While fraud may be pled on information and belief when the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge, the plaintiff must still set forth the factual basis for his belief."). Relator pleads no firsthand knowledge, or specific facts, about how DQ USA fulfilled its obligations under the Texas Medicaid contract and DQ LLC's role in that fulfillment. Therefore, to the extent Relator generally alleges that DQ USA committed an unlawful act with respect to all of its submitted claims simply because DQ LLC provided administrative services, the Court finds Relator fails to state a claim for an unlawful act under subsection 36.002(6)(A).

Relator also alleges DQ USA and DQ LLC committed an unlawful act under subsection 36.002(1) by falsely certifying, or causing certification of, compliance with Texas Medicaid Contract and RFP provisions requiring that DQ USA's employees, agents, and subcontractors providing services under the contract are properly licensed and certified (Doc. 107, p. 160). The Court finds that Relator states facts to support a claim against DQ USA and DQ LLC for an unlawful act under subsection 36.002(1), like subsection 36.002(6)(A), to the extent she has alleged facts to show DQ LLC performed quality improvement/utilization review functions pursuant to the Texas Medicaid Contract without a certification to do so.

    3. *Violations of Subsection 36.002(10)(B)*

Under TMFPA subsection 36.002(10)(B), it is an "unlawful act" for a managed care organization like DQ USA to "knowingly … fail[] to provide … information required to be provided by ... contractual provision." HUM. RES. § 36.002(10)(B). Relator alleges the following

unlawful acts in DQ USA's amendments to the Texas Medicaid Contract: (1) failing to provide HHSC with information on DQ LLC as a subcontractor; (2) failing to provide HHSC with a "signed letter of commitment" from subcontractor GTESS; (3) failing to inform HHSC of an organizational conflict of interest with CDC through DQ LLC; and (4) failing to inform HHSC of a letter of deficiency, corrective action plan, and fine issued to DSM by the Massachusetts Executive Office of Health and Human Services in August 2012 and a 2014 Massachusetts class action lawsuit against DQ LLC and DSM pertaining to the Orthodontic Medicaid program (Doc. 107, pp. 110-12).[12]

The Court previously found that, prior to obtaining the Texas Medicaid Contract, DQ USA disclosed to HHSC DQ LLC's role in providing services to DQ USA pursuant to a management services agreement and provided organizational charts illustrating the intra-corporate relationships among the DSM affiliates  (Doc. 92, pp. 16-17).  DQ USA also provided information about subcontractor GTESS and its role.  Accordingly, the Court finds that Relator has not alleged facts to show that DQ USA's subsequent failure to designate DQ LLC as a subcontractor or provide the GTESS letter of commitment constitute a knowing failure to provide required information.

The Court also finds that Relator fails to allege facts to show DQ USA knowingly failed to provide requested information related to an organizational conflict of interest.  As discussed above, Relator's assertion that HHSC was unaware of the relationships between CDC, DQ LLC and DQ USA lacks support, and her allegations that those relationships necessarily impair or

---

[12]  Relator also complains that DQ USA failed to provide HHSC with DQ LLC financials, but the RFP provision she cites states that, if there are one or more "intermediate owners" between the contractor and its "ultimate owner," the contractor must provide the financials of its "ultimate owner" (Doc. 107, p. 61).  DQ USA provided the financial information of its ultimate parent, DSM (*Id.*).  Accordingly, the Court finds that DQ USA did not fail to provide the information required by the provision.

diminish DQ USA's "ability to render impartial or objective assistance or advice to HHSC" or create "an unfair competitive advantage in future HHSC procurements" are speculative.

Relator alleges that DQ USA was required to disclose to HHSC a letter of deficiency, corrective action, and sanction issued to DSM in 2012 and a 2014 lawsuit involving DQ LLC and DSM, but failed to do so in connection with Texas Medicaid contract amendments (Doc. 107, pp. 57-60). Relator, however, again alleges no facts to show that DQ USA did not make the disclosures. Indeed, she does not allege she had any involvement in the bidding or amendment process for DQ USA's contracts with the Texas Medicaid program or any knowledge of communications between DQ USA and HHSC after the contract was awarded. Instead, she worked as a dentist at CDC. Because Relator fails to plead the factual basis for her allegation that DQ USA knowingly failed to provide the required information, the Court finds she had failed to allege an unlawful act under subsection 36.002(10)(b). *See Williams*, 417 F.3d at 454 (stating a plaintiff must set forth the factual basis for his or her information and belief).

In sum, the Court finds that Relator states facts to support a claim against DQ USA and DQ LLC for an unlawful act under subsections 36.002(1) and 36.002(6)(A) to the extent she has alleged facts to show DQ LLC performed quality improvement/utilization review functions pursuant to the Texas Medicaid Contract without a certification to do so. In all other respects, Relator fails to state a claim for an unlawful act under section 36.002, and Defendants' motion to dismiss those claims must be dismissed.

### 4. Defendants Liable for TMFPA Violations

In addition to DQ USA and DQ LLC, Relator seeks to hold DSM liable for unlawful acts under the TMFPA based on its "Corporate Guarantee" of DQ USA's performance in the Texas

25

Medicaid Contract.   Specifically, she alleges that, "by its unconditional and irrevocable continuing guarantee of DQ USA's performance of the Texas Medicaid Contract in 2011," "DSM knowingly caused material false representations to be made to HHSC to permit DQ USA to receive the Texas Medicaid Contract in 2011 and payments pursuant thereto from 2012 until present that were unauthorized" (Doc. 107, pp. 57, 113).   Although the guarantee may be grounds for DSM's liability as a guarantor in the event of breach, Relator does not identify any specific facts to support its assertion that DSM knowingly caused DQ USA to make any false representation.   Accordingly, the Court finds it must dismiss Relator's section 36.002 claims against DSM.

C.   _Counts Five and Six – Violations of CMFCA and TMFCA_

Under Counts Five and Six, Relator alleges DQ USA, DQ LLC, and DSM knowingly presented false claims and/or caused false claims to be made, used, and presented to the states of Colorado and Tennessee and falsely certified full compliance with all federal and state laws and regulations prohibiting fraudulent acts and false reporting (Doc. 107, pp. 89-92).   Like her TMFPA claims, Relator alleges false claims and certifications as a result of DQ USA's failure to properly designate DQ LLC as a subcontractor and DQ LLC's lack of a state license to perform services under the Colorado and Tennessee Medicaid Contracts.   As support, Relator cites a DQ USA RFP response for the state of Nevada, which did designate DQ LLC as a subcontractor, and the fact that the DQ Office Reference Manual shows providers were requested to submit authorizations and claims to DQ LLC's address.

The CMFCA and TMFCA each mirror the FCA; they prohibit (a) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval, and

26

(b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. *See* COLO. REV. STAT. ANN. § 25.5-4-305(1)(a), (b); TENN. CODE ANN. § 71-5-182(a)(1)(A), (B).

The Court previously found that, as with respect to the Texas Medicaid Contract, DQ USA's RFP responses for both the Colorado and Tennessee Medicaid Contracts made clear, and did not misrepresent, that DQ USA was describing, and relying on, the skills, qualifications, and experience of their extended corporate family, and not just its own (Doc. 92, p. 20). Further, Relator does not allege facts to support her assertions that DQ LLC was required to be licensed in Colorado or Tennessee or, in fact, was unlicensed beginning in 2013 and 2014, when the RFPs to appoint a dental contractor were issued in Tennessee and Colorado, respectively. And, unlike her TMFPA allegations, Relator does not identify the specific claims, false statements, or contract terms or conditions requiring certification that form the basis of her claims. For these reasons, the Court finds it must dismiss Relator's claims for violations of the CMFCA and TMFCA related to false claims and certifications of contract and RFP terms and conditions. *See, e.g., Ligai*, 611 F. App'x at 220; *Nunnally*, 519 F. App'x at 894–95 (failure to allege with particularity an actual certification to the government that was a prerequisite to obtaining a government benefit fails to satisfy Rule 9(b)).

D.      *Counts Two and Four – Retaliation*

Defendants incorporate and adopt the arguments made in their previous motion to dismiss regarding Relator's retaliation claims under FCA section 3730(h) and TMFPA section 36.115. The Court again denies the motion to dismiss the claims on the grounds stated in its

previous Memorandum Opinion and Order (Doc. 92, pp. 32-34).  Accordingly, Relator's claims as to retaliatory acts alleged after February 26, 2015 against CDC remain.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Doc. 108) is **GRANTED in part** and **DENIED in part.**  In her response, Relator again requests leave to amend her complaint to the extent the Court finds if lacks sufficient factual detail.  However, she has amended her complaint three times, once having the benefit of the Court's decision on Defendants' previous motion to dismiss.  The Court, therefore, finds that Relator's request for leave to amend should be, and is hereby **DENIED** and Relator's claims, as described below, are **DISMISSED with prejudice**.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 329 (5th Cir. 2002).

With the exception of Relator's claims under subsections 3729(a)(1)(A) and (a)(1)(B) for allegedly false certifications related to violations of (a) OSHA and state safety standards for handling blood borne pathogens, (b) contract provisions and state laws on dentist licensing, (c) contract provisions on child abuse reporting requirements, and (d) contract provisions requiring reporting on any knowledge of the "suspected fraud" brought to CDC's attention by Relator, the claims for FCA violations in Count One are **DISMISSED**.

With the exception of Relator's claims for an unlawful act under subsections 36.002(1) and 36.002(6)(A) for allegedly false certification and submission of claims related to DQ LLC performing quality improvement/utilization review functions pursuant to the Texas Medicaid Contract without a certification to do so, the claims for TMFPA unlawful acts in Count Three are **DISMISSED**.

28

Counts Five and Six are **DISMISSED**.

**SO ORDERED**; signed July 29, 2021.

ADA BROWN
UNITED STATES DISTRICT JUDGE